## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| PILOT, United States Coast Guard, LCDR PILOT, United States Coast Guard, LIEUTENANT 2, United States Coast Guard, AVIONICS ELECTRICAL TECHNICIAN 1, United States Coast Guard, MARINE SCIENCE TECHNICIAN 3, United States Coast Guard, and SENIOR CHIEF BOATSWAIN'S MATE, United States Coast Guard Reserve, for themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) | No. 8:22-cv-1278-SDM-TGW |
| Plaintiffs, | ) | |
| v. | ) ) | |
| LLOYD AUSTIN, in his official capacity as Secretary of the United States Department of Defense, ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security, ADMIRAL LINDA FAGAN, in her official capacity as Commandant of the Coast Guard, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## THIRD AMENDED
## VERIFIED CLASS ACTION COMPLAINT
## FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF,
## <u>DECLARATORY RELIEF, AND DAMAGES</u>

**"Our citizens in uniform may not be stripped of basic rights
simply because they doffed their civilian clothes."[1]**

For their VERIFIED CLASS ACTION COMPLAINT against Defendants, LLOYD AUSTIN, in his official capacity as Secretary of the United States Department of Defense, ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security, and ADMIRAL LINDA FAGAN, in her official capacity as Commandant of the Coast Guard, Plaintiffs, PILOT, United States Coast Guard, LCDR PILOT, United States Coast Guard, LIEUTENANT 2, United States Coast Guard, AVIONICS ELECTRICAL TECHNICIAN 1, United States Coast Guard, MARINE SCIENCE TECHNICIAN 3, United States Coast Guard, and SENIOR CHIEF BOATSWAIN'S MATE, United States Coast Guard Reserve, for themselves and all others similarly situated, allege and aver as follows:

## URGENCIES JUSTIFYING EMERGENCY RELIEF

**"The Executive Order mandating vaccinations
for all federal employees has provided clear direction. . . .
Frankly, if you are not vaccinated, you will not work for the U.S. Navy."[2]**

1.      Plaintiffs are United States Coast Guard servicemembers who faced a deadline under the Federal COVID-19 Vaccine Mandate to receive a COVID-19

---

[1]      *Chappell v. Wallace*, 462 U.S. 296, 304 (1983) (citing E. Warren, *The Bill of Rights and the Military*, 37 N.Y.U. L. Rev. 181, 188 (1962)).

[2]      Vice Admiral William Galinis, Commander, Naval Sea Systems Command (NAVSEA), *ALL HANDS NOTE (10/14/2021) COMNAVSEA Vaccination Message* (Oct. 14, 2021) (warning entire command, comprising more than 85,000 civilian and military personnel).

vaccine that violates their sincerely held religious beliefs, and have been refused any religious exemption or accommodation. United States Coast Guardsman had until November 28, 2021 to become fully vaccinated. **This date has passed, and disciplinary actions have already commenced.** Relief is needed now to prevent these military heroes from facing dishonorable discharge, court martial, other life-altering disciplinary procedures, and termination.

2.       "Greater love hath no man than this, that a man lay down his life for his friends." *John* 15:13 (KJV). Plaintiffs have all agreed, voluntarily and sacrificially, to devote their entire lives by this axiomatic truth, regardless of the cost to them personally or to their families who likewise sacrifice in defense of this Nation. They all have sworn an oath to protect and defend the Constitution of the United States, to sacrificially lay down their lives for their fellow citizens against enemies both foreign and domestic, and to preserve for our progeny the heritage and treasure passed down to them by Veterans of old. And, for that ultimate sacrifice in defense of the Constitution and our freedoms, **Defendants threatened these military heroes with dishonorable discharge for even requesting a religious exemption from the COVID-19 shots. Dishonorable discharge is worse than criminal conviction for these servicemembers because it is a badge of disgrace that follows them for the rest of their lives**. *Having sacrificed everything to defend America and its citizenry—and while carrying the images and sounds of war with them throughout their lives—America, the "land of the free and the home of the brave," would betray them with the worst punishment of*

*dishonorable discharge. And for what cause? Simply because they seek an accommodation from the COVID-19 shots on account of their sincerely held religious beliefs.*

3.     **The deadlines for Plaintiffs to receive the COVID-19 shots have passed**. *No servicemembers should be forced to choose between dishonorable discharge by the Nation they love or sinning against God by violating their sincere religious beliefs (which, by the way, can be easily accommodated).* **The Court must protect the rights of these military heroes and remove from the Republic the stain of government coercion of conscience**.

4.     As the Supreme Court has long affirmed, **the heroes of the United States Armed Forces do not shed their constitutional rights at the moment of their sacrificial oath**. Indeed, "[t]his Court has never held, nor do we now hold, that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service." *Chappell v. Wallace*, 462 U.S. 296, 304 (1983).

5.     Moreover, while servicemembers certainly have duties and responsibilities "without counterpart in civilian life," *Schlesinger v. Councilman*, 420 U.S. 738, 757 (1975), **the Constitution still provides them with the same blanket of constitutional protection that their dedicated service and sacrifice provide to the average civilian**. For to turn the same Constitution that United States Armed Forces members protect and defend into a weapon against them would be a travesty unknown

4

to the Nation's founding charter and eclipse any dereliction of duty heretofore seen in the great experiment of America. Indeed, as Justice Brennan noted,

> Military (or national) security is a weighty interest, not least of all because national survival is an indispensable condition of national liberties. But the concept of military necessity is seductively broad, and has a dangerous plasticity. **Because they invariably have the visage of overriding importance, there is always a temptation to invoke security "necessities" to justify an encroachment upon civil liberties. For that reason, the military-security argument must be approached with a healthy skepticism: its very gravity counsels that courts be cautious when military necessity is invoked by the Government to justify a trespass on First Amendment rights.**

*Brown v. Glines*, 444 U.S. 348, 369 (1980) (Brennan, J., dissenting) (emphasis added) (citation omitted).

6.    As he continued,

> To be sure, generals and admirals, not federal judges, are expert about military needs. **But it is equally true that judges, not military officers, possess the competence and authority to interpret and apply the First Amendment.** Moreover, in the context of this case, the expertise of military officials is, to a great degree, tainted by the natural self-interest that inevitably influences their exercise of the power to control expression. Partiality must be expected when government authorities censor the views of subordinates, especially if those views are critical of the censors. **Larger, but vaguely defined, interests in discipline or military efficiency may all too easily become identified with officials' personal or bureaucratic preferences. This Court abdicates its responsibility to safeguard free expression when it reflexively bows before the shibboleth of military necessity.**

*Id.* at 370.

7.     Servicemembers who protect the constitutional freedoms cherished in this Nation can also invoke those same constitutional protections for breaches of their own liberties, despite military service. Here, Defendants have made it clear that they think Plaintiffs' sacrificial act of swearing an oath to protect the Nation and support and defend the Constitution is accompanied by the sacrificial surrender of those same constitutional protections they defend. The Constitution opposes such callous indifference to sacrificial service, and so, too, should the Court. Indeed, "military life do[es] not, of course, render entirely nugatory in the military context the guarantees of the First Amendment." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986). *See also Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) (**"[T]he military is subject to the Bill of Rights and its constitutional implications**." (emphasis added)). Put simply, "although First Amendment rights . . . may be 'less' for a soldier than a civilian, they are by no means lost to him." *Anderson v. Laird*, 466 F.2d 283, 295 (D.C. Cir. 1972). "**Individual freedom may not be sacrificed to military interests to the point that constitutional rights are abolished**." *Id.* (emphasis added).

8.     Plaintiffs and all those dedicated members of the United States Armed Forces voluntarily and sacrificially answered their Nation's call to defend the freedoms we enjoy. Yet, Defendants are demanding that these brave military members sacrifice their constitutional rights which they risk their lives to defend. Indeed, "**[i]t is a basic tenet of our legal system that a government agency is not at liberty to ignore its own laws and that agency action in contravention of applicable statutes and regulations**

is unlawful. **The military departments enjoy no immunity from this proscription**."
*Dilley v. Alexander*, 603 F.2d 914, 920 (D.C. Cir. 1979) (emphasis added) (citation
omitted). For without question, when critical constitutional rights are at issue, "the
Supreme Court [has] heard numerous constitutional challenges to military policies."
*Singh v. Carter*, 168 F. Supp. 3d 216, 225 (D.D.C. 2016) (cleaned up).

9.     As the Supreme Court held less than two years ago, "**even in a pandemic,
the Constitution cannot be put away and forgotten**." *Roman Catholic Diocese of
Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (emphasis added). When we have
demanded so much of our Soldiers, Sailors, Airmen, and Marines, we owe them
nothing less than the full measure of our own devotion and commitment to
constitutional principles. Anything less would be desecrating the sacrifices these
heroes have made for untold numbers of people when the call of duty demanded it,
and would trample upon the graves of so many who made the ultimate sacrifice before
them.

10.     When the great American experiment was commenced, our Founders
ordained and established the Constitution—including all of the rights it recognized
and enshrined—"in Order to form a more perfect Union, establish Justice, insure
domestic Tranquility, provide for the common defence, promote the general Welfare,
and **secure the Blessings of Liberty to ourselves and our Posterity**." U.S. Const.
Pmbl. (emphasis added). To this very day, "we continue to strive toward '[that] more
perfect union.'" *Smith v. City of New Smyrna Beach*, No. 6:11–cv–1110–Orl–37KRS,

2013 WL 5230659, at *1 (M.D. Fla. Sept. 16, 2013). That work is not easy, and sometimes it requires the intervention of the judiciary to set the guardrails for the protection of the Republic's liberties.

11.     Recognizing that times of crisis would arise, that such times might lead governments to seek to repress precious freedoms, and that the Republic's survival depended upon defeating such repressive instincts, the genius of our founding document is that it placed explicit protections into the text of the Bill of Rights. And, importantly, "[o]ur Bill of Rights placed our survival on firmer ground—that of freedom, not repression." *Konigsberg v. State Bar of California*, 366 U.S. 36, 79 (1961) (Black, J., dissenting).

12.     During times of national crisis, the very times when we call upon the United States Armed Forces heroes most, "the fog of public excitement obscures the ancient landmarks set up in our Bill of Rights." *American Communist Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 453 (1950) (Black, J., dissenting). But, where the fog of public excitement is at its apex, "the more imperative is the need to preserve inviolate the constitutional rights of [the First Amendment]." *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937). Without doubt, "[t]herein lies the security of the Republic, the very foundation of constitutional government." *Id.*

13.     Indeed, "[t]imes of crisis take the truest measure of our commitment to constitutional values. **Constitutional values are only as strong as our willingness to reaffirm them when they seem most costly to bear**." *Hartness v. Bush*, 919 F.2d 170,

181 (D.C. Cir. 1990) (Edwards, J., dissenting) (emphasis added). Our willingness to reaffirm our staunch commitment to our fundamental freedoms is imperative to the very survival of the American experiment. **Plaintiffs have demonstrated their staunch commitment, and it is time that we honor ours.** "History reveals that the initial steps in the erosion of individual rights are usually excused on the basis of an 'emergency' or threat to the public. **But the ultimate strength of our constitutional guarantees lies in the unhesitating application in times of crisis and tranquility alike**." *United States v. Bell*, 464 F.2d 667, 676 (2d Cir. 1972) (Mansfield, J., concurring) (emphasis added). For, "**[i]f the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be discarded**." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 483 (1934) (Sutherland, J., dissenting) (emphasis added).

14.     Plaintiffs have demonstrated their commitments to the United States Constitution and the Nation's future comfort, security, and prosperity. **The Court should demand that the Nation return the favor**. Telling Plaintiffs they must accept or receive a shot they oppose according to their sincerely held religious beliefs, or face court martial, dishonorable discharge, and other life altering disciplinary measures, disgraces the sacrifices these heroes have made.

15.     Indeed, "Our nation asks the men and women in our military to serve, suffer, and sacrifice. But we do not ask them to lay aside their citizenry and give up the very rights they have sworn to protect." *U.S. Navy Seals v. Biden*, No. 4:21-cv-1236-O, 2022 WL 34443, at *1 (N.D. Tex. Jan. 3, 2022) (granting preliminary injunction).

16.    "The Navy provides a religious accommodation process, but by all accounts, **it is theater**. The Navy has not granted a religious exemption to any vaccine in recent memory. **It merely rubber stamps each denial**." *Id.* (emphasis added).

17.    The same is true of every other branch. While there have been many requests, Defendants have granted a grand total of **0 religious exemptions.** The United States Coast Guard has received 1,308 requests for religious exemption and has denied every request—all of which after a determination of sincerity. (*See* Doc. 73-6 at 4.) The Coast Guard has denied every appeal from religious exemption denials. (*Id.*)

18.    The Coast Guard has granted 10 requests for medical exemption, both permanent and temporary, and possibly many more because the Coast Guard does not know the number of requests for an exemption that were submitted. (Doc. 73-6 at 4.)

19.    As the Court recognized in its Order (ECF No. 40) on Plaintiffs' preliminary injunction motion over seven months ago, Defendants had received 16,643 requests for religious exemption and "had granted none" at that time. (ECF No. 40 at 1.)

20.    The Court noted, it is "quite plausible that each branch's procedure for requesting a religious exemption is a ruse that will result inevitably in the undifferentiated (and therefore unlawful under RFRA) denial of each service member's request." (ECF No. 40 at 33.)

21.     The Court's foresight proves true in hindsight, as Defendants have still failed to grant any meaningful religious exemptions. What was a ruse at the commencement of this action is still a ruse today.

22.     Defendants' vaccine mandate, ostensibly responding to a public health crisis, has created a national emergency of much greater magnitude. The mandate attacks the military from *within* by removing brave servicemembers from defending the Nation by land, air, and sea, and from *without* by eliminating the dedicated civilian defense contractors and employees providing everything from boots and uniforms, to cyber security, to the world's most advanced stealth fighter jet—the F-35 Lightning II—solely because these protectors of our constitutional freedoms requested accommodation of their sincerely held religious beliefs under the same Constitution. The crisis created by Defendants' mandates, applied to two million federal employees, is unnecessary and completely avoidable, but nonetheless imminent and real.

23.     An injunction is needed now to prevent the immediate and irreparable injury to Plaintiffs imposed by these unlawful COVID-19 mandates.

## PARTIES

24.     Plaintiff PILOT, United States Coast Guard, is an officer and fixed-wing aircraft pilot in the Coast Guard. He is qualified in the HC-144B aircraft and estimates the cost of his training borne by the taxpayers as at least $1,400,000. He commissioned in the Coast Guard in 2018. He has served the people of the United States for over 4 years, enforcing the law and keeping people safe. PILOT participated in many search and rescue operations and has been critical in locating and coordinating aid for many

distressed mariners and persons in the water. He has flown countless law enforcement patrols of our nation's southern border and has aided in the detection and interdiction of illegal immigrants and fishing vessels. The command climate where he is stationed is hostile to any religious beliefs and requests for religious accommodation that conflict with the vaccine mandate. On August 26, 2021, PILOT first learned about the vaccine mandate, and was compelled by his faith to submit a religious accommodation request (RAR). On September 27, 2021, PILOT submitted an RAR on the grounds that there are fetal cell lines used in the production and/or testing of all the currently available vaccines which is contrary to his understanding of the sanctity of human life, and that the status of his body as a temple of the Holy Spirit makes it a sin to accept medicines or treatments with unknown long term effects and numerous adverse events documented in only the first 12 months of use. After submitting his RAR, Pilot experienced retaliation and discrimination from his command in the form of restriction to a 50-mile radius from his home and duty station because he had merely submitted an RAR. PILOT's Commanding Officer stated, regarding the purpose of the increased restrictions on PILOT as a result of submitting an RAR, "It's not to just keep you from being infected, because if that was the case then we would maintain what we did before, which was early on, Admiral Netto, D8, said, you know, people go to locations where it's a reduced infection rate in the area, then they're permitted to do so. . . . That was what we were able to do in order to make sure everybody maintained a healthy mentality, and then when the vaccine was available, things did shift." PILOT's Commanding Officer has clearly stated that the Coast Guard has

created policy specifically intended to "make things difficult" for those seeking to obtain religious accommodation from the vaccine mandate, not for the purposes of "health and safety" or mitigating infection risk. **On July 25, 2022, the Coast Guard released a message stating that all commands must initiate separation for all unvaccinated Coast Guard servicemembers by August 24, 2022.**

25.    Plaintiff LCDR PILOT, United States Coast Guard, is a Lieutenant Commander and aviator in the Coast Guard, having served honorably on active duty for over 13 years. A graduate of the United States Coast Guard Academy, LCDR PILOT has flown the HC-130J fixed-wing aircraft for over 2 years, and previously flew the MH-65C/D helicopter for 8 years. He has 3,010 military flight hours along with 234 simulator hours and has served in operational tours in Louisiana, Puerto Rico, and Alaska. He has served as the HC-130J Engineering Officer and the unit's Assistant Engineering Officer. He estimates the cost of his training to exceed $10 million over 13 years of military aviation. Since COVID-19 vaccines have been available to Coast Guard servicemembers, the Coast Guard has awarded LCDR PILOT two commendation medals. The vaccine mandate has placed LCDR PILOT in a position of conflict between his faith and a military order and must decide whether to remain faithful to his conscience and God or be separated from service. Based on his Roman Catholic Christian faith and absolute opposition to abortion, he cannot accept a vaccine that has been manufactured, or whose efficacy has been

tested and proved, using aborted fetal cells. LCDR PILOT submitted a Religious Accommodation Request (RAR) on September 24, 2021, which was denied on January 20, 2022, at which time he had already contracted and easily recovered from COVID-19. LCDR PILOT submitted an appeal from the denial on February 2, 2022. On February 4, 2022, one of the Coast Guard's highest ranking officers, Vice Admiral Michael F. McAllister, stated to an assembly of Coast Guard officers, "If you are unvaccinated, you are not suited for service in the Coast Guard or any other military service." On May 3, 2022, the Coast Guard denied LCDR PILOT's appeal and on May 18 ordered him to be COVID-19 vaccinated. On June 24 the Coast Guard gave LCDR PILOT a Performance and Discipline Report 41-D, notifying him he was in violation of the UCMJ and subject to discipline, and required him to sign the report in acknowledgement of receipt. LCDR PILOT is subject to the Coast Guard's July 25, 2022 message stating that all commands must initiate separation for all unvaccinated Coast Guard servicemembers by August 24, 2022.

26.     Plaintiff LIEUTENANT 2, United States Coast Guard, is a Lieutenant in the Coast Guard and domiciled in Clearwater, Florida. On October 7, 2021, LIEUTENANT 2 submitted a request for a religious accommodation from Defendants' vaccination requirement. LIEUTENANT 2 noted that he is a pro-life Christian who has sincerely held religious objections to injecting anything into his body that contains the product of aborted fetal cells. LIEUTENANT 2 noted that he believes every life is fearfully and wonderfully made and that accepting a vaccine in

any way associated with aborted fetal cells represents a grave sin and major moral problem. The reviewing officer determined LIEUTENANT 2's request to be based upon sincerely held religious beliefs. On January 5, 2022, the Coast Guard denied LIEUTENANT 2's religious accommodation request. On January 24, 2022, LIEUTENANT 2 appealed the denial. On May 4, 2022, Rear Admiral E.C. Jones, the appellate authority assigned to review LIEUTENANT 2's appeal, denied the appeal, and the Coast Guard ordered LIEUTENANT 2 to receive a COVID-19 vaccine. LIEUTENANT 2 is subject to the Coast Guard's July 25, 2022 message stating that all commands must initiate separation for all unvaccinated Coast Guard servicemembers by August 24, 2022.

27.      Plaintiff AVIONICS ELECTRICAL TECHNICIAN 1, United States Coast Guard ("AET1"), is a Petty Officer First Class stationed at Coast Guard Air Station Clearwater, and has faithfully served in the Coast Guard for almost 19 years. AET1 is a Navigator on HC-130H aircraft and currently runs the training program and flight schedules at his air station, which is the only Coast Guard air station flying HC-130H aircraft. There is a shortage of Navigators in the Coast Guard, and AET1 is the only Navigator at his air station trained to perform his training function.  AET1 has been a Christian from a young age, and his faith has grown through his marriage and the survival of his son who, at 5 weeks old in 2019, was diagnosed with a rare condition that only one of three babies survives and is usually diagnosed in utero, often leading to abortion. AET1 believes his son's surviving and thriving, following a major surgery and multiple hospital stays, when many children with the same condition are

aborted, is only by God's grace, which strengthens AET1's faith and pro-life convictions. On September 10, 2021, AET1 submitted a request for religious accommodation from the COVID-19 vaccine mandate based on his sincere religious objections to receiving any vaccine involving the use of aborted fetal cell lines in development or production, which beliefs AET1 had confirmed through consultation with two military chaplains and the pastors of his home churches in California and Florida. The Coast Guard denied his request on February 15, 2022, and AET1 timely appealed the denial on March 8. The Coast Guard denied his appeal on May 6, 2022, and ordered him to report to medical for vaccination by May 23. AET1 reported to medical as ordered but politely refused vaccination according to his conscience. On May 26, 2022, the Coast Guard issued AET1 a negative form CG-3307(P&D-41D) stating he had violated Article 90 and Article 92 of the UCMJ, which AET1 acknowledged by signing "under duress of religious freedoms." AET1 is retirement eligible as of September 1, 2023 according to an approved retirement letter issued prior to the vaccine mandate, which status is directly threatened by the Coast Guard's July 25, 2022 message stating that all commands must initiate separation for all unvaccinated Coast Guard servicemembers by August 24, 2022.

28.    Plaintiff MARINE SCIENCE TECHNICIAN 3, United States Coast Guard ("MST3"), is domiciled and stationed in St. Petersburg, Florida. On November 2, 2021, MST3 submitted a request for religious accommodation from Defendants' vaccination requirement. MST3 noted that she is a pro-life Christian who has sincerely held religious objections to injecting anything into her body that contains the product

of aborted fetal cells. She also noted that injecting an mRNA vaccine into her body is accepting a synthetic product that alters God's design for her. The reviewing officer determined MST3's request to be based upon sincerely held religious beliefs. On February 9, 2022, the Coast Guard denied MST3's religious accommodation request. On February 18, 2022, MST3 appealed the denial. On May 31, 2022, Rear Admiral E.C. Jones, the appellate authority assigned to review MST3's appeal, denied the appeal, and the Coast Guard ordered MST3 to receive a COVID-19 vaccine. MST3 is subject to the Coast Guard's July 25, 2022 message stating that all commands must initiate separation for all unvaccinated Coast Guard servicemembers by August 24, 2022.

29.     Plaintiff SENIOR CHIEF BOATSWAIN'S MATE, United States Coast Guard Reserve, is a Senior Chief Petty Officer in the Coast Guard Reserve and a resident of Polk County, Florida. Administratively, SENIOR CHIEF is the Leading Chief Petty Officer (LCPO) of the N7 Training Department at Maritime Expeditionary Security Squadron 10 (MSRON 10) Alpha Security Boat Company (SBC-A), where he leads a department of dedicated young servicemembers whom he mentors and loves. SENIOR CHIEF enlisted in the Coast Guard Reserve in June 1999 as a young Petty Officer Third Class. He has over 23 years of faithful, uninterrupted service and zero disciplinary action. As a Boatswain's Mate, his primary operational duties and responsibilities throughout his career have revolved around the safe operation and navigation of multiple small craft. While on the water, he enforces

federal boating safety regulations, protects High Value Assets (HVA) vital to national security including US Naval warships, submarines, and critical ports and harbors. SENIOR CHIEF is also trained in Search and Rescue (SAR) and has responded to maritime distress calls ensuring the safety of civilians, citizens, and visitors of US waterways. SENIOR CHIEF's initial duty station assignment was with Port Security Unit 307 out of Tampa Florida. He mobilized to Boston Harbor to provide escort and waterside security for cruise ships diverted up from New York in the wake of the September 11th attacks. In 2004, SENIOR CHIEF deployed overseas for 10 months to Kuwait with the PSU to provide Force Protection to US assets. In 2005, he mobilized to New Orleans, Louisiana for 3 months to help in the search and rescue, recovery, and security of victims affected by Hurricane Katrina. In 2007, SENIOR CHIEF was reassigned to Coast Guard Small Boat Station Port Canaveral where he spent the majority of his time as Training Petty Officer and Coxswain of the station's small boats. He provided HVA protection to cruise ships and US Navy Trident submarines, as well as SAR and Law Enforcement. In 2010, SENIOR CHIEF returned to New Orleans to assist in the BP Oil Spill recovery. His primary responsibilities included environmental and wildlife protection. In 2018, he was reassigned to the Navy's Coastal Riverine Security Squadron 10 in Jacksonville, Florida. Here he served as one of only a few USCG representatives and as liaison. In 2020, SENIOR CHIEF volunteered to mobilize with a sister company to go overseas and serve with his new Navy unit in Djibouti, Africa providing anti-piracy Force Protection to US and Coalition HVAs and port and harbor security and defense.

SENIOR CHIEF ran a security boat for eight months in-country in Djibouti during the height of the pandemic and had no access to any vaccine. No one in his crew, unit, or command contracted COVID. In late 2020, SENIOR CHIEF flew back to the US, and no one in his unit COVID. Since SENIOR CHIEF's return to drilling status, he has been conducting underway training evolutions on the unit's security boats, including successfully completing an annual two-week Active Duty Training (AT/ADT) in Little Creek, Virginia, where no participant contracted COVID. SENIOR CHIEF is a Christian with sincere religious beliefs in the sanctity of human life at all stages of development, which beliefs are strengthened by his personal experience with the birth and short but important life of his daughter, whom SENIOR CHIEF and his wife elected to bring into the world despite having been diagnosed in utero with multiple life-threatening conditions and recommended for abortion. The Coast Guard ordered SENIOR CHIEF to be COVID-19 vaccinated on September 26, 2021. He submitted a religious accommodation request on October 26, 2021, citing his sincere religious objections to receiving any vaccine involving the use of aborted fetal cells in development or production. The Coast Guard denied his request on February 13, 2022, and SENIOR CHIEF submitted a timely appeal on February 28, 2022. The Coast Guard denied his appeal on May 30, 2022. Despite his exemplary record and extensive successful field operations in the face of COVID without vaccination, the Coast Guard deems SENIOR CHIEF an unacceptable threat to his unit and has notified SENIOR CHIEF that he is subject to dismissal and separation. SENIOR CHIEF is subject to the Coast Guard's July 25, 2022 message stating that all

commands must initiate separation for all unvaccinated Coast Guard servicemembers by August 24, 2022.

30.    Defendant LLOYD AUSTIN, in his official capacity as the Secretary of the United States Department of Defense (DoD), is responsible for enacting, implementing, and enforcing the federal COVID-19 vaccine mandate for members of the United States Armed Forces under DoD authority. Specifically, Secretary Austin issued the August 24 Memorandum for Senior Pentagon Leadership and other officials mandating that all military servicemembers under Department of Defense authority receive a COVID-19 vaccine. Secretary Austin is sued in his official capacity.

31.    ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security, is responsible for enacting, implementing, and enforcing the federal COVID-19 vaccine mandate for members of the United States Coast Guard and other civilian federal employees and contractors. Secretary Austin issued a directive, in accordance with President Biden's September 6 Executive Orders, mandating that all Department of Homeland Security employees, including United States Coast Guard servicemembers, receive a COVID-19 vaccine. Secretary Mayorkas is sued in his official capacity.

32.    Defendant ADMIRAL LINDA FAGAN, in her official capacity as Commandant of the United States Coast Guard, is the highest ranking Coast Guard officer and has operational control over the Coast Guard. Admiral Fagan is responsible for enacting, implementing, and enforcing the Federal COVID-19 Vaccine

Mandate for members of the United States Coast Guard. Admiral Fagan is sued in her official capacity.

## JURISDICTION AND VENUE

33.    This action arises under the First Amendment to the United States Constitution. This action also arises under federal statutory law, namely the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4, and the Emergency Use Authorization provisions of the Federal Food Drug and Cosmetic Act, 21 U.S.C. § 360bbb-3, as applied by 10 U.S.C. §§ 1107 and 1107a.

34.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

35.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a this action is against an officer or employee of the United States and is where a plaintiff resides.

36.    This Court has the authority to grant the requested declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, implemented through Rule 57, Federal Rules of Civil Procedure, and the requested injunctive relief under 28 U.S.C. § 2202 and Rule 65, Federal Rules of Civil Procedure.

37.    This Court has the authority to award the requested costs and attorney's fees under 28 U.S.C. §§ 1920 and 2412 and 42 U.S.C. § 1988.

## GENERAL ALLEGATIONS

### A.     THE FEDERAL COVID-19 VACCINE MANDATE.

38.     On September 9, 2021, President Biden issued Executive Order 14043, Requiring Coronavirus Disease 2019 Vaccination for Federal Employees, requiring all federal employees to receive one of the COVID-19 vaccines as a condition of employment. (A true and correct copy of Executive Order 14043 is docketed at ECF No. 1-1 as **EXHIBIT A** and incorporated herein.)

39.     In Executive Order 14043, President Biden stated: "I have determined that to promote the health and safety of the Federal workforce and the efficiency of the civil service, it is necessary to require COVID-19 vaccination for all Federal employees . . . ." (Ex. A at 2.)

40.     Consistent with that determination, Executive Order 14043 states: "Each agency shall implement, to the extent consistent with applicable law, a program to require COVID-19 vaccination for all of its Federal employees . . . ." (Ex. A at 2.)

41.     Also on September 9, 2021, President Biden issued Executive Order 14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors, requiring that all federal contractors and subcontractors "comply with all guidance for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force." (A true and correct copy of Executive Order 14042 is docketed at ECF No. 1-2 as **EXHIBIT B** and incorporated herein.) Pursuant to Executive Order 14042, the Safer Federal Workforce Task Force issued its *Guidance*

*for Federal Contractors and Subcontractors* on September 24, 2021, requiring that all employees of federal contractors and subcontractors receive one of the COVID-19 vaccines as a condition of performing any contract for work for the Federal Government. (A true and correct copy of the *Guidance* is docketed at ECF No. 1-3 as **Exhibit C** and incorporated herein.)

42.    On August 24, 2021, Secretary Austin issued a Memorandum for Senior Pentagon Leadership, Commanders of the Combatant Commands, and Defense Agency and DoD Field Activity Directors, Subject: Mandatory Coronavirus Disease 2019 Vaccination of Department of Defense Service Members, mandating that all military servicemembers under DoD authority receive the COVID-19 vaccine. (A true and correct copy of the Secretary's August 24 Memorandum is docketed at ECF No. 1-4 as **EXHIBIT D** and incorporated herein.)

43.    In his Memorandum, Secretary Austin stated: "After careful consultation with medical experts and military leadership, and with the support of the President, I have determined that mandatory vaccination against coronavirus disease 2019 (COVID-19) is necessary to protect the Force and defend the American people." (Exhibit C at 1.)

44.    Secretary Austin further stated: "I therefore direct the Secretaries of the Military Departments to immediately begin full vaccination of all members of the Armed Forces under DoD authority on active duty or in the Ready Reserve, including the National Guard, who are not fully vaccinated against COVID-19." (Exhibit C at 1.)

23

45.     Though not even possible right now (*see infra*), the Secretary stated that mandatory vaccination "will only use COVID-19 vaccines that receive full licensure from the Food and Drug Administration (FDA), in accordance with FDA-approved labeling and guidance." (Ex. C at 1.)

46.     President Biden's Executive Orders, Secretary Austin's Memorandum, and all related, resulting, subsequent, amended, or superseding federal orders or directives mandating the vaccination of United States Armed Forces servicemembers, federal civilian employees, or federal civilian contractors, are sometimes collectively referred to herein as the "Federal COVID-19 Vaccine Mandate."

47.     **On July 25, 2022, the Coast Guard released a message stating that all commands must initiate separation for all unvaccinated Coast Guard servicemembers within 30 days after the message.**

**B.     PLAINTIFFS' SINCERELY HELD RELIGIOUS BELIEFS.**

48.     Plaintiffs all have sincerely held religious beliefs, rooted in Scripture, that preclude them from complying with the Federal COVID-19 Vaccine Mandate because of the connections between the various COVID-19 vaccines and the cell lines of aborted fetuses, whether in the vaccines' origination, production, development, testing, or other inputs. Plaintiffs also have sincerely held religious beliefs, rooted in Scripture, that their bodies are temples of the Holy Spirit and that they cannot place anything into their Temples without confirmation and conviction from the Holy Spirit.

49.     A fundamental component of Plaintiffs' sincerely held religious beliefs is that all life is sacred, from the moment of conception to natural death, and that abortion is the murder of an innocent life and a grave sin against God.

50.     Plaintiffs' sincerely held religious beliefs are rooted in Scripture's teachings that "[a]ll Scripture is given by inspiration of God, and is profitable for doctrine, for reproof, for correction, [and] for instruction in righteousness." *2 Timothy* 3:16 (KJV).

51.     Because of that sincerely held religious belief, Plaintiffs believe that they must conform their lives, including their decisions relating to medical care, to the commands and teaching of Scripture.

52.     Plaintiffs have sincerely held religious beliefs that God forms children in the womb and knows them prior to birth, and that because of this, life is sacred from the moment of conception to natural death. *See Psalm* 139:13–14 (ESV) ("For you formed my inward parts; you knitted me together in my mother's womb. I praise you, for I am fearfully and wonderfully made."); *Psalm* 139:16 (ESV) ("Your eyes saw my unformed substance; in your book were written, every one of them, the days that were formed for me, when as yet there was none of them."); *Isaiah* 44:2 (ESV) ("Thus says the LORD who made you, who formed you from the womb . . . ."); *Isaiah* 44:24 (ESV) ("Thus says the LORD, your Redeemer, who formed you from the womb: 'I am the Lord, who made all things . . . .'"); *Isaiah* 49:1b (ESV) ("The LORD called me from the womb, from the body of my mother he named my name."); *Isaiah* 49:5 (ESV) ("And now the LORD says, he who formed me from the womb to be his servant . . . .");

*Jeremiah* 1:5 (ESV) ("'Before I formed you in the womb I knew you, and before you were born I consecrated you; I appointed you a prophet to the nations.'").

53.    Plaintiffs also have sincerely held religious beliefs that every child's life is sacred because each is made in the image of God. *See Genesis* 1:26–27 (ESV) ("Then God said, 'Let us make man in our image, after our likeness. . . . So God created man in his own image, in the image of God he created him; male and female he created them.'" (footnote omitted)).

54.    Plaintiffs have sincerely held religious beliefs that because life is sacred from the moment of conception, the killing of that innocent life is the murder of an innocent human in violation of Scripture. *See, e.g.*, *Exodus* 20:13 (ESV) ("'You shall not murder.'"); *Exodus* 21:22–23 (ESV) (imposing death penalty for killing of an unborn child); *Exodus* 23:7 (ESV) ("'[D]o not kill the innocent and righteous . . . .'"); *Genesis* 9:6 (ESV) ("'Whoever sheds the blood of man, by man shall his blood be shed, for God made man in his own image.'"); *Deuteronomy* 27:25 (ESV) ("Cursed be anyone who takes a bribe to shed innocent blood." (internal quotation marks omitted)); *Proverbs* 6:16–17 (ESV) ("There are six things that the LORD hates, seven that are an abomination to him: . . . hands that shed innocent blood . . . .").

55.    The Hebrew word for "abomination" in the text above is תּוֹעֵבָה (to`eba). The verbal form is "abhor," "loath," "detest," and "exclude." Twelve times the Book of Proverbs uses תּוֹעֵבָה in reference to an "abomination to the LORD." (יהוה or Yahweh). The word is also used in conjunction with the Ammonites and the Ashtoreth, the Sidonians, Chemosth, and Moab. Some of these nations sacrificed their

children to Baal. Indeed, *Jeremiah* 19:4–9, refers to the shedding of innocent blood by sacrificing children as the reason for judgement against Judah. Abortion is the modern-day sacrifice of children made in the image of God. Plaintiffs do not want to be part of such an "abomination." They do not want indirectly or directly to be in any way associated with abortion. To do so is abhorrent, loathsome, detestable, abominable to God. In short, to require these employees to inject a substance into their bodies that has any association (no matter how near or remote to abortion) is a sin against their Creator, their Lord, and their Savior.

56.     Plaintiffs also have sincerely held religious beliefs that it would be better to tie millstones around their necks and be drowned in the sea than to bring harm to an innocent child. *See Matthew* 18:6; *Luke* 17:2 (ESV).

57.     Plaintiffs also have sincerely held religious beliefs that their bodies are temples of the Holy Spirit, and that to inject medical products that have any connection whatsoever to aborted fetal cell lines would be defiling the temple of the Holy Spirit. (*See 1 Corinthians* 6:15–20 (ESV) ("Do you not know that your bodies are members of Christ? . . . Or do you not know that your body is a temple of the Holy Spirit within you, whom you have from God? You are not your own, for you were bought with a price. So glorify God in your body.").

58.     Plaintiffs' religious beliefs compel them to not condone, support, justify, or benefit (directly or indirectly) from the taking of innocent human life via abortion, and that to do so is sinning against God.

59.     Plaintiffs' sincerely held religious beliefs preclude them from accepting any one of the three currently available COVID-19 vaccines derived from, produced or manufactured by, tested on, developed with, or otherwise connected to aborted fetal cell lines.

60.     As reported by the North Dakota Department of Health, in its handout literature for those considering one of the COVID-19 vaccines, "[t]he non-replicating viral vector vaccine produced by Johnson & Johnson **did require the use of fetal cell cultures, specifically PER.C6, in order to produce and manufacture the vaccine**." *See* North Dakota Health, *COVID-19 Vaccines & Fetal Cell Lines* (Apr. 20, 2021), https://www.health.nd.gov/sites/www/files/documents/COVID%20Vaccine%20P age/COVID-19_Vaccine_Fetal_Cell_Handout.pdf.

61.     The Louisiana Department of Health likewise confirms that the Johnson & Johnson COVID-19 vaccine used the PER.C6 fetal cell line, which "is a retinal cell line that was **isolated from a terminated fetus in 1985**." La. Dep't of Public Health, *You Have Questions, We Have Answers: COVID-19 Vaccine FAQ* (Dec. 21, 2020), https://ldh.la.gov/assets/oph/Center-PHCH/Center-PH/immunizations/ You_Have_Qs_COVID-19_Vaccine_FAQ.pdf (emphasis added).

62.     Scientists at the American Association for the Advancement of Science have likewise published research showing that the Johnson & Johnson vaccine used aborted fetal cell lines in the development and production phases of the vaccine.

28

Meredith Wadman, *Vaccines that use human fetal cells draw fire*, Science (June 12, 2020), *available at* https://science.sciencemag.org/content/368/6496/1170.full.

63.     The same is true of the Moderna and Pfizer-BioNTech mRNA vaccines. The Louisiana Department of Health's publications again confirm that aborted fetal cells lines were used in the "proof of concept" phase of the development of their mRNA vaccines. *See* La. Dep't of Public Health, *supra*.

64.     The North Dakota Department of Health likewise confirms: "Early in the development of mRNA vaccine technology, **fetal cells were used for 'proof of concept' (to demonstrate how a cell could take up mRNA and produce the SARS-CoV-2 spike protein) or to characterize the SARS-CoV-2 spike protein**." N.D. Health, *supra* (emphasis added).

65.     The Chief Scientific Officer and Senior Director of Worldwide Research for Pfizer have also been reported to demonstrate that its COVID-19 vaccine is derived from aborted fetal cells and have made statements that they wanted to keep that information from the public. *See PFIZER LEAKS: Whistleblower Goes On Record, Reveals Internal Emails from Chief Scientific Officer & Senior Director of Worldwide Research Discussing COVID Vaccine ... 'We Want to Avoid Having the Information on the Fetal Cells Floating        Out        There'*,        ProjectVeritas        (Oct.        6,        2021), https://www.projectveritas.com/news/pfizer-leaks-whistleblower-goes-on-record-reveals-internal-emails-from-chief/.

66.     Specifically, Vanessa Gelman, Pfizer Senior Director of Worldwide Research: "From the perspective of corporate affairs, we want to avoid having the information on fetal cells floating out there…The risk of communicating this right now outweighs any potential benefit we could see, particularly with general members of the public who may take this information and use it in ways we may not want out there. We have not received any questions from policy makers or media on this issue in the last few weeks, so we want to avoid raising this if possible." *Id.*

67.     And, Philip Dormitzer, Pfizer's Chief Scientific Officer is reported as saying that he wanted to keep the information secret because of the objections that pro-life individuals, such as Plaintiffs in this action, would have: "HEK293T cells, used for the IVE assay, are ultimately derived from an aborted fetus. On the other hand, the Vatican doctrinal committee has confirmed that they consider it acceptable for Pro-Life believers to be immunized. Pfizer's official statement couches the answer well and is what should be provided in response to an outside inquiry." *Id.*

68.     Because all three of the currently available COVID-19 vaccines are developed and produced from, tested with, researched on, or otherwise connected with the aborted fetal cell lines HEK-293 and PER.C6, Plaintiffs' sincerely held religious beliefs compel them to abstain from obtaining or injecting any of these products into their body, regardless of the perceived benefit or rationale.

69.     Plaintiffs have sincerely held religious beliefs that their bodies are temples of the Holy Spirit, and that to inject medical products that have any connection whatsoever to aborted fetal cell lines would be defiling the temple of the Holy Spirit.

70.     Plaintiffs sincerely religious beliefs that their bodies are temples of the Holy Spirit and that they are to glorify God with their bodies lays the foundation for everything they do, consume, or inject into their bodies. From this foundation they make studied and reasonable decisions about what is good and what is not good or may not be good for their bodies. To knowingly abuse their bodies by engaging in a dishonorable act, or consuming or injecting a substance that will or may produce adverse consequences, is a sin against God. Based on this foundation, Plaintiffs would consume pure water over a similarly clear liquid they know or reasonably conclude is harmful to the body. This belief and other sincerely held religious beliefs are foundational to all their decisions and actions and are not limited to aborted fetal cell lines.

71.     Plaintiffs have sincerely held religious beliefs that the Holy Spirit—through prayer and the revelation of Scripture—guide them in all decisions they make in life.

72.     Plaintiffs have sincerely held religious beliefs that Jesus Christ came to this earth, died on the cross for their sins, was resurrected three days later, and that when He ascended to Heaven, He sent the Holy Spirit to indwell His believers and to guide them in all aspects of their lives. *See John* 16:7 (ESV) ("Nevertheless, I tell you the truth: it is to your advantage that I go away, for if I do not go away, the Helper will not come to you. But if I go, I will send him to you."); *John* 14:26 (ESV) ("But the Helper, the Holy Spirit, whom the Father will send in my name, he will teach you all things and bring to your remembrance all that I have said to you.").

73.     Plaintiffs have sincerely held religious beliefs that the Holy Spirit was given to them by God to reprove them of righteousness and sin and to guide them into all truth. *See John* 16:8–13 (ESV) ("And when he comes, he will convict the world concerning sin and righteousness and judgment . . . . When the Spirit of truth comes, he will guide you into all the truth, for he will not speak on his own authority, but whatever he hears he will speak, and he will declare to you the things that are to come.").

74.     Plaintiffs also have sincerely held religious beliefs that they will receive answers to their questions through prayer and supplication, including for decisions governing their medical health. *See James* 1:5 (ESV) ("If any of you lacks wisdom, let him ask God, who gives generously to all without reproach, and it will be given him."); *Mark* 11:24 (ESV) ("Therefore I tell you, whatever you ask in prayer, believe that you have received it, and it will be yours."); *Philippians* 4:6–7 (ESV) ("[D]o not be anxious about anything, but in everything by prayer and supplication with thanksgiving let your requests be made known to God. And the peace of God, which surpasses all understanding, will guard your hearts and your minds in Christ Jesus."); *1 John* 4:14–15 (ESV) ("And we have seen and testify that the Father has sent his Son to be the Savior of the world. Whoever confesses that Jesus is the Son of God, God abides in him, and he in God.").

75.     Through much prayer and reflection, Plaintiffs have sought wisdom, understanding, and guidance on the proper decisions to make concerning these COVID-19 vaccines, and Plaintiffs have been convicted by the Holy Spirit that

accepting any of the three currently available vaccines is against the teachings of Scripture and would be a sin.

76.     Plaintiffs have sincerely held religious beliefs that compel them to follow the teachings of the Holy Spirit, who has not given them peace, comfort, or admonition to accept any of the three currently available COVID-19 vaccines.

77.     Plaintiffs have sincerely held religious beliefs that they are being guided and instructed by the Holy Spirit not to accept any of the three currently available COVID-19 vaccines and that it would be a sin against God to do so.

### C.     PLAINTIFFS' WILLINGNESS TO COMPLY WITH SAFE AND TESTED ALTERNATIVES TO UNIVERSAL VACCINATION AS ACCOMMODATION OF THEIR SINCERELY HELD RELIGIOUS BELIEFS.

78.     Plaintiffs have offered, and are ready, willing, and able to comply with all reasonable health and safety requirements to facilitate their religious exemption and accommodation from the Federal COVID-19 Vaccine Mandate.

79.     Plaintiffs have all informed their respective commanding officers that they are willing to comply with reasonable conditions that were sufficient for nearly two years, permitting them to fulfill their sworn duties and faithful service to their employers and a grateful nation, and which reasonable conditions continued from the FDA's Emergency Use Authorization (EUA) of the first COVID-19 vaccine in December 2020, until August 24, 2021 for military servicemembers. Nothing has changed except for the Vaccine Mandate, and thus the past proves a good example of present and future reasonable accommodations.

80.    The accommodations which have been ongoing for nearly two years are certainly reasonable under the accumulating scientific evidence. Indeed,

> A preliminary study has shown that in the case of a breakthrough infection, the Delta variant is able to grow in the noses of vaccinated people **to the same degree as if they were not vaccinated at all**. The virus that grows is just as infectious as that in unvaccinated people, meaning vaccinated people can transmit the virus and infect others.

Sanjay Mishra, *Evidence mounts that people with breakthrough infections can spread Delta easily*, National Geographic (Aug. 20, 2021), https://www.nationalgeographic.com/science/article/evidence-mounts-that-people-with-breakthrough-infections-can-spread-delta-easily (emphasis added); *see also Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR* (July 30, 2021), https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html (noting "**the Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people**" (emphasis added).)

81.    The CDC Director also admitted that the currently available COVID-19 vaccines do not prevent transmission. *See* Tim Hains, *CDC Director: Vaccines No Longer Prevent You From Spreading COVID* (Aug. 6, 2021), https://www.realclearpolitics.com/video/2021/08/06/cdc_director_vaccines_no_longer_prevent_you_from_spreading_covid.html#!.

82.    Other reasonable protocols beyond the currently-available COVID vaccines remain sufficient to prevent the spread of COVID-19 among military

servicemembers, and constitute a reasonable alternative to mandatory, universal vaccination as an accommodation of sincerely held religious beliefs.

83.     The United States District Court for the Western District of Louisiana recently issued a TRO against a medical school for the school's failure to grant religious exemptions when other reasonable accommodations were available and mandatory vaccination was not the least restrictive means of achieving the school's interest in protecting the school's student body. *See Magliulo v. Edward Via College of Osteopathic Medicine*, No. 3:21-CV-2304, 2021 WL 36799227 (W.D. La. Aug. 17, 2021).

84.     The United States District Court for the Western District of Michigan issued a TRO against a university for its failure to allow students with religious objections to vaccination to participate in athletics and other extracurricular activities when other reasonable alternatives were available as a reasonable accommodation for their religious beliefs. *See Dahl v. Bd. of Trustees of W. Mich. Univ.*, No. 1:21-cv-757, 558 F. Supp. 3d 561 (W.D. Mich. Aug. 31, 2021). The Sixth Circuit Court of Appeals affirmed that preliminary injunction in its order refusing to stay the preliminary injunction. *See Dahl v. Bd. of Trustees of W. Mich. Univ.*, No. 21-2945, 15 F.4th 728 (6th Cir. Oct. 7, 2021).

85.     In *U.S. Navy Seals v. Biden*, No. 4:21-cv-1236-O, 2022 WL 34443 (N.D. Tex. Jan. 3, 2022), the United States District Court for the Northern District of Texas entered a preliminary injunction against the United States Navy's sham process for requesting and receiving a religious exemption and accommodation. Indeed, the Court

there noted that "The Navy provides a religious accommodation process, but by all accounts, **it is theater**. The Navy has not granted a religious exemption to any vaccine in recent memory. **It merely rubber stamps each** denial." *Id.* at *1 (emphasis added).

86.    In *State v. Nelson*, No. 8:21-cv-2524-SDM-TGW, 2021 WL 6108948, *11 (M.D. Fla. Dec. 22, 2021) (Merryday, J.), this Court held that Defendants' COVID-19 vaccine mandate on federal contractors was also unlawful and issued a preliminary injunction. This Court held that the mandate was issued in excess of the statutory jurisdiction provided to Defendants.

87.    The Sixth Circuit, too, has held that the President and the agencies to whom he purportedly delegated authority for the vaccine mandate on federal contractors lacked authority to issue a mandate on federal contractors. *See Kentucky v. Biden*, No. 21-6147, 23 F.4th 585 (6th Cir. Jan. 5, 2022). Indeed, "if the President can order medical interventions in the name of reducing absenteeism, what is the logical stopping point of that power?" *Id.* at 610. Defendants' vaccine mandate on federal contractors "**requires vaccination everywhere and all the time**. It is not 'anchored' to the statutory text, not is it even 'anchored' to the work of federal contractors." *Id.* (emphasis added).

88.    The United States Military Health System allows three different types of permanent *medical* exemptions from compulsory immunizations: (1) "determination by a medical provider that vaccination will seriously endanger a patient's health;" (2) "'Medical, Reactive' exemption . . . based on previous severe reaction . . . after a

specific vaccine;" and (3) "'Medical, Immune' exemption . . . based on evidence of existing immunity to a vaccine-preventable infection." *See* Military Health System, *Immunization Exemption Guidance*, Health.mil, https://www.health.mil/Military-Health-Topics/Health-Readiness/Immunization-Healthcare/Clinical-Consultation-Services/Exemption-Guidance (last visited June 29, 2022).

89.    Several Plaintiffs and countless other class members were previously infected with COVID-19, have serologic test results demonstrating natural antibodies and immunity to COVID-19, and otherwise qualify for the exemptions ostensibly available for servicemembers. Plaintiffs, however, have been denied the ability to even requests the officially available exemptions.

### D.    PLAINTIFFS' REQUESTS FOR AN ACCOMMODATION FROM THE MANDATORY COVID-19 VACCINE POLICY.

90.    On September 27, 2021, PILOT submitted a religious accommodation request (RAR) on the grounds that there are fetal cell lines used in the production and/or testing of all the currently available vaccines which is contrary to his understanding of the sanctity of human life, and that the status of his body as a temple of the Holy Spirit makes it a sin to accept medicines or treatments with unknown long term effects and numerous adverse events documented in only the first 12 months of use. After submitting his RAR, Pilot experienced retaliation and discrimination from his command in the form of a travel restriction to a 50-mile radius from his home and duty station merely because he had submitted an RAR. PILOT is subject to the Coast

Guard's July 25, 2022 message stating that all commands must initiate separation for all unvaccinated Coast Guard servicemembers by August 24, 2022.

91.    LCDR PILOT submitted a Religious Accommodation Request (RAR) on September 24, 2021, based on his Roman Catholic Christian faith and absolute opposition to abortion, under which he cannot accept a vaccine that has been manufactured, or whose efficacy has been tested and proved, using aborted fetal cells. The Coast Guard denied LCDR PILOT's RAR on January 20, 2022. LCDR PILOT submitted an appeal from the denial on February 2, 2022. On May 3, 2022, the Coast Guard denied LCDR PILOT's appeal and on May 18 ordered him to be COVID-19 vaccinated. On June 24 the Coast Guard gave LCDR PILOT a Performance and Discipline Report 41-D, notifying him he was in violation of the UCMJ and subject to discipline, and required him to sign the report in acknowledgement of receipt. LCDR PILOT is subject to the Coast Guard's July 25, 2022 message stating that all commands must initiate separation for all unvaccinated Coast Guard servicemembers by August 24, 2022.

92.    On October 7, 2021, LIEUTENANT 2 submitted a request for a religious accommodation from Defendants' vaccination requirement. LIEUTENANT 2 noted that he is a pro-life Christian who has sincerely held religious objections to injecting anything into his body that contains the product of aborted fetal cells. LIEUTENANT 2 noted that he believes every life is fearfully and wonderfully made and that accepting a vaccine in any way associated with aborted fetal cells represents a grave sin and

major moral problem. Because of this, LIEUTENANT 2requested an accommodation for his beliefs. LIEUTENANT 2's request was determined to be based upon sincerely held religious beliefs by the reviewing officer. On January 5, 2022, LIEUTENANT 2's request for a religious accommodation was denied. On January 24, 2022, LIEUTENANT 2 submitted his appeal of the denial of his requested religious accommodation. On May 4, 2022, Rear Admiral E.C. Jones, the appellate authority assigned to review LIEUTENANT 2's appeal, denied his request for a religious accommodation, and LIEUTENANT 2 was ordered to receive the vaccine. LIEUTENANT 2 is subject to the Coast Guard's July 25, 2022 message stating that all commands must initiate separation for all unvaccinated Coast Guard servicemembers by August 24, 2022.

93.    On September 10, 2021, AET1 submitted a request for religious accommodation from the COVID-19 vaccine mandate based on his sincere religious objections to receiving any vaccine involving the use of aborted fetal cell lines in development or production, which beliefs AET1 had confirmed through consultation with two military chaplains and the pastors of his home churches in California and Florida. The Coast Guard denied his request on February 15, 2022, and AET1 timely appealed the denial on March 8. The Coast Guard denied his appeal on May 6, 2022, and ordered him to report to medical for vaccination by May 23. AET1 reported to medical as ordered but politely refused vaccination according to his conscience. On May 26, 2022, the Coast Guard issued AET1 a negative form CG-3307(P&D-41D) stating he had violated Article 90 and Article 92 of the UCMJ, which AET1

39

acknowledged by signing "under duress of religious freedoms." AET1 is retirement eligible as of September 1, 2023 according to an approved retirement letter issued prior to the vaccine mandate, which status is directly threatened by the Coast Guard's July 25, 2022 message stating that all commands must initiate separation for all unvaccinated Coast Guard servicemembers by August 24, 2022.

94.    On November 2, 2021, MST3 submitted a request for a religious accommodation from Defendants' vaccination requirement. MST3 noted  that she is a pro-life Christian who has sincerely held religious objections to injecting anything into her body that contains the product of aborted fetal cells. She also noted that injecting an mRNA vaccine into her body is accepting a synthetic product that alters God's design for her. Because of this, MST3 requested an accommodation for her beliefs. MST3's request was determined to be based upon sincerely held religious beliefs by the reviewing officer. On February 9, 2022, MST3's request for a religious accommodation was denied. On February 18, 2022, MST3 submitted her appeal of the denial of her requested religious accommodation. On May 31, 2022, Rear Admiral E.C. Jones, the appellate authority assigned to review MST3's appeal, denied the appeal, and the Coast Guard ordered MST3 to receive a COVID-19 vaccine. MST3 is subject to the Coast Guard's July 25, 2022 message stating that all commands must initiate separation for all unvaccinated Coast Guard servicemembers by August 24, 2022.

95.     The Coast Guard ordered SENIOR CHIEF to be COVID-19 vaccinated on September 26, 2021. He submitted a religious accommodation request on October 26, 2021, citing his sincere religious objections to receiving any vaccine involving the use of aborted fetal cells in development or production. The Coast Guard denied his request on February 13, 2022, and SENIOR CHIEF submitted a timely appeal on February 28, 2022. The Coast Guard denied his appeal on May 30, 2022. Despite his exemplary record and extensive successful field operations in the face of COVID without vaccination, the Coast Guard deems SENIOR CHIEF an unacceptable threat to his unit and has notified SENIOR CHIEF that he is subject to dismissal and separation. SENIOR CHIEF is subject to the Coast Guard's July 25, 2022 message stating that all commands must initiate separation for all unvaccinated Coast Guard servicemembers by August 24, 2022.

96.     While many Plaintiffs' and class members' religious exemption requests have already been denied, the still pending requests have been effectively denied, as Plaintiffs and class members with pending requests have been threatened with dishonorable discharge, court martial, termination, or other life-altering disciplinary measures for merely seeking accommodation of their sincerely held religious beliefs, and some of these Plaintiffs have been informed by their superiors that **no religious exemption or accommodation will be given so there is no point in even making a request**.

97.    For example, on October 14, 2021, Vice Admiral William Galinis, Commander, Naval Sea Systems Command (NAVSEA), sent a warning to his entire command, comprising more than 85,000 civilian and military personnel: "The Executive Order mandating vaccinations for all federal employees has provided clear direction. We are moving quickly toward a workforce where vaccinations are a condition of employment. Frankly, if you are not vaccinated, you will not work for the U.S. Navy."

> **E.    THE ONLY COVID-19 VACCINES AVAILABLE IN THE UNITED STATES ARE ADMINISTERED UNDER EMERGENCY USE AUTHORIZATION BECAUSE THERE IS NO FDA APPROVED COVID-19 VACCINE CURRENTLY AVAILABLE IN THE UNITED STATES.**

98.    Despite the misreporting, there is no COVID-19 vaccine available in the United States that has received full FDA licensing and approval.

99.    On August 23, 2021, the United States Food and Drug Administration issued two separate letters pertaining to two separate COVID-19 vaccines. *See* Letter, United States Food and Drug Administration to BioNTech Manufacturing GmbH (Aug. 23, 2021), https://www.fda.gov/media/151710/download ("BioNTech Letter"); Letter, United States Food and Drug Administration to Pfizer, Inc. (Aug. 23, 2021), https://www.fda.gov/media/150386/download ("Pfizer Letter"). (A true and correct copy of the BioNTech Letter is docketed at ECF No. 1-5 as **EXHIBIT E** and incorporated herein. A true and correct copy of the Pfizer Letter is docketed at ECF No. 1-6 as **EXHIBIT F** and incorporated herein.)

100.   In the Pfizer Letter, the FDA confirms that, on December 11, 2020, it granted Emergency Use Authorization (EUA) for the Pfizer-BioNTech COVID-19 Vaccine. (Pfizer Letter at 1.) It also notes that the EUA was continued on December 23, 2020, February 25, 2020, May 10, 2021, June 25, 2021, and August 12, 2021. (Pfizer Letter at 1-2.)

101.   The Pfizer Letter also makes clear that there are scientific, manufacturing, and **legal** differences between the Pfizer-BioNTech COVID-19 Vaccine and the newly approved BioNTech COMIRNATY, COVID-19 Vaccine, mRNA. (Pfizer Letter at 2 n.9, 3 n.10.)

102.   Specifically, the FDA stated that although COMIRNATY was granted full approval by the FDA, the Pfizer-BioNTech COVID-19 Vaccine was still only authorized under the EUA. (Pfizer Letter at 2 n.9 ("In the August 23, 2021 revision, FDA clarified that, subsequent to the FDA approval of COMIRNATY (COVID-19 Vaccine, mRNA) for the prevention of COVID-19 for individuals 16 years of age and older, **this EUA would remain in place for the Pfizer-BioNTech COVID-19 vaccine for the previously-authorized indication and uses**. It also authorized COMIRNATY (COVID-19 Vaccine, mRNA) under this EUA for certain uses that are not included in the approved biologics license application (BLA)." (emphasis added).

103.   All existing vials of the Pfizer-BioNTech COVID-19 Vaccine remain available only under the authorization of the EUA. (Pfizer Letter at 2 n.9.)

104.   On information and belief, the existing vials of Pfizer-BioNTech COVID-19 Vaccine in the United States number in the millions, and that all of these

EUA vaccine doses will be administered **before any does of the fully approved COMIRNATY**, meaning the fully approved COMIRNATY will not be available for administration in the United States in the near future.

105.   There are currently no available doses of COMIRNATY in the United States, and **COMIRNATY is not being manufactured for production or distribution in the United States at this time**.

106.   **In fact, the FDA Pfizer Letter plainly states that COMIRNATY is not available in the United States: "Although COMIRNATY (COVID-19 Vaccine, mRNA) is approved to prevent COVID-19 in individuals 16 years of age and older, there is no sufficient approved vaccine for distribution to the population**." (Pfizer Letter at 6 n.12 (emphasis added).)

107.   Thus, the FDA has admitted and acknowledged that COMIRNATY is not available for the population in the United States, and thus extended the EUA for the Pfizer-BioNTech Covid-19 Vaccine. (*Id.*)

108.   Indeed, in order for the FDA to have extended the EUA for the Pfizer-BioNTech Covid-19 Vaccine, **it was required to find that there were no alternatives available for the Pfizer-BioNTech Vaccine**. (*See* Pfizer Letter at 6 ("There is no adequate, approved, and **available alternative** to the Pfizer-BioNTech COVID-19 Vaccine to prevent COVID-19." (emphasis added).)

109.   Moreover, though Secretary Austin stated that the Federal COVID-19 Vaccine Mandate "will only use COVID-19 vaccines that receive full licensure from

the Food and Drug Administration (FDA), in accordance with FDA-approved labeling and guidance," (Ex. D at 1), additional military documents reveal that the Department of Defense is not following its own directive and is, instead, using EUA vaccines because there is no FDA approved vaccine available. In a Memorandum for Assistant Secretary of the Army (Manpower and Reserve Affairs), Assistant Secretary of the Navy (Manpower and Reserve Affairs), Assistant Secretary of the Air Force (Manpower and Reserve Affairs), and the Director of the Defense Health Agency, Terry Adirim, Acting Assistant Secretary of Defense for Health Affairs, admitted that the Department of Defense was not administering a fully licensed and approved vaccine to the heroes in the United States Armed Forces, but was instead skirting federal law by mandating an EUA vaccine instead. (A true and correct copy of Acting Assistant Secretary Adirim's Memorandum is docketed at ECF No. 1-7 as **EXHIBIT G** and incorporated herein.)

110.   Specifically, the Memorandum stated that Department of Defense health care providers "**should use doses distributed under the EUA to administer the vaccination series as if the doses were the licensed vaccine**." (Ex. G at 1 (emphasis added).)

111.   The same distinctions exist between the Moderna COVID-19 Vaccine, authorized for emergency use on December 18, 2020, and which is available in the United States under the EUA, and Moderna's SPIKEVAX (COVID-19 Vaccine, mRNA), which was approved on January 31, 2022, and which is not available in the

United States. *See* Letter, United States Food and Drug Administration to ModernaTX, Inc. (June 17, 2022), https://www.fda.gov/media/144636/download, at 1–2, 11 & n.16 ("Although SPIKEVAX (COVID-19 Vaccine, mRNA) and Comirnaty (COVID-19 Vaccine, mRNA) are approved to prevent COVID-19 in certain individuals who fall within the scope of the Moderna COVID-19 Vaccine authorization, **there is not sufficient approved vaccine available** for distribution to this population . . . ." (emphasis added)), 16 ("The Moderna COVID-19 Vaccine . . . and Spikevax (COVID-19 Vaccine, mRNA) have the same formulation. **The products are legally distinct** with certain differences that do not impact safety or effectiveness." (emphasis added)).

112.    Thus, the only currently available COVID-19 vaccines are authorized under EUA only, and therefore cannot be mandated by Secretary Austin. (*See* Count I, *infra*.)

113.    The Federal Food, Drug, And Cosmetic Act provides that

> **subject to the provisions of this section**, the Secretary (of the Department of Health and Human Services) may authorize the introduction into interstate commerce, during the effective period of a declaration under subsection (b), of a drug, device, or biological product intended for use in an actual or potential emergency (referred to in this section as an "emergency use."

21 U.S.C. § 360bbb-3(a)(1) (emphasis added) [hereinafter EUA Statute].

114.    As an essential part of the explicit statutory conditions for EUA**, the EUA Statute mandates that all individuals to whom the EUA product may be administered be given the option to accept or refuse administration of the product**:

46

With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following:

. . . .

(ii) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed—

(I) that the Secretary has authorized the emergency use of the product;

(II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and

(III) **of the option to accept or refuse administration of the product**, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(I)–(III) (emphasis added).

115.   The statutorily required Fact Sheets for each of the EUA COVID-19 vaccines acknowledge that individuals cannot be compelled to accept or receive the vaccine. *See, e.g.*, Pfizer-BioNTech, *Fact Sheet for Recipients and Caregivers* (June 25, 2021), https://www.fda.gov/media/144414/download ("**It is your choice to receive or not to receive the Pfizer-BioNTech COVID-19 Vaccine. Should you decide not to receive it, it will not change your standard medical care**." (emphasis added)).

116.   Because all COVID-19 vaccines available in the United States are subject to the EUA Statute restrictions and limitations, all individuals—**including military**

**servicemembers, federal employees, and federal civilian contractors**—have the explicit right under the EUA Statute to accept or refuse administration of the products.

### F.   IRREPARABLE HARM TO PLAINTIFFS.

117.   Because of Defendants' refusal to grant Plaintiffs merited religious exemptions from the Federal COVID-19 Vaccine Mandate, Plaintiff servicemembers face the unconscionable choice of violating their sincerely held religious beliefs or facing court martial and dishonorable discharge from their faithful service to the Nation.

118.   As a result of the Federal COVID-19 Vaccine Mandate, Plaintiffs have suffered and are suffering irreparable injury by being prohibited from engaging in their constitutionally and statutorily protected rights to the free exercise of their sincerely held religious beliefs.

119.   As a result of the Federal COVID-19 Vaccine Mandate, Plaintiffs have suffered and are suffering irreparable injury by being forced to choose between maintaining the ability to feed their families and the free exercise of their sincerely held religious beliefs.

120.   As a result of the Federal COVID-19 Vaccine Mandate, Plaintiffs have suffered and are suffering irreparable injury by being stripped of their rights to equal protection of the law and being subjected to disfavored class status in the United States Armed Forces.

121.   Plaintiffs also face the prospect of irreparable medical injury as a result of the Federal COVID-19 Vaccine Mandate. A recent study conducted by the

Department of Defense found "**higher than expected rates of heart inflammation following receipt of COVID-19 vaccines**" among military servicemembers. *See* Patricia Kime, *DoD Confirms: Rare Heart Inflammation Cases Linked to COVID-19 Vaccines*, Military.com (June 30, 2021), https://www.military.com/daily-news/2021/06/30/dod-confirms-rare-heart-inflammation-cases-linked-covid-19-vaccines.html (emphasis added).

> In fact, on or about June 29, 2021, Defendants knew that the mRNA vaccines would causing myocarditis/pericarditis (a potentially serious and deadly heart inflammation) in certain members of the military, particularly in males 30 and under. In a study conducted by United States Army, Navy, and Air Force physicians specifically found: A total of 23 male patients (22 currently serving in the military and 1 retiree; median [range] age, 25 [20-51] years) **presented with acute onset of marked chest pain within 4 days after receipt of an mRNA COVID-19 vaccine. All military members were previously healthy with a high level of fitness**. Seven received the BNT162b2-mRNA vaccine and 16 received the mRNA-1273 vaccine. A total of 20 patients had symptom onset following the second dose of an appropriately spaced 2-dose series. All patients had significantly elevated cardiac troponin levels. Among 8 patients who underwent cardiac magnetic resonance imaging within the acute phase of illness, all had findings consistent with the clinical diagnosis of myocarditis. . . . **While the observed number of myocarditis cases was small, the number was higher than expected among male military members after a second vaccine dose**.

Jay Montgomery, et al., *Myocarditis Following Immunization With mRNA COVID-19 Vaccines in Members of the US Military*, Journal of American Medical Association Network (June 29, 2021), *available at* https://jamanetwork.com/journals/jamacardiology/fullarticle/2781601 (emphasis added).

122.    Dr. Matthew Oster, a member of the President's COVID-19 Task Force, confirmed the link between the COVID-19 vaccines and myocarditis, stating: "It does appear that mRNA vaccines may be a new trigger for myocarditis yet it does have some different characteristics." Jackie Salo, *COVID-19 mRNA vaccines likely linked to rare heart condition in kids: CDC panel*, (June 23, 2021), https://nypost.com/2021/06/23/covid-19-vaccines-from-pfizer-moderna-likely-linked-to-rare-heart-condition-cdc-panel/.

123.    Indeed, it is now well confirmed by the CDC and other studies that males 30 and under have an unacceptable risk of developing myocarditis as a result of the COVID-19 vaccines. (*See* Declaration of Dr. Peter McCullough, docketed at ECF No. 1-8 as **EXHIBIT H** and incorporated herein.)

124.    The COVID-19 genetic vaccines (Pfizer, Moderna, J&J) skipped testing for genotoxicity, mutagenicity, teratogenicity, and oncogenicity. In other words, it is unknown whether or not these products will change human genetic material, cause birth defects, reduce fertility, or cause cancer. (Ex. H, McCullough Decl. ¶ 16.)

125.    The Pfizer, Moderna, and JNJ vaccines are considered "genetic vaccines", or vaccines produced from gene therapy molecular platforms which according to US FDA regulatory guidance are classified as gene delivery therapies and should be under a 15-year regulatory cycle with annual visits for safety evaluation by the research sponsors. FDA. Food and Drug Administration. (*Id.* ¶ 17.)

126.    The FDA has "advised sponsors to observe subjects for delayed adverse events for as long as 15 years following exposure to the investigational gene therapy

product, specifying that the long-term follow-up observation should include a minimum of five years of annual examinations, followed by ten years of annual queries of study subjects, either in person or by questionnaire." (emphasis added) Thus, the administration of the Moderna, Pfizer, and JNJ vaccines should not be undertaken without the proper consent and arrangements for long-term follow-up which are currently not offered in the US. (See, EUA briefing documents for commitments as to follow up: Moderna , Pfizer , J&J ). They have a dangerous mechanism of action in that they all cause the body to make an uncontrolled quantity of the pathogenic wild-type spike protein from the SARS-CoV-2 virus for at least two weeks probably a longer period based on the late emergence of vaccine injury reports. This is unlike all other vaccines where there is a set amount of antigen or live-attenuated virus. This means for Pfizer, Moderna, and J&J vaccines it is not predictable among patients who will produce more or less of the spike protein. The Pfizer, Moderna, and JNJ vaccines because they are different, are expected to produce different libraries of limited antibodies to the now extinct wild-type spike protein. We know the spike protein produced by the vaccines is obsolete because the 17th UK Technical Report on SARS-CoV-2 Variants issued June 25, 2021, and the CDC June 19, 2021, Variant Report both indicate the SARS-CoV-2 wild type virus to which all the vaccines were developed is now extinct. (*Id.* ¶ 18.)

127.   The spike protein itself has been demonstrated to injure vital organs such as the brain, heart, lungs, as well as damage blood vessels and directly cause blood clots. Additionally, because these vaccines infect cells within these organs, the

generation of spike protein within heart and brain cells, in particular, causes the body's own immune system to attach to these organs. This is abundantly apparent with the burgeoning number of cases of myocarditis or heart inflammation among individuals below age 30 years. (*Id.*)

128.   Because the US FDA and CDC have offered no interpretation of overall safety of the COVID-19 vaccines according to the manufacturer or as a group, nor have they offered methods of risk mitigation for these serious adverse effects which can lead to permanent disability or death, no one should be pressured, coerced, receive the threat or reprisal, or be mandated to receive one of these investigational products against their will. Because the vaccine centers, CDC, FDA, and the vaccine manufacturers ask for the vaccine recipient to grant indemnification on the consent form before injection, all injuries incurred by the person are at their own cost which can be prohibitive depending on the needed procedures, hospitalizations, rehabilitation, and medications. (*Id.*)

129.   The COVID-19 public vaccination program operated by the CDC and the FDA is a clinical investigation and under no circumstance can any person receive pressure, coercion, or threat of reprisal on their free choice of participation. Violation of this principle of autonomy by any entity constitutes reckless endangerment with a reasonable expectation of causing personal injury resulting in damages. (*Id.* ¶ 21.)

130.   The total safety reports in VAERS for all vaccines per year up to 2019 was 16,320. The total safety reports in VAERS for COVID-19 Vaccines alone through October 1, 2021, is 778,683. Based on VAERS as of October 1, 2021, there were 16,310

COVID-19 vaccine deaths reported and 75,605 hospitalizations reported for the COVID-19 vaccines (Pfizer, Moderna, JNJ). By comparison, from 1999, until December 31, 2019, VAERS received 3167 death reports (158 per year) adult death reports for all vaccines combined. Thus, the COVID-19 mass vaccination is associated with at least a 39-fold increase in annualized vaccine deaths reported to VAERS. (*Id.* ¶ 28.)

131.   COVID-19 vaccine adverse events account for 98% of all vaccine-related AEs from December 2020 through the present in VAERS. (*Id.* ¶ 29.)

132.   The COVID-19 vaccines are not safe for general use and cannot be deployed indiscriminately or supported, recommended, or mandated among any group. (*Id.* ¶ 30.)

133.   There are emerging trends showing that the vaccine is especially risky for those 12- 29 in Dr. McCullough's expert medical opinion with complications in the cardiovascular, neurological, hematologic, and immune systems. (See, Rose J, et al). Increasingly the medical community is acknowledging the possible risks and side effects including myocarditis, Bell's Palsy, Pulmonary Embolus, Pulmonary Immunopathology, and severe allergic reaction causing anaphylactic shock. See Chien-Te Tseng, Elena Sbrana, Naoko Iwata- Yoshikawa, Patrick C Newman, Tania Garron, Robert L Atmar, Clarence J Peters, Robert B Couch, Immunization with SARS coronavirus vaccines leads to pulmonary immunopathology on challenge with the SARS virus, https://pubmed.ncbi.nlm.nih.gov/22536382/ (last visited June 21, 2021); Centers for Disease Control and Prevention, Allergic Reactions Including

Anaphylaxis After Receipt of the First Dose of Pfizer-BioNTech COVID-19 Vaccine—United States, December 14– 23, 2020 (Jan 15, 2021). (*Id.* ¶ 31.)

134.   The Centers for Disease Control has held emergency meetings on this issue and the medical community is responding to the crisis. It is known that myocarditis causes injury to heart muscle cells and may result in permanent heart damage resulting in heart failure, arrhythmias, and cardiac death. These conditions could call for a lifetime need for multiple medications, implantable cardio defibrillators, and heart transplantation. Heart failure has a five-year 50% survival and would markedly reduce the lifespan of a child or young adult who develops this complication after vaccine-induced myocarditis. (*Id.* ¶ 32.)

135.   COVID-19 vaccine-induced myocarditis has a predilection for young males below age 30 years. The Centers for Disease Control has held emergency meetings on this issue and the medical community is responding to the crisis and the US FDA has issued a warning on the Pfizer and Moderna vaccines for myocarditis. In the cases reviewed by the CDC and FDA, 90% of children with COVID-19 induced myocarditis developed symptoms and clinical findings sufficiently severe to warrant hospitalization. Because this risk is not predictable and the early reports may represent just the tip of the iceberg, no individual under age 30 under any set of circumstances should feel obliged to take this risk with the current genetic vaccines particularly the Pfizer and Moderna products. (*Id.* ¶ 33.)

136.   Multiple recent studies and news reports detail people 18-29 dying from myocarditis after receiving the COVID-19 vaccine. According to the CDC, 475 cases

of pericarditis and myocarditis have been identified in vaccinated citizens aged 30 and younger. See FDA, Vaccines and Related Biological Products Advisory Committee June 10, 2021, Meeting Presentation. The FDA found that people 12-24 account for 8.8% of the vaccines administrated, but 52% of the cases of myocarditis and pericarditis were reported. (*Id.* ¶¶ 34-35.)

137.   The CDC recently released data stating that there have been 267 cases of myocarditis or pericarditis reported after receiving one dose of the COVID-19 vaccines and 827 reported cases after two doses through June 11. There are 132 additional cases where the number of doses received is unknown. Id. There have been 2466 reported cases of myocarditis that have occurred, and the median age is thirty. (*Id.* ¶ 37.) And, the CDC just announced that the vaccine is "likely linked" to myocarditis. Advisory Board, CDC panel reports 'likely association' of heart inflammation and mRNA COVID-19 vaccines in young people. (*Id.* ¶ 36.)

138.   The irreparable harm to Plaintiffs and the class members they represent is incalculable, unconscionable, and unconstitutional.

## CLASS ALLEGATIONS

139.   Plaintiffs satisfy the requirements Fed. R. Civ. P. 23(a) because the class is so numerous that joinder of all members is impracticable, each member's claims involve common questions of law and fact, the claims of the representatives are typical of and identical to the claims of the other members of the class, and the representatives here will fairly and adequately protect the interests of the class in having the primarily

legal questions addressed by the Court in an expeditious manner. In the Coast Guard, 1,308 individuals have submitted requests for religious accommodation.

140.   Plaintiffs have typicality with the other members of the class of military servicemembers who have been denied religious exemption from the Federal COVID-19 Vaccine Mandate and who are threatened with the unconscionable choice between conformance with their sincerely held religious convictions adverse employment action.

141.   Plaintiffs have commonality with the other members of the class because they are all members of the United States Coast Guard subject to the Federal COVID-19 Vaccine Mandate with a policy-in-fact of denying all merited religious accommodation requests.

142.   Plaintiffs' claims in the Court are representative of the claims of other class members and involve questions of fact and law that are common to all class members, including, *inter alia*,

(a) whether the EUA Statute requires that Plaintiffs be given the option to refuse a COVID-19 vaccine because there is currently no FDA approved COVID-19 vaccine available;

(b) whether Defendants violate the First Amendment to the United States Constitution by mandating that Plaintiffs accept and receive a COVID-19 vaccine regardless of whether Plaintiffs' and the other class members' sincerely held religious beliefs compel them to abstain from acceptance or receipt of the three currently available COVID-19 vaccines; and

(c) whether the federal Religious Freedom Restoration Act (RFRA) requires Defendants and all those in active concert with them to provide accommodations and exemptions to those Plaintiffs with sincerely held religious convictions that compel them to abstain from receiving one of the three currently available COVID-19 vaccines.

143.   Plaintiffs' claims are representative and common among all class members because the injury sustained—Defendants' refusals to grant exemption and accommodation for sincerely held religious objections to the COVID-19 vaccines and the resulting adverse employment actions—are categorically identical. Indeed, Plaintiffs and the other members of the class "have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

144.   Plaintiffs will fairly and adequately protect the interests of the class because they are seeking a temporary restraining order, preliminary and permanent injunctive relief, and declaratory relief against enforcement of the Federal COVID-19 Vaccine Mandate and Defendants' refusals to entertain or grant religious exemptions and accommodations which will provide relief to all class members.

145.   Plaintiffs likewise satisfy the requirements of Fed. R. Civ. P. 23(b) because Defendants have acted in a manner that applies to all members of the class with respect to the Federal COVID-19 Vaccine Mandate, and have refused to grant religious accommodations to the entire group of class members who have sincerely held religious objections to receiving a COVID-19 vaccine under the Mandate. Fed. R. Civ. P. 23(b)(2).

146.     Additionally, Plaintiffs' requested injunctive and declaratory relief would appropriately protect of the entire class as a whole. Fed. R. Civ. P. 23(b)(2).

147.     Moreover, Plaintiffs satisfy the requirements of Fed. R. Civ. P. 23(b) because the common questions of law and fact applicable to the class members' claims predominate over individualized questions pertaining to individual class members. Fed. R. Civ. P. 23(b)(3).

148.     Adjudication of Plaintiffs and the other class members' claims are more fairly and efficiently adjudicated by a class action, as the claims for religious accommodation and exemption from the Federal COVID-19 Vaccine Mandate are virtually identical among all class members, the relevant facts applicable to each individual class member are substantially similar, and the applicable substantive law for the class members' claims is identical in all respects. Fed. R. Civ. P. 23(b)(3).

**COUNT I – VIOLATION OF THE EMERGENCY USE AUTHORIZATION PROVISIONS OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT, 21 U.S.C. § 360bbb-3, AS APPLIED BY 10 U.S.C. §§ 1107 AND 1107a**

149.     Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–148 as if fully set forth herein.

150.     The Federal Food, Drug, And Cosmetic Act provides that

> **subject to the provisions of this section**, the Secretary (of the Department of Health and Human Services) may authorize the introduction into interstate commerce, during the effective period of a declaration under subsection (b), of a drug, device, or biological product intended for use in an actual or potential emergency (referred to in this section as an "emergency use."

21 U.S.C. § 360bbb-3(a)(1) (emphasis added).

58

151.   For ease of reference, Plaintiffs will refer to the general provisions of 21 U.S.C. §360bbb-3 as the "Emergency Use Authorization Statute" or "EUA Statute."

152.   The Emergency Use Authorization Statute further provides the limitations on when the Secretary may authorize the emergency use of an unapproved product for use in interstate commerce, and specifically limits such authorization to circumstances where the Secretary of Homeland Security has determined certain emergencies exits, where the Secretary of Defense has determined that certain military emergencies exist, where the Secretary of the Department of Health and Human services has determined that certain public health emergencies exist, and where there has been some identification of a material threat pursuant to other provisions of the United States Code. *See* 21 U.S.C. § 360bbb-3(b)(1)(A)-(D).

153.   The Secretary's Emergency Use Authorization terminates whenever the circumstances described in 21 U.S.C. § 360bbb-3(b)(1)(A)-(D) cease to exist or where the product approved for Emergency Use under the statute receives a change in approval status. 21 U.S.C. § 360bbb-3(b)(2)(A)(i)-(ii).

154.   As an essential part of the explicit statutory conditions for EUA**, the EUA Statute mandates that all individuals to whom the EUA product may be administered be given the option to accept or refuse administration of the product**:

> With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following:

. . . .

(ii) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed—

(I) that the Secretary has authorized the emergency use of the product;

(II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and

(III) **of the option to accept or refuse administration of the product**, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(I)–(III) (emphasis added).

155. Consistent with the requirement in the Emergency Use Authorization statute that all potential recipients of the COVID-19 vaccine be informed of the option to accept or refuse the vaccine, the Emergency Use Authorization Fact Sheet for all three of the currently available COVID-19 vaccines specifically states—**as required by the Emergency Use Authorization Statute**—that individuals have the right to refuse administration of the COVID-19 vaccine. *See* Moderna, *Vaccine Information Fact Sheet for Recipients and Caregivers* (Jan. 31, 2022), https://www.fda.gov/media/144638/download ("**Under the EUA, it is your choice to receive or not receive the vaccine. Should you decide not to receive it, it will not change your standard medical care.**" (emphasis added)); Pfizer-BioNTech, *Vaccine Information Fact Sheet for Recipients and Caregivers* (Jan. 31, 2022), https://www.fda.gov/media/153716/download ("**Under the EUA, it is your choice to receive or not receive the vaccine. Should you decide**

not to receive it, it will not change your standard medical care." (emphasis added));
Janssen, *Fact Sheet for Recipients and Caregivers* (Jan. 31, 2022), https://www.fda.gov/
media/146305/download ("**It is your choice to receive or not receive the Janssen
COVID-19 Vaccine. Should you decide not to receive it, it will not change your
standard medical care.**" (emphasis added)).

156.    "Congress has prohibited the administration of investigational drugs to
service members without their consent." *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 19 (D.D.C.
2004).

157.    There is a very strict mechanism under which any military exception to
the EUA statute may be deployed, and neither have occurred here.

158.    First, the President can waive the informed consent requirement, but that
Presidential waiver must be in writing and demonstrate that the President has
determined "that obtaining consent is not in the interests of national security," 10
U.S.C. § 1107(f), or "that complying with such requirement is not in the interests of
national security," 10 U.S.C. § 1107a(a).

159.    The strict criteria laid out in the statutory framework demonstrate the
limited scope of the exceptions to the informed consent requirement. To start, the
initial emergency declaration by the HHS Secretary must be based on one of four
statutorily listed justifications—none of which apply here. The first requires the
Secretary of Defense to find a **domestic emergency**, or significant potential for a
domestic emergency, based on heightened risk of attack with a **biological, chemical,**

**radiological, or nuclear agent**. 21 U.S.C. § 360bbb–3(b)(1)(A) ("A "determination by the Secretary of Homeland Security that there is a domestic emergency, or a significant potential for a domestic emergency, involving a heightened risk of attack with a biological, chemical, radiological, or nuclear agent or agents.").

160.   The second requires a finding that there is a **military emergency** involving a heightened risk to US military forces of an attack with a **biological, chemical, radiological, or nuclear agent**, or an agent that may cause an imminently life-threatening and specific risk to US military forces. 21 U.S.C. § 360bbb-3(b)(1)(B) ("A "determination by the Secretary of Defense that there is a **military emergency**, or a significant potential for a military emergency, involving a heightened risk to United States military forces, including personnel operating under the authority of title 10 or title 50, of **attack with a biological, chemical, radiological, or nuclear agent or agents**; or an agent or agents that may cause, or are otherwise associated with, **an imminently life-threatening and specific risk** to United States military forces." (emphasis added)).

161.   The third requires a finding that there is a public health emergency, or significant potential for a public health emergency that affects national security or the health and security of US citizens abroad that involves a **biological, chemical, radiological, or nuclear agent or a disease or condition attributable to one of those agents**. 21 U.S.C. §360bbb-3(b)(1)(C) (A "determination by the Secretary that there is a **public health emergency**, or a significant potential for a public health emergency,

**that affects**, or has a significant potential to affect, **national security** or the health and security of United States citizens living abroad, **and** that involves **a biological, chemical, radiological, or nuclear agent or agents, or a disease or condition that may be attributable to such agent or agents**." (emphasis added)).

162.   The fourth requires the identification of a material threat involving **chemical, biological, radiological, and nuclear agents** sufficient to affect national security or the health and security of US citizens living abroad. 21 U.S.C. § 360bbb-3(b)(1)(D) ("The "identification of a **material threat** [involving chemical, biological, radiological, and nuclear agents] pursuant to section 319F–2 of the Public Health Service Act [42 U.S.C. § 247d–6b] sufficient **to affect national security** or the health and security of United States citizens living abroad." (emphasis added)).

163.   Under the above statute, there is no legal basis on which the President may waive consent for the COVID-19 vaccines for the military. Indeed, he has not done so because he has no statutory authority under these facts to waive the EUA requirements for the military.

164.   Even after the HHS Secretary establishes that one of the four criteria are satisfied, then under § 360bbb–3 the HHS Secretary then must make a separate determination that an "agent" referred to in the declaration can cause a serious or life-threatening disease or condition **and** that based on the scientific evidence available for the product authorized under the EUA (i) it may be effective in diagnosing, treating, or preventing the disease or serious life-threatening disease, (ii) the known and

potential benefits outweigh the risks; (iii) there is no adequate, approved, and available alternative to the product authorized under the EUA; (iv) **in the case of a military emergency based on a biological, chemical, radiological, or nuclear agent, the Secretary of Defense made the emergency use request**; and (v) other criteria established by regulation are satisfied.

165.   None of the foregoing criteria has been satisfied.

166.   Defendants have ignored their obligations under the EUA Statute.

167.   There has been no Presidential declaration sufficient to invoke the consent exceptions of the EUA statute.

168.   There has been no domestic emergency, military emergency, public health emergency, or material threat of a biological, chemical, radiological, or nuclear agent, or a disease attributable to one of those conditions.

169.   As such, Defendants are prohibited by the EUA statute from mandating that any Plaintiffs or similarly situated military servicemembers receive or accept one of the COVID-19 vaccines.

170.   Put simply, the Emergency Use Authorization Statute provides that, **as a condition of receiving authorization for emergency use, <u>ALL individuals to whom the EUA product may be administered are given the right to accept or refuse administration of the product—and this includes members of the military. And, of course, the EUA right to accept or refuse applies and cannot be waived respecting the federal employees and federal civilian contractor Plaintiffs.</u>**

171.   The only currently available COVID-19 vaccines (Janssen/Johnson & Johnson, Moderna, and Pfizer/BioNTech) are only authorized for use under the Emergency Use Authorization statute and have no general approval under the United States Code.

172.   Because all three of the currently available COVID-19 vaccines are subject only to Emergency Use under the Emergency Use Authorization statute, the Emergency Use Authorization statute mandates that all individuals to whom the product may be administered, **including Plaintiffs**, be given the right to accept or refuse administration of the product.

173.   Put simply, because all three of the currently available COVID-19 vaccines are subject only to Emergency Use under the Emergency Use Authorization statute, the Emergency Use Authorization statute prohibits Defendants from making the COVID-19 vaccines mandatory.

174.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship on Plaintiffs' sincerely held religious beliefs.

175.   Plaintiffs have no adequate remedy at law for the continuing deprivation of their most cherished constitutional liberties and sincerely held religious beliefs.

WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## COUNT II – VIOLATION OF THE FIRST AMENDMENT
## TO THE UNITED STATES CONSTITUTION

176.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–148 above as if fully set forth herein.

177.    The Free Exercise Clause of the First Amendment to the United States Constitution prohibits the government from abridging Plaintiffs' rights to free exercise of religion.

178.    Plaintiffs have sincerely held religious beliefs that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that they are to follow its teachings.

179.    Plaintiffs have and exercise sincerely held religious beliefs (articulated in Section B, *supra*) which compel them to abstain from receiving or accepting any of the currently available COVID-19 vaccines.

180.    The Federal COVID-19 Vaccine Mandate, on its face and as applied, targets Plaintiffs' sincerely held religious beliefs by prohibiting Plaintiffs from seeking and receiving exemption and accommodation for their sincerely held religious beliefs against the COVID-19 vaccines.

181.    The Federal COVID-19 Vaccine Mandate, on its face and as applied, impermissibly burdens Plaintiffs' sincerely held religious beliefs, compels Plaintiffs to either change those beliefs or act in contradiction to them, and forces Plaintiffs to choose between the teachings and requirements of their sincerely held religious beliefs in the commands of Scripture and the government's imposed value system.

182.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, places Plaintiffs in an irresolvable conflict between compliance with the mandate and their sincerely held religious beliefs.

183.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, puts substantial pressure on Plaintiffs to violate their sincerely held religious beliefs or face loss of their ability to feed their families.

184.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, is neither neutral nor generally applicable.

185.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, specifically targets Plaintiffs' religious beliefs for disparate and discriminatory treatment.

186.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, creates a system of individualized exemptions for preferred exemption requests while discriminating against requests for exemption and accommodation based on sincerely held religious beliefs.

187.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, constitutes a religious gerrymander by unconstitutionally orphaning exemption and accommodation requests based solely on sincerely held religious beliefs of Plaintiffs while permitting the more favored medical exemptions to be granted.

188.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, constitutes a substantial burden on Plaintiffs' exercise of their sincerely held religious beliefs.

189.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, fails to accommodate Plaintiffs' sincerely held religious beliefs.

190.   There is no legitimate, rational, or compelling interest in the Federal COVID-19 Vaccine Mandate's exclusion of exemptions and accommodations for sincerely held religious beliefs.

191.   The Federal COVID-19 Vaccine Mandate is not the least restrictive means of achieving an otherwise permissible government interest.

192.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship on Plaintiffs' sincerely held religious beliefs.

193.   Plaintiffs have no adequate remedy at law to protect the continuing deprivation of their most cherished constitutional liberties and sincerely held religious beliefs.

WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## COUNT III - VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT, 42 U.S.C. §§ 2000bb to 2000bb-4

194.   Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–148 above as if fully set forth herein.

195.   The Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb to 2000bb-4, provides that "Government shall not substantially burden a person's

exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a).

196.   RFRA also demands that, should the government substantially burden a person's free exercise of religion, it bears the burden of demonstrating that its burden on religious exercise furthers a compelling government interest and is the least restrictive means of achieving that compelling government interest. 42 U.S.C. § 2000bb-1(b).

197.   RFRA plainly applies to Defendants, as they constitute a "branch, department, agency, instrumentality, and official of the United States." 42 U.S.C. § 2000bb-2(1).

198.   Congress enacted RFRA "to provide **very broad** protection for religious liberty," going "far beyond what [the Supreme Court] has held is constitutionally required" under the First Amendment. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693, 706 (2014) (emphasis added).

199.   As such, RFRA encompasses a very broad definition of "exercise of religion," which includes "'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Hobby Lobby*, 573 U.S. at 696 (quoting 42 U.S.C. § 2000bb—5(7)(A)).

200.   Congress has mandated that RFRA "'be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'" *Hobby Lobby*, 573 U.S. at 696 (quoting 42 U.S.C. § 2000cc-3(g)).

201.   "RFRA operates as a kind of super statute, displacing the normal operation of other federal laws." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1754 (2020).

202.   Plaintiffs have sincerely held religious beliefs that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that they are to follow its teachings.

203.   Plaintiffs have and exercise sincerely held religious beliefs (articulated *supra* Section B) which compel them to abstain from receiving or accepting any of the currently available COVID-19 vaccines.

204.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, targets Plaintiffs' sincerely held religious beliefs by prohibiting Plaintiffs from seeking and receiving exemption and accommodation for their sincerely held religious beliefs against the COVID-19 vaccines.

205.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, impermissibly burdens Plaintiffs' sincerely held religious beliefs, compels Plaintiffs to either change those beliefs or act in contradiction to them, and forces Plaintiffs to choose between the teachings and requirements of their sincerely held religious beliefs in the commands of Scripture and the government's imposed value system.

206.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, places Plaintiffs in an irresolvable conflict between compliance with the mandate and their sincerely held religious beliefs.

207.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, puts substantial pressure on Plaintiffs to violate their sincerely held religious beliefs or face loss of their ability to feed their families.

208.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, specifically targets Plaintiffs' religious beliefs for disparate and discriminatory treatment.

209.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, creates a system of individualized exemptions for preferred exemption requests while discriminating against requests for exemption and accommodation based on sincerely held religious beliefs.

210.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, constitutes a substantial burden on Plaintiffs' exercise of their sincerely held religious beliefs.

211.   By forcing Plaintiffs into the unconscionable choice between violating their sincerely held religious convictions or facing dishonorable discharge, courts martial, termination, and other disciplinary measures, Defendants' mandate constitutes a substantial burden on Plaintiffs' exercise of religion.

212.   The Federal COVID-19 Vaccine Mandate, on its face and as applied, fails to accommodate Plaintiffs' sincerely held religious beliefs.

213.   There is no legitimate, rational, or compelling interest in the Federal COVID-19 Vaccine Mandate's exclusion of exemptions and accommodations for sincerely held religious beliefs.

214. The Federal COVID-19 Vaccine Mandate is not the least restrictive means of achieving an otherwise permissible government interest.

215. The Federal COVID-19 Vaccine Mandate, on its face and as applied, has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship on Plaintiffs' sincerely held religious beliefs.

216. Plaintiffs have no adequate remedy at law for the continuing deprivation of their most cherished constitutional liberties and sincerely held religious beliefs.

WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully pray for relief as follows:

A. That the Court issue a preliminary injunction pending trial, and a permanent injunction upon judgment, restraining and enjoining Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with the Federal COVID-19 Vaccine Mandate such that:

  i. Defendants will immediately comply with the Emergency Use Authorization Statute so that each individual has the "option to accept or refuse" administration of the COVID-19 vaccines as

there is currently no FDA approved COVID-19 vaccine available to the population;

ii.   Defendants will immediately cease in their refusal to consider, evaluate, or accept Plaintiffs' requests for exemption and accommodation for their sincerely held religious beliefs;

iii.  Defendants' will immediately grant Plaintiffs' requests for religious exemption and accommodation from the Federal COVID-19 Vaccine Mandate; and

iv.   Defendants will immediately cease any actions arising from or connected to Plaintiffs' religious exemption and accommodation requests, including current and ongoing punishment and threatening to dishonorably discharge, court martial, and impose other life-altering disciplinary actions on Plaintiffs for failure to accept a COVID-19 vaccine that violates their sincerely held religious beliefs;

B.   That the Court render a declaratory judgment declaring that the Federal COVID-19 Vaccine Mandate, both on its face and as applied by Defendants, is illegal and unlawful in that it purports to remove federal civil rights and constitutional protections from military servicemembers, and further declaring—

i.   the Federal COVID-19 Vaccine Mandate violates the federal Emergency Use Authorization provisions of the Federal Food, Drug, and Cosmetic Act by imposing a mandatory COVID-19

shot upon Plaintiffs without giving the "option to accept or refuse" the EUA product;

    ii.    the Federal COVID-19 Vaccine Mandate, without sufficient provision for exemption or accommodation for sincerely held religious beliefs, violates the First Amendment to the United States Constitution by imposing a substantial burden on Plaintiffs' sincerely held religious beliefs; and

    iii.    the Federal COVID-19 Vaccine Mandate, without sufficient provision for exemption or accommodation for sincerely held religious beliefs, violates the federal Religious Freedom Restoration Act by imposing a substantial burden on Plaintiffs' sincerely held religious beliefs;

C.    That the Court adjudge, decree, and declare the rights and other legal obligations and relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment;

D.    That the Court award Plaintiffs actual damages in an amount to be determined at trial;

E.    That the Court award Plaintiffs their reasonable attorney's fees, costs, and other expenses and disbursements in this action under 28 U.S.C. §§ 1920 and 2412 and 42 U.S.C. § 1988, and as otherwise allowed by law;

F.    That the Court retain jurisdiction over the matter for the purposes of enforcing the Court's order; and

G.     That the Court grant such other and further relief as the Court deems

equitable and just under the circumstances.


/s/ Daniel J. Schmid
Mathew D. Staver
Horatio G. Mihet
Roger K. Gannam
Daniel J. Schmid*
Richard L. Mast*
Liberty Counsel
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@lc.org
hmihet@lc.org
rgannam@lc.org
dschmid@lc.org*
rmast@lc.org*
*Specially admitted
*Attorneys for Plaintiffs*

## **VERIFICATION**

I, PILOT, am over the age of eighteen years and a Plaintiff in this action. The statements and allegations that pertain to me or which I make in this THIRD AMENDED VERIFIED CLASS ACTION COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States, that the foregoing statements are true and correct to the best of my knowledge.

Dated:       July 26, 2022

/s/ PILOT_____
PILOT
(Original Signature retained by Counsel)

## **VERIFICATION**

I, LCDR PILOT, am over the age of eighteen years and a Plaintiff in this action.

The statements and allegations that pertain to me or which I make in this THIRD

AMENDED VERIFIED CLASS ACTION COMPLAINT are true and correct, and

based upon my personal knowledge (unless otherwise indicated). If called upon to

testify to their truthfulness, I would and could do so competently. I declare under

penalty of perjury, under the laws of the United States, that the foregoing statements

are true and correct to the best of my knowledge.

Dated:    July 26, 2022

/s/ LCDR PILOT
LCDR PILOT
(Original Signature retained by Counsel)

## **VERIFICATION**

I, LIEUTENANT 2, am over the age of eighteen years and a Plaintiff in this action. The statements and allegations that pertain to me or which I make in this THIRD AMENDED VERIFIED CLASS ACTION COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States, that the foregoing statements are true and correct to the best of my knowledge.

Dated:        July 26, 2022

/s/ LIEUTENANT 2
LIEUTENANT 2
(Original Signature retained by Counsel)

## **VERIFICATION**

I, AVIONICS ELECTRICAL TECHNICIAN 1, am over the age of eighteen years and a Plaintiff in this action. The statements and allegations that pertain to me or which I make in this THIRD AMENDED VERIFIED CLASS ACTION COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States, that the foregoing statements are true and correct to the best of my knowledge.

Dated:      July 26, 2022

/s/ AVIONICS ELECTRICAL TECHNICIAN 1
AVIONICS ELECTRICAL TECHNICIAN 1
(Original Signature retained by Counsel)

## **VERIFICATION**

I, MARINE SCIENCE TECHNICIAN 3, am over the age of eighteen years and a Plaintiff in this action. The statements and allegations that pertain to me or which I make in this THIRD AMENDED VERIFIED CLASS ACTION COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States, that the foregoing statements are true and correct to the best of my knowledge.

Dated:      July 26, 2022

/s/ MARINE SCIENCE TECHNICIAN 3
MARINE SCIENCE TECHNICIAN 3
(Original Signature retained by Counsel)

## **VERIFICATION**

I, SENIOR CHIEF BOATSWAIN'S MATE, am over the age of eighteen years and a Plaintiff in this action. The statements and allegations that pertain to me or which I make in this THIRD AMENDED VERIFIED CLASS ACTION COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States, that the foregoing statements are true and correct to the best of my knowledge.

Dated:      July 26, 2022

/s/ SENIOR CHIEF BOATSWAIN'S MATE
SENIOR CHIEF BOATSWAIN'S MATE
(Original Signature retained by Counsel)