# Exhibit 7



| | |
|---|---|
| **U.S. Department of Homeland Security** **United States Coast Guard** | Commandant United States Coast Guard |

2703 Martin Luther King Jr. Ave SE
Washington, DC 20020
Staff Symbol: CG-1
Phone: (202) 475-5001

6230
30 May 2022

# MEMORANDUM

JONES.ERIC.C.1177   Digitally signed by
712120   JONES.ERIC.C.1177712120
Date: 2022.05.30 14:33 59 -04'00'

From:   E. C. Jones, RADM
      Appellate Authority

To:   ███████████, BMCS

Subj:   DECISION ON APPEAL OF RELIGIOUS ACCOMMODATION DENIAL

Ref:   (a) Your memo 1000 of 28 Feb 2022
      (b) CG-133 memo 6230 of 13 Feb 2022
      (c) Military Religious Accommodations, COMDTINST 1000.15 (series)

1. I have personally reviewed and fully considered your appeal (reference (a)) of the decision to deny your request for a religious accommodation (reference (b)). I find no error occurred in reaching the decision to deny your religious accommodation request. As such, and in accordance with reference (c), your appeal is denied.

2. My decision in your case came only after extensive consideration. I personally reviewed your appeals package and consulted with a Judge Advocate to ensure I accurately applied the law and policy to your specific circumstances. My actions in denying your request are intended to meet Coast Guard requirements as a ready military workforce and national first responder in which you play a valuable role.

3. I realize my denial of your appeal is not welcome news. It takes courage to submit an accommodation request that requires sharing your closely held beliefs, as well as to trust others to treat those beliefs thoughtfully. I also understand that you may have experienced additional stress during this process and, if so, strongly encourage you to take advantage of the many resources the Coast Guard provides to help you best manage that stress. Contact your command if you have questions about how to access these resources.

4. I have no doubt that you have made significant sacrifices along your journey, investing yourself in our Coast Guard and the Nation. I hope you will decide to comply with the Coast Guard's vaccine requirement and continue your service well into the future.

#



**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave SE
Washington, DC 20020
Staff Symbol: CG-1
Phone: (202) 475-5001

6230

# MEMORANDUM

From:   E. C. Jones, RADM
        Appellate Authority

To:     ████████████, BMCS

Subj:   DECISION ON APPEAL OF RELIGIOUS ACCOMMODATION DENIAL

Ref:    (a) Your memo 1000 of 28 Feb 2022
        (b) CG-133 memo 6230 of 13 Feb 2022
        (c) Military Religious Accommodations, COMDTINST 1000.15 (series)

1. I have personally reviewed and fully considered your appeal (reference (a)) of the decision to deny your request for a religious accommodation (reference (b)).  I find no error occurred in reaching the decision to deny your religious accommodation request.  As such, and in accordance with reference (c), <u>your appeal is denied</u>.

2. My decision in your case came only after extensive consideration.  I personally reviewed your appeals package and consulted with a Judge Advocate to ensure I accurately applied the law and policy to your specific circumstances.  My actions in denying your request are intended to meet Coast Guard requirements as a ready military workforce and national first responder in which you play a valuable role.

3. I realize my denial of your appeal is not welcome news.  It takes courage to submit an accommodation request that requires sharing your closely held beliefs, as well as to trust others to treat those beliefs thoughtfully.  I also understand that you may have experienced additional stress during this process and, if so, strongly encourage you to take advantage of the many resources the Coast Guard provides to help you best manage that stress.  Contact your command if you have questions about how to access these resources.

4. I have no doubt that you have made significant sacrifices along your journey, investing yourself in our Coast Guard and the Nation.  I hope you will decide to comply with the Coast Guard's vaccine requirement and continue your service well into the future.

#



**JUDGE ADVOCATE GENERAL**
**OUTLINE: 20 MAY 2022, V. 12**
**COVID-19 VACCINATION MANDATE**
**RELIGIOUS ACCOMMODATION APPEAL**
**FORESEEABLE ARGUMENTS AND GENERAL RESPONSES**



1. Background. The following outline provides an overview of common bases for requesting an appeal from a denial of the religious accommodation request to the Coast Guard's COVID-19 vaccine mandate. The outline also provides generalized responses that can be used by reviewers in support of an appeal decision. The responses are not fully comprehensive and are not a substitute for legal review and coordination of briefing documents provided to religious accommodation request appeal authorities. The outline is intended to supplement and not replace previously provided references.

2. Outline.
   2.a. **Compelling government interest**.
       2.a.(1)  <u>The Coast Guard did not provide an individualized assessment of the Member's request</u>. At least five members of the Coast Guard, including the initial decision maker reviewed the member's request for religious accommodation. As part of this review, these members assessed the member's request, correspondence from the command, the recommendation from the chaplain, and associated medical documents. CG-133's Decision Memorandum also includes discussion analysis individualized to that member's particular assignment.
       2.a.(2)  <u>Operated without issues during the pandemic</u>. Although the Coast Guard was able to operate during the pandemic and before the release of the vaccine, it did so at risk. The dynamic nature of the pandemic, however, means that whatever success the Coast Guard enjoyed in this is not guaranteed as the pandemic continues. COVID-19 infections degraded Coast Guard operations. Stations, boarding teams, cutters, and aircrews were unable to execute Coast Guard missions because they were sick. Coast Guard cutters experienced significant delays at sea, including Panama Canal transits, which meant that the Coast Guard did not operate at its full capacity. Coast Guard marine inspectors fell behind in pace, and were unable to adequately conduct inspections virtually, which increased risk to an already strained maritime transportation system. The National Maritime Center and Vessel Documentation Center suffered staffing shortfalls which increased risk of fraud. Missed work by the Coast Guard's cyber-workforce, much of which must be conducted in classified spaces and on classified systems and therefore cannot be accomplished by teleworking, created risk to Coast Guard cyber-security responsibilities. And the Coast Guard experienced maintenance support shortfalls at all levels due to COVID-19 infections, which affected Coast Guard materiel readiness. Further, the Coast Guard's contingency operations did not allow it to accomplish its goal of unit cohesion because our members were required to work in isolation both on site and off. The Coast Guard's interest in unit cohesion continues to require in-person interaction, as a default. Moreover, the Coast Guard benefitted from the global commitment to virus

1

BMCS003

mitigation, like ensuring social distance and masking in public. These broader practices helped contribute to the lower COVID-19 infection numbers. The risk to the health and safety of the Coast Guard workforce is now greater, with new highly transmissible variants (including multiple subvariants of Omicron) and more businesses opening with fewer requirements for masking and social distancing. We cannot predict future variants that may emerge, the rate of transmission, or the severity of symptoms. Finally, emergency operations were just that, emergency. Now that vaccines are available, they provide a more effective way of accomplishing the Coast Guard's compelling interests in a healthy, ready, and unified force.

2.a.(3) <u>Risk of death is minimal. Only .03% death rate in DOD</u>. Although the risk of death is relatively low, any risk is too much when a death is preventable. The COVID-19 vaccine helps prevent serious virus-related outcomes, including death. Moreover, preventing death is not the only government interest the Coast Guard seeks to accomplish via its COVID-19 vaccination mandate. Hospitalization and serious illness, including the long term effects of COVID-19, also have significant impacts on Coast Guard missions. Having a healthy, ready force advances the Coast Guard's interest in mission readiness.

2.a.(4) <u>Breakthrough cases indicate that the vaccine does not accomplish the USCG's interest. CDC memo indicates that the vaccine does not prevent disease</u>. Although the vaccine may not be 100% effective in preventing COVID-19, elimination of the virus is not the Coast Guard's only interest. Those who are vaccinated are less likely to contract COVID-19, but importantly if they do contract the virus, they are more likely to avoid severe symptoms or side effects. Studies have shown vaccinated individuals who become infected are less likely to pass COVID-19 to others because they are contagious for a shorter time period and they have a lower viral load. The fact that vaccinated individuals may have and spread COVID-19 to an unvaccinated person is further reason that the Coast Guard requires all members to vaccinate.

2.a.(5) <u>Vaccinated but unboosted members create similar risk from the Omicron variant</u>. That is a misstatement of the science behind the COVID-19 vaccine. Although members who are not considered "up to date" under CDC guidance because they have not received a booster may have less protection than their boosted counterparts, the initial vaccine regime still provides greater protection against the Omicron variant and leads to less severe illness and fewer instances of hospitalization. A February 2022 CDC study shows that hospitalization rates for unvaccinated were 23 times more likely than those who were boosted but still 5.3 times more likely than those who were vaccinated but not boosted. Also, the incidence rate was 3.6 and 2.0, respectively. (https://www.cdc.gov/mmwr/volumes/71/wr/mm7105e1.htm?s_cid=mm7105e1_w)



**JUDGE ADVOCATE GENERAL**
**OUTLINE: 20 MAY 2022, V. 12**
**COVID-19 VACCINATION MANDATE**
**RELIGIOUS ACCOMMODATION APPEAL**
**FORESEEABLE ARGUMENTS AND GENERAL RESPONSES**



2.a.(6)  ETS case and others indicate that a full mandate is too broad. That case does not reach the Coast Guard. The Coast Guard's vaccination mandate is similar to the nine other vaccine mandates required by the military to ensure that our forces are healthy and ready to respond in service of the nation.

2.a.(7)  Loss of employees does not accomplish goal of readiness. The Coast Guard's goal is to have a fully vaccinated workforce. Good order and discipline, however, are paramount to military readiness. A smaller force of ready and responsive members is better for the Coast Guard's long-term operations. Moreover, a predictable short-term loss of members is more desirable than the unpredictable nature of COVID-19 outbreaks amongst the Coast Guard's units.

2.a.(8)  Other exemptions have been granted for opposition to abortion (*LCDR Healy request for exemption to HepA*). The Coast Guard considers requests for religious accommodation on a case-by-case basis. The COVID-19 pandemic has resulted in unprecedented risks. The Coast Guard weighed those risks when assessing requests for religious accommodation from the COVID-19 vaccine mandate. Specifically with reference to the LCDR Healy case, that was a case from ten years ago by an officer whose individual circumstances are not like any member today (in no small part because there was no HepA global pandemic).

2.a.(9)  Medical exemptions are offered, so religious exemptions should be offered. The standards of review for medical exemption requests and requests for religious accommodation are different and are governed by separate law and policies. If a member believes he or she is entitled to a medical exemption, they may request a medical exemption independent of this request. Most medical exemptions are temporary in nature as opposed to requests for religious accommodation which are permanent, unless the agency reconsiders. Generally, the only permanent medical exemptions granted are for members who had, or will have, a contraindication to the vaccine and who therefore cannot be vaccinated.

2.a.(10)  Minor absences do not impact readiness – similar to pregnancy or other leave. The Coast Guard operates with the understanding that some leave, including medical leave, may occur. The Coast Guard's goal is not to eliminate all leave requests, but is, in part, to avoid preventable negative health effects, particularly highly contagious ones that can result in large numbers of its workforce, at the same time, or while deployed, unable to adequately perform the Coast Guard's vital missions. Taking measures to mitigate preventable absences enables the Coast Guard to better absorb other, less preventable absences.

2.a.(11)  Risk of harm from the vaccine undermines readiness interest. The Coast Guard encourages all employees to review any potential side effects of the vaccine with medical officers. However, research indicates that the risk of harm from taking the

3




vaccine is minimal and manageable. This is in clear contrast to the significant and unpredictable harm that could result from contracting COVID-19 while unvaccinated.

2.a.(12)   Fully vaccinated individuals are more of a safety risk to the Coast Guard because they can spread COVID-19 without knowing due to reduced symptoms. Although vaccinated members can spread the virus to others, they are less likely to become infected which lowers their chance of spreading the virus. Studies have shown vaccinated individuals who become infected are less likely to pass COVID-19 to others because they are contagious for a shorter time period and they have a lower viral load. Unvaccinated members have a higher likelihood of becoming infected and spreading the virus which poses a greater risk to the unit, public, and the Coast Guard's missions. And again, as noted here, unvaccinated members are more likely to have more severe cases, placing them at higher risk of being too sick to execute Coast Guard missions.

2.a.(13)   The Coast Guard has not provided evidence to show the vaccine alone has helped the Coast Guard achieve its compelling government interest. CG-LGL's operational and legal issue memo provides a thorough analysis, supported by CG-1's statistics, showing that full vaccination is the least restrictive means of achieving the Coast Guard's compelling government interest.

2.a.(14)   Member's current assignment requires no interaction with the public. Interactions with the public are not limited to the member's duty hours. Unvaccinated members risk contracting and spreading COVID-19 at a higher rate than vaccinated members when they visit grocery stores, use public transportation, interact with their families, and attend social gatherings. They can then contract the disease and are unable to perform their duties, affecting the mission. Furthermore, the Coast Guard has a compelling government interest in preventing the spread of COVID-19 to members of the public *and* to other members of the Coast Guard. Furthermore, a request for religious accommodation is a request for a permanent exemption from the vaccination requirement, unless the Coast Guard otherwise repeals it, and the member's future Coast Guard assignments may require greater public interaction.

2.a.(15)   Past noncompliance with annual vaccine requirements did not have negative impacts on military readiness. The Coast Guard's enforcement of prior vaccine requirements does not limit the Coast Guard's ability to enforce current or future vaccine requirements. Further, RFRA requires a fact-specific inquiry into the compelling governmental interest and least restrictive means of accomplishing that interest. CG-LGL's operational and legal issue memo provides a thorough analysis, supported by CG-1's statistics, showing that full COVID-19 vaccination is the least restrictive means of achieving the Coast Guard's compelling government interest.

BMCS006



**JUDGE ADVOCATE GENERAL**
**OUTLINE: 20 MAY 2022, V. 12**
**COVID-19 VACCINATION MANDATE**
**RELIGIOUS ACCOMMODATION APPEAL**
**FORESEEABLE ARGUMENTS AND GENERAL RESPONSES**



2.a.(16)   <u>The FAA prohibits pilots from taking medication that has not been FDA approved for one year or longer. Taking the vaccine undercuts the Coast Guard's readiness argument.</u> The FDA has fully approved two COVID-19 vaccines for the prevention of COVID-19 in individuals 18 years of age or older so any FAA policy regarding non-FDA approved medications is irrelevant. Nevertheless, the Coast Guard's mission is separate and unique from the FAA.

2.a.(17)   <u>The Coast Guard's high vaccination rate allows it to achieve herd immunity. One more vaccinated member will not contribute to the Coast Guard's compelling government interest.</u> Coast Guard members generally do not live or work in isolation from the public so the relevant vaccination rate is that of the U.S. population as a whole. That vaccination rate is still too low to achieve herd immunity as evidenced by the extremely high numbers of hospitalizations and deaths caused by the recent Omicron variant. In addition, much of the world has low vaccination rates and Coast Guard members must remain worldwide deployable. The least restrictive means of achieving the Coast Guard's compelling government interest in having a healthy, ready workforce is full vaccination of all of its members. Each member must take all available steps to avoid preventable diseases to ensure the Coast Guard remains ready and responsive.

2.a.(18)   <u>Coast Guard has allowed unvaccinated members to deploy.</u> Although the Coast Guard may have deployed unvaccinated members, the Coast Guard recognized that the vaccine is the least restrictive way of accomplishing the Coast Guard's compelling government interest in a healthy, ready, and cohesive force by releasing a lawful general order in ALCOAST 305/21 R 262212Z AUG 21 and ALCOAST 315/21 R 072247Z SEP 21. A member successfully completing a deployment without issue in the past does not mean remaining unvaccinated does not pose a risk to the next mission. Each member must take all available steps to avoid preventable diseases to ensure the Coast Guard remains ready and responsive.

2.a.(19)   <u>Coast Guard does not require the roughly 21,000 members of the Coast Guard Auxiliary, which is approximately 27 percent of the total workforce to receive the vaccine.</u> This is a misstatement of the current policy for vaccination of Auxiliary members. Auxiliarists are volunteers, are treated as federal employees only under limited circumstances, and are not subject to conditions of federal employment such as a vaccine mandate. The Coast Guard, however, recognizing the compelling government interest in a healthy, ready, and cohesive force has taken steps to ensure Auxiliarists performing in person duties do not pose a risk to the mission, the unit, or the public. In Enclosure 13 of the CGHQ COVID-19 PLANORD, the Chief Director of Auxiliary required that all Auxiliarists become fully vaccinated against COVID-19

5

BMCS007



**JUDGE ADVOCATE GENERAL**
**OUTLINE: 20 MAY 2022, V. 12**
**COVID-19 VACCINATION MANDATE**
**RELIGIOUS ACCOMMODATION APPEAL**
**FORESEEABLE ARGUMENTS AND GENERAL RESPONSES**



prior to volunteering for an assignment to duty that involves in-person interaction with Coast Guard personnel, other government personnel, or members of the public.

2.b. **Less restrictive means**.

    2.b.(1) <u>Natural immunity from previous infections</u>. Per CG-112's Issue Paper, "Although emerging research suggests that prior infection with SARS-CoV-2, the virus that causes COVID-19, may confer adequate immunity for six months or longer, there is also evidence that re-infection risk may increase with time due to waning of this natural immunity. Incomplete or waning immunity has also been observed with other vaccine-preventable infectious diseases, including pertussis (whooping cough), rotavirus, and tetanus, making re-infection possible. Multiple pathogen serotypes (such as are found with influenza, pneumococcus, and possibly SARS-CoV-2 variants) also makes determination of a protective serologic level and timeframe more difficult. Thus, the presence of SARS-CoV-2 antibodies cannot be accepted as proof of immunity, because COVID-19 disease and the post-infection antibody tests have variable performance characteristics, and the serologic correlates of protection have not been established."

    2.b.(2) <u>Healthy lifestyles allow members to avoid COVID-19</u>. Data indicates COVID-19 affects people of every demographic. Healthy lifestyles may provide an additional safeguard against the most serious effects of the virus but are not a replacement for the vaccine.

    2.b.(3) <u>Teleworking</u>. While some duties may be completed remotely for short periods of time, institutionalizing remote completion of ones duties permanently would be detrimental to readiness, good order and discipline, and unit cohesion. Further, it requires that one's in person duties be shifted to another member of the workforce.

    2.b.(4) <u>Member willing to accept risk</u>. A member accepting the risk is not a form of lesser restraint available to accomplish the Coast Guard's goal of maintaining a healthy, ready, and cohesive force because a member's acceptance of health risks does not only affect the member. An individual decision to accept health risk affects the Coast Guard which may lose the member for an extended period of time if he or she contracts COVID-19. A member's decision to accept COVID-19 also affects their shipmates and the public who may contract the virus from them.

    2.b.(5) <u>Continue working with existing pandemic mitigation measures</u>. The pandemic restrictions are not a tenable long-term solution. The existing pandemic mitigation measures are not as effective as the vaccine in stopping the spread of the virus. Further, if one of the mitigation measures involves teleworking or social distancing, see b(3) above and b(6) below.

BMCS008




**JUDGE ADVOCATE GENERAL**
**OUTLINE: 20 MAY 2022, V. 12**
**COVID-19 VACCINATION MANDATE**
**RELIGIOUS ACCOMMODATION APPEAL**
**FORESEEABLE ARGUMENTS AND GENERAL RESPONSES**

2.b.(6) <u>Office environment permits social distancing</u>. The pandemic restrictions are not a tenable long-term solution. While social distancing greatly assists in stopping the spread of COVID-19, it does not eliminate it. Further, social distancing cannot be maintained in all circumstances even if one's office or cubicle is a social distance from others. Members entering and exiting the facilities, transiting the hallways, using dining, medical, and physical fitness facilities, and engaging in in-person meetings all increase the risk of a person not maintaining a social distancing and spreading the virus. Furthermore, a request for religious accommodation is a request for permanent exemption from the vaccination requirement unless otherwise repealed by the Coast Guard, and the member's future Coast Guard assignments may not include an office environment that permits social distancing.

2.b.(7) <u>Treatment can prevent serious outcomes from the virus</u>. Treating the virus does not accomplish the Coast Guard's goal of limiting the spread of COVID-19 because a member would necessarily have to contract it in the first place. Further, even minor treatment costs far exceed the cost of vaccination, and would likely place the member in an SIQ status where they are not able to perform their duties. Treatments are also not available everywhere, *e.g.*, aboard Coast Guard cutters on extended patrols.

2.b.(8) <u>Reassignment</u>. Reassigning members is not a viable alternative. Members are expected to play a vital role in the Coast Guard even if they are not assigned to an operational unit. Each Coast Guard member must be ready to respond to the greatest extent possible, and perform operational duties, with limited notice. If a member is unvaccinated, they unnecessarily put themselves at risk of being unable to serve. Further, the Coast Guard's assignment process does not take place in a vacuum. There are downstream effects with every assignment decision that affects other personnel and units and it is overly administratively burdensome to allow re-assignment as an alternative to vaccination, as well as puts a significant financial cost on the government to do so. In addition, even if a member could be reassigned to a job that permitted other mitigating measures, that member must be replaced by another member, forcing the second member to bear the fiscal and social costs associated with transferring in addition to the likely burden of a job assignment with a higher operational tempo including deployments. This burden shifting is unfair to other members and lowers moral and unit cohesion.

2.b.(9) <u>If testing is insufficient and inaccurate, why does CG medical still use it</u>? Rapid testing is helpful in identifying those who have been infected, and then somewhat helpful in mitigating the risk of exposing others, but does very little to prevent the spread of COVID-19. More important, testing provides no protection to prevent an unvaccinated member from becoming infected, and is therefore insufficient to replace

7

BMCS009



**JUDGE ADVOCATE GENERAL**
**OUTLINE: 20 MAY 2022, V. 12**
**COVID-19 VACCINATION MANDATE**
**RELIGIOUS ACCOMMODATION APPEAL**
**FORESEEABLE ARGUMENTS AND GENERAL RESPONSES**



the protections provided by vaccination, necessary to further the Coast Guard's substantial government interest of a safe, healthy, and ready workforce.

2.b.(10)  <u>CG-133 did not use the most current scientific data when determining the least restrictive means to accomplish the governments compelling interest.</u> CG-112 continuously provided the most up-to-date medical information regarding COVID-19 to inform the religious accommodation process. Pursuant to CG-112's advice, full vaccination of members remains the least restrictive means to accomplish the Coast Guard's compelling interests in a healthy, ready, and unified force.

2.b.(11)  <u>The CO/OIC endorsement states the unit can accommodate the Religious Accommodation request.</u> CG-133 is the decision authority for Religious Accommodation requests pertaining to immunizations. The decision authority for these requests rests with CG-133 because unit COs/OICs do not have the perspective necessary to ensure a religious accommodation determination best serves the Coast Guard's compelling government interests at large, as they generally only have visibility on how those decisions affect their individual unit. For example, the ability to surge staff members and the Coast Guard's assignment process do not take place in a vacuum, and COs/OICs generally do not have to consider how a member's vaccination status would impact the member's ability to answer a surge staffing demand. There are also downstream effects with every assignment decision that affects other personnel and units, which the CO/OIC does not have knowledge of and therefore cannot take into consideration. Ultimately, the CO's/OICs endorsement is a factor for CG-133 to consider in making the decision, but the endorsement, by itself, is not determinative. If it were, then COs/OICs would be the approval authority for religious accommodation requests to immunization requirements.

2.b.(12)  <u>Early retirement is far less restrictive than mandating the vaccine against religious convictions or administratively separating a member.</u> A member retiring early is not a form of lesser restraint available to accomplish the Coast Guard's compelling interest of maintaining a healthy, ready, and cohesive force. Also, the Coast Guard may only use the statutory authority for early retirement (Temporary Early Retirement Authority (TERA)) as "a temporary additional force management tool with which to effect the drawdown of military forces during the active force drawdown period." 10 U.S.C. § 1293 note. The Coast Guard is not authorized to grant early retirements for any other purpose.

2.b.(13)  <u>CDC's Morbidity and Mortality Weekly Report dated 28 January 2022 on their website indicates people with previous COVID-19 infection have lower case rates than people who were vaccinated alone.</u> Pursuant to CG-112's advice, this CDC report has limited applicability in the current COVID-19 landscape because it predates the Omicron variant. There remains no basis in CDC or DoD policy, or

BMCS010





vaccine science, for accepting prior COVID-19 infection as equivalent to immunization. Until an accepted laboratory standard for prior immunity exists, vaccination remains the most controlled, safest, and most systematic way to protect individuals and the Coast Guard's overall force. Full vaccination of members remains the least restrictive means to accomplish the Coast Guard's compelling interests in a healthy, ready, and unified force.

2.b.(14)  Reservists have time between drills to test. Pursuant to 14 U.S.C. § 3713, the Coast Guard Reserve provides operationally capable and ready personnel to support surge and mobilization requirements in the Homeland and abroad. In the case of natural or man-made disasters, Reservists may be given notification of mobilization with as little as 48 hours; therefore, they must be ready at all times and would not have sufficient time to become fully vaccinated per ALCOAST 305/21 R 262212Z AUG 21 and ALCOAST 315/21 R 072247Z SEP 21.

2.b.(15)  Placing members in a non-deployable status is far less restrictive and is what the Coast Guard does for members found to have HIV. This is a misstatement of Coast Guard policy pertaining to HIV-antibody positive members found in Coast Guard Human Immunodeficiency Virus (HIV) Program, COMDTINST M6230.9 (series). The Coast Guard does not place long-term deployment restrictions on HIV-antibody positive members. Furthermore, placing members in a non-deployable status is not a form of lesser restraint available to accomplish the Coast Guard's compelling interest of maintaining a healthy, ready, and cohesive force. Members are expected to play a vital role in the Coast Guard. Each Coast Guard member must be ready to respond to the greatest extent possible, and perform operational duties, with limited notice. If a member is unvaccinated, they unnecessarily put themselves at risk of being unable to serve.

2.b.(16)  Temporary separation is far less restrictive than mandating the vaccine against religious convictions or involuntarily separating a member. A member temporarily separating is not a form of lesser restraint available to accomplish the Coast Guard's compelling interest of maintaining a healthy, ready, and cohesive force. Allowing a member to temporarily leave the service affects readiness as the departing member takes with them the skills and training they have acquired, and requires the service to shift resources to fill critical gaps. The separation is also unlikely to be temporary as there is no reason to believe that the COVID-19 vaccine will not be required in the future. What would be billed as a temporary separation would likely become permanent. Further, this argument presumes that all members who refuse the order to be vaccinated will be separated. While involuntary separation is a potential future consequence of a member not following a lawful order, this outcome is not certain. The Coast Guard must balance the need for good order and discipline with mission

9




**JUDGE ADVOCATE GENERAL**
**OUTLINE: 20 MAY 2022, V. 12**
**COVID-19 VACCINATION MANDATE**
**RELIGIOUS ACCOMMODATION APPEAL**
**FORESEEABLE ARGUMENTS AND GENERAL RESPONSES**

execution, and may choose to retain members who have violated the order to be vaccinated if doing so is necessary to achieve the Coast Guard's compelling interest in carrying out its missions. Even though the Coast Guard has taken action to separate some members for refusing to be vaccinated, there is a distinction between a member who is asking to voluntarily separate from the service and one who is involuntarily separated for misconduct. A member who is seeking to TEMPSEP as a form of lesser restraint to taking the vaccine has not refused to obey an order and otherwise remains in good standing in the service. The interest to the Service in retaining that member is much stronger than retaining a member who has been repeatedly ordered to get the vaccine and who continues to refuse, thereby impacting good order and discipline and eroding unit readiness.

2.c. **Other**.

    2.c.(1) <u>Injunction was issued in Navy Seal Case</u>. The Coast Guard is aware that a preliminary injunction was issued in the case of U.S. Navy Seals v. Biden, Civil Action No 4:21-cv-01236-O, in the Northern District of Texas, Fort Worth Division. In reading the analysis as to why the judge issued the preliminary injunction (which itself is not a final decision on the merits), the Coast Guard operates its RA process much differently than what is alleged by the plaintiffs in that case, such that the alleged Navy process and Coast Guard process are not analogous. On March 28, 2022, U.S. District Court Judge Reed O'Connor certified all sailors who have submitted a religious accommodation request as a class and extended the preliminary injunction to cover the approximately 4,000 service members who have submitted a religious accommodation request, all of whom were members of the United States Navy. Furthermore, the U.S. Supreme Court in a 6-3 decision partially lifted the injunction, which before being lifted precluded the Navy from considering vaccination status in making deployment, assignment, and other operational decisions.

    2.c.(2) <u>Coast Guard cannot mandate Pfizer-BioNtech, only Comirnaty</u>. The FDA guidance notes that Pfizer-BioNtech COVID-19 vaccine and Pfizer's name-branded Comirnaty are identically formulated and are interchangeable for the purpose of vaccine administration. Further, the member cannot articulate a religious objection to Pfizer-BioNtech and not Comirnaty, as they were both made and tested using the same process and are an identical formula.

    2.c.(3) <u>Servicing Legal Office and Civil Rights were not consulted</u>. The "unit" who is acting on the request is CG-133. They have consulted extensively with CG-LGL, their servicing legal office, regarding all requests. CG-1 has also engaged with Civil Rights Directorate (CG-00H) regarding the process and EO requests that may result.

10

BMCS012





2.c.(4) <u>Coast Guard considered expanded Chaplain comments.</u> Not error for the CG to consider and comment on matters that the member raised with the chaplain. Even if the CG did not consider the member's own words to the chaplains, no relief is warranted as the Coast Guard's response to the original request would have still been a denial because of the compelling interest and absence of less restrictive means to achieve it.

2.c.(5) <u>Coast Guard policies like limiting training for unvaccinated members are discriminatory.</u> Not relevant to the adjudication of the RA request. Even if it were error, which the CG does not concede, it would have no bearing on the outcome of the RA request.

2.c.(6) <u>Coast Guard did not follow the Religious Freedom Restoration Act.</u> The Coast Guard followed the appropriate steps for reviewing each religious accommodation request under the Religious Freedom Restoration Act (RFRA). CG-LGL's operational and legal issues memo addresses the appropriate RFRA standards, which were used when reviewing military members' religious accommodation requests.

2.c.(7) <u>Military is being held to a higher standard than civilian employees.</u> RFRA requires an individualized assessment of the specific governmental interest and a determination as to whether lesser forms of restraint are available. The governmental interests of a military service capable of worldwide deployability, good order and discipline, and the health and safety of personnel who live and work together in proximate conditions are far different considerations than the needs of civilian government personnel working within a controlled office building or teleworking. It is entirely consistent that one situation may allow lesser restraints that are inappropriate for the other.

2.c.(8) <u>Coast Guard and applicable DoD policies do not include the COVID-19 vaccine as a required immunization for readiness.</u> The military has a compelling government interest to ensure military readiness during the global pandemic and issued a general order for all military members to become fully vaccinated. The Coast Guard released ALCOAST 305/21 R 262212Z AUG 21 and ALCOAST 315/21 R 072247Z SEP 21, which mandates the COVID-19 vaccine for all Coast Guard military members and provided guidance that the Coast Guard will use existing policies and procedures to manage COVID-19 vaccination.

2.c.(9) <u>Member's description of duties were improperly characterized in the initial decision memo.</u> Relief is not warranted, even after consideration of the updated facts provided by the member in the appeal, because the member's updated duty description still demonstrates that they are a risk to their shipmates and the public because of their unvaccinated status.

BMCS013




**JUDGE ADVOCATE GENERAL**
**OUTLINE: 20 MAY 2022, V. 12**
**COVID-19 VACCINATION MANDATE**
**RELIGIOUS ACCOMMODATION APPEAL**
**FORESEEABLE ARGUMENTS AND GENERAL RESPONSES**

2.c.(10)  <u>The vaccine mandate violates federal law, which prohibits a person from being a test subject for research without their informed consent</u>. The FDA fully approved the Pfizer-BioNtech COVID-19 vaccine. The vaccine mandate is not subjecting Coast Guard members to an experimental drug and does not violate federal law. In addition, informed consent merely requires that members be provided with information about the vaccine, its purpose, and potential side effects before the vaccine is administered and members do receive this information.

2.c.(11)  <u>Reserve member ineligible for ADOS/EAD due to Time in Service policy</u>. Coast Guard policy generally disfavors activating a Reserve member who has accumulated almost enough active duty time to qualify for an active duty retirement. However, that policy can and has been waived when the needs of the service require that the member be activated to fill a certain position. The fact that a member has been denied an EAD or ADOS opportunity in the past due to time-in-service does not foreclose the Coast Guard from activating him/her in the future, and the Coast Guard's compelling government interest in a ready Reserve workforce requires all Reserve members to be eligible for surge staffing if the situation presents itself.

2.c.(12)  <u>Initial Adjudication Authority was not authorized to act by CG policy</u>. CG-1 is responsible for both promulgating Coast Guard policy on military religious accommodation, as was done through issuance of Military Religious Accommodations, CI 1000.15, and execution of the policy. CG-1 may choose to delegate certain authorities within CI 1000.15 to ensure the timely execution of the Coast Guard's responsibilities, unless that delegation would be contrary to law or a Coast Guard policy of a higher precedent. CG-1 has delegated the authority to act for CG-133 to certain military officers. This delegation is not a violation of law or CG policy.

2.c.(13)  <u>The influenza vaccine is not effective at preventing influenza</u>. Although the vaccine may not be 100% effective in preventing influenza, elimination of the virus is not the Coast Guard's only interest. Those who are vaccinated are less likely to contract influenza, but importantly if they do contract the virus, they are more likely to avoid severe symptoms or side effects. Studies have shown vaccinated individuals who become infected are less likely to pass influenza to others because they are contagious for a shorter time period and they have a lower viral load. The fact that vaccinated individuals may have and spread influenza to an unvaccinated person is further reason that the Coast Guard requires all members to vaccinate. Vaccination, even where it is not 100% effective, mitigates the risk to individual medical readiness, which can adversely affect unit readiness, which in turn can adversely affect Service readiness.

BMCS014



**JUDGE ADVOCATE GENERAL**
**OUTLINE: 20 MAY 2022, V. 12**
**COVID-19 VACCINATION MANDATE**
**RELIGIOUS ACCOMMODATION APPEAL**
**FORESEEABLE ARGUMENTS AND GENERAL RESPONSES**



2.c.(14)   Major General Jeff Taliaferro, United States Air Force, Vice Director of Operations for the Joint Staff was asked by Congress "Are unvaccinated members deployable" and he answered "yes." Therefore, the reason you provided to deny my religious accommodation request is in error. Major General Taliaferro provided testimony to Congress in his role as Vice Director of Operations for the Joint Staff. While the Coast Guard is a member of the joint force and a military service, it resides in in the Department of Homeland Security, and thus Major General's Taliaferro's assertions don't necessarily reach the Coast Guard. Further, the Coast Guard has different mission requirements and operational needs, in addition to those of the DoD services, because the Coast Guard does not maintain forces in garrison; advances critical homeland security, safety, and national defense equities, both here in the United States and around the world; and has increasingly active domestic emergency and disaster contingency response responsibilities.

2.c.(15)   Coast Guard did not properly follow its policy in the Military Religious Accommodations, COMDTINST 1000.15 (series). The Coast Guard properly followed the process set forth in the Military Religious Accommodations, COMDTINST 1000.15 (series).

2.d. **General response**. As indicated in CG-133's Decision Memorandum to the member, the Coast Guard has a compelling government interest in a healthy, ready, and cohesive force. The least restrictive way of accomplishing that during the ongoing COVID-19 pandemic is to have all members vaccinated against COVID-19. Accordingly, the Coast Guard properly denied the request for a religious accommodation to the COVID-19 vaccination mandate and did not commit any errors in considering the request.

3.   This document may be updated periodically as the Coast Guard continues adjudicating member requests for religious accommodation from the Coast Guard's COVID-19 vaccine mandate.

#

BMCS015

Executive Summary

████████████, BMCS, Maritime Security Squadron Ten

Date RA Filed: 26 Oct 2021
Date of Initial Denial: 13 Feb 2022
Date member notified of denial: 15 Feb 2022
10th business day after notification of denial: 03 Mar 2022
Date Appeal Filed: 01 Mar 2022
TIMELY SUBMISSION

Summary of Arguments on Appeal. This summary is intended to aid adjudicators in reviewing appeals of religious accommodation request denials to the Coast Guard's COVID-19 vaccine mandate. Adjudicators should still conduct an independent review of the appeals package, and consult with counsel, as necessary, before rendering a decision on the appeal request.

- Member states that the decision to deny their request was made broadly and with an incomplete analysis of the tenets of the request which violates RFRA. (pg. 1, ¶1; pg. 2, ¶2.c)
  - ¶2.c.(6): The Coast Guard followed the appropriate steps for reviewing each religious accommodation request under the Religious Freedom Restoration Act (RFRA). CG-LGL's operational and legal issues memo addresses the appropriate RFRA standards, which were used when reviewing military members' religious accommodation requests.
- Member states the timeframe with which their request was responded to and the incomplete analysis was not in keeping with policy or good faith. (pg. 2, ¶2.c)
  - ¶2.c.(15): The Coast Guard properly followed the process set forth in the Military Religious Accommodations, COMDTINST 1000.15 (series).
- Member states the Adjudication Authority did not apply the government's compelling interest specifically to their circumstances. (pg. 2, ¶3.c)
  - ¶2.a.(1): At least five members of the Coast Guard, including the initial decision maker reviewed the member's request for religious accommodation. As part of this review, these members assessed the member's request, correspondence from the command, the recommendation from the chaplain, and associated medical documents. CG-133's Decision Memorandum also includes discussion analysis individualized to that member's particular assignment.
- Member states that they and DoD communities continued to operate throughout the pandemic using pre-existing COVID mitigation strategies. (pg. 2, ¶3.c; pg. 4, ¶4.c.2)
  - ¶2.a.(2): Although the Coast Guard was able to operate during the pandemic and before the release of the vaccine, it did so at risk. The dynamic nature of the pandemic, however, means that whatever success the Coast Guard enjoyed in this is not guaranteed as the pandemic continues. COVID-19 infections degraded Coast Guard operations. Stations, cutters, boarding teams, and aircrews were unable to execute Coast Guard missions because they were sick. Coast Guard cutters experienced significant delays at sea, including Panama Canal transits, which meant that the Coast Guard did not operate at its full capacity. Coast Guard marine inspectors fell behind in pace, and were unable to adequately conduct

BMCS016

inspections virtually, which increased risk to an already strained maritime transportation system. The National Maritime Center and Vessel Documentation Center suffered staffing shortfalls which increased risk of fraud. Missed work by the Coast Guard's cyber-workforce, much of which must be conducted in classified spaces and on classified systems and therefore cannot be accomplished by teleworking, created risk to Coast Guard cyber-security responsibilities. And Coast Guard experienced maintenance support shortfalls at all levels due to COVID-19 infections, which affected Coast Guard materiel readiness. Further, the Coast Guard's contingency operations did not allow it to accomplish its goal of unit cohesion because our members were required to work in isolation both on site and off. The Coast Guard's interest in unit cohesion continues to require in-person interaction, as a default. Moreover, the Coast Guard benefitted from the global commitment to virus mitigation, like ensuring social distance and masking in public. These broader practices helped contribute to the lower COVID-19 infection numbers. The risk to the health and safety of the Coast Guard workforce is now greater, with the highly transmissible Omicron variant and more businesses opening with fewer requirements for masking and social distancing. We cannot predict future variants that may emerge that may pose similar challenges. Finally, emergency operations were just that, emergency. Now that vaccines are available, they provide a more effective way of accomplishing the Coast Guard's compelling interests in a healthy, ready, and unified force.

- Member states the frequency of breakthrough cases negates the Coast Guard's claim of no lesser restrictive means. (pg. 2–3, ¶3.c.2; pg. 5¶ 2)
    - o ¶2.a.(4): Although the vaccine may not be 100% effective in preventing COVID-19, elimination of the virus is not the Coast Guard's only interest. Those who are vaccinated are less likely to contract COVID-19, but importantly if they do contract the virus, they are more likely to avoid severe symptoms or side effects. Studies have shown vaccinated individuals who become infected are less likely to pass COVID-19 to others because they are contagious for a shorter time period and they have a lower viral load. The fact that vaccinated individuals may have and spread COVID-19 to an unvaccinated person is further reason that the Coast Guard requires all members to vaccinate.

- Member states the effectiveness of natural immunity outweighs the necessity of a vaccine mandate for those with previous infections. (pg. 2–3, ¶3.c.2–3)
    - o ¶2.b.(1): Per CG-112's Issue Paper, "Although emerging research suggests that prior infection with SARS-CoV-2, the virus that causes COVID-19, may confer adequate immunity for six months or longer, there is also evidence that re-infection risk may increase with time due to waning of this natural immunity. Incomplete or waning immunity has also been observed with other vaccine-preventable infectious diseases, including pertussis (whooping cough), rotavirus, and tetanus, making re-infection possible. Multiple pathogen serotypes (such as are found with influenza, pneumococcus, and possibly SARS-CoV-2 variants) also makes determination of a protective serologic level and timeframe more difficult. Thus, the presence of SARS-CoV-2 antibodies cannot be accepted as proof of immunity, because COVID-19 disease and the post-infection antibody

tests have variable performance characteristics, and the serologic correlates of protection have not been established."

- Member states that medical and administrative exemptions are being granted, so their religious exemption request should be given the same consideration. (pg. 3, ¶3.c.iii)
  - ○ ¶2.a.(9): The standards of review for medical exemption requests and requests for religious accommodation are different and are governed by separate law and policies. If a member believes he or she is entitled to a medical exemption, they may request a medical exemption independent of this request. Most medical exemptions are temporary in nature as opposed to requests for religious accommodation which are permanent, unless the agency reconsiders. Generally, the only permanent medical exemptions granted are for members who had, or will have, a contraindication to the vaccine and who therefore cannot be vaccinated.
- Member states the mitigation measures implemented during the pandemic should remain effective as the country shifts to an endemic phase. (pg. 4, ¶4.c.2)
  - ○ ¶2.b.(5): The pandemic restrictions are not a tenable long-term solution. The existing pandemic mitigation measures are not as effective as the vaccine in stopping the spread of the virus.

Date of CG-LGL Review: 30 Mar 2022

CG-LGL Recommendation:
Recommend you deny the appeal because the member has failed to demonstrate that there was a specific basis on which the initial denial was in error. Based on this member's circumstances and the operational needs of the Coast Guard, there remain no less restrictive means for the government to achieve its compelling interest.

Name of Appeal Authority: E. C. Jones, RADM

I have reviewed the member's appeal submission and will execute the following:

JONES.ERIC.C.1177   Digitally signed by
712120              JONES.ERIC.C.1177712120
                    Date: 2022.05.30 14:32:54 -04'00'                    30 May 2022
Deny Appeal                                                              Date

_____                    _____
Grant Appeal                                        Date

_____                    _____
Further Discussion                                  Date

Executive Summary

███████████, BMCS, Maritime Security Squadron Ten

Date RA Filed: 26 Oct 2021
Date of Initial Denial: 13 Feb 2022
Date member notified of denial: 15 Feb 2022
10th business day after notification of denial: 03 Mar 2022
Date Appeal Filed: 01 Mar 2022
TIMELY SUBMISSION

Summary of Arguments on Appeal. This summary is intended to aid adjudicators in reviewing appeals of religious accommodation request denials to the Coast Guard's COVID-19 vaccine mandate. Adjudicators should still conduct an independent review of the appeals package, and consult with counsel, as necessary, before rendering a decision on the appeal request.

- Member states that the decision to deny their request was made broadly and with an incomplete analysis of the tenets of the request which violates RFRA. (pg. 1, ¶1; pg. 2, ¶2.c)
  - ¶2.c.(6): The Coast Guard followed the appropriate steps for reviewing each religious accommodation request under the Religious Freedom Restoration Act (RFRA). CG-LGL's operational and legal issues memo addresses the appropriate RFRA standards, which were used when reviewing military members' religious accommodation requests.
- Member states the timeframe with which their request was responded to and the incomplete analysis was not in keeping with policy or good faith. (pg. 2, ¶2.c)
  - ¶2.c.(15): The Coast Guard properly followed the process set forth in the Military Religious Accommodations, COMDTINST 1000.15 (series).
- Member states the Adjudication Authority did not apply the government's compelling interest specifically to their circumstances. (pg. 2, ¶3.c)
  - ¶2.a.(1): At least five members of the Coast Guard, including the initial decision maker reviewed the member's request for religious accommodation. As part of this review, these members assessed the member's request, correspondence from the command, the recommendation from the chaplain, and associated medical documents. CG-133's Decision Memorandum also includes discussion analysis individualized to that member's particular assignment.
- Member states that they and DoD communities continued to operate throughout the pandemic using pre-existing COVID mitigation strategies. (pg. 2, ¶3.c; pg. 4, ¶4.c.2)
  - ¶2.a.(2): Although the Coast Guard was able to operate during the pandemic and before the release of the vaccine, it did so at risk. The dynamic nature of the pandemic, however, means that whatever success the Coast Guard enjoyed in this is not guaranteed as the pandemic continues. COVID-19 infections degraded Coast Guard operations. Stations, cutters, boarding teams, and aircrews were unable to execute Coast Guard missions because they were sick. Coast Guard cutters experienced significant delays at sea, including Panama Canal transits, which meant that the Coast Guard did not operate at its full capacity. Coast Guard marine inspectors fell behind in pace, and were unable to adequately conduct

inspections virtually, which increased risk to an already strained maritime transportation system. The National Maritime Center and Vessel Documentation Center suffered staffing shortfalls which increased risk of fraud. Missed work by the Coast Guard's cyber-workforce, much of which must be conducted in classified spaces and on classified systems and therefore cannot be accomplished by teleworking, created risk to Coast Guard cyber-security responsibilities. And Coast Guard experienced maintenance support shortfalls at all levels due to COVID-19 infections, which affected Coast Guard materiel readiness. Further, the Coast Guard's contingency operations did not allow it to accomplish its goal of unit cohesion because our members were required to work in isolation both on site and off. The Coast Guard's interest in unit cohesion continues to require in-person interaction, as a default. Moreover, the Coast Guard benefitted from the global commitment to virus mitigation, like ensuring social distance and masking in public. These broader practices helped contribute to the lower COVID-19 infection numbers. The risk to the health and safety of the Coast Guard workforce is now greater, with the highly transmissible Omicron variant and more businesses opening with fewer requirements for masking and social distancing. We cannot predict future variants that may emerge that may pose similar challenges. Finally, emergency operations were just that, emergency. Now that vaccines are available, they provide a more effective way of accomplishing the Coast Guard's compelling interests in a healthy, ready, and unified force.

- Member states the frequency of breakthrough cases negates the Coast Guard's claim of no lesser restrictive means. (pg. 2–3, ¶3.c.2; pg. 5¶ 2)
  - ¶2.a.(4): Although the vaccine may not be 100% effective in preventing COVID-19, elimination of the virus is not the Coast Guard's only interest. Those who are vaccinated are less likely to contract COVID-19, but importantly if they do contract the virus, they are more likely to avoid severe symptoms or side effects. Studies have shown vaccinated individuals who become infected are less likely to pass COVID-19 to others because they are contagious for a shorter time period and they have a lower viral load. The fact that vaccinated individuals may have and spread COVID-19 to an unvaccinated person is further reason that the Coast Guard requires all members to vaccinate.
- Member states the effectiveness of natural immunity outweighs the necessity of a vaccine mandate for those with previous infections. (pg. 2–3, ¶3.c.2–3)
  - ¶2.b.(1): Per CG-112's Issue Paper, "Although emerging research suggests that prior infection with SARS-CoV-2, the virus that causes COVID-19, may confer adequate immunity for six months or longer, there is also evidence that re-infection risk may increase with time due to waning of this natural immunity. Incomplete or waning immunity has also been observed with other vaccine-preventable infectious diseases, including pertussis (whooping cough), rotavirus, and tetanus, making re-infection possible. Multiple pathogen serotypes (such as are found with influenza, pneumococcus, and possibly SARS-CoV-2 variants) also makes determination of a protective serologic level and timeframe more difficult. Thus, the presence of SARS-CoV-2 antibodies cannot be accepted as proof of immunity, because COVID-19 disease and the post-infection antibody

BMCS021

tests have variable performance characteristics, and the serologic correlates of protection have not been established."

- Member states that medical and administrative exemptions are being granted, so their religious exemption request should be given the same consideration. (pg. 3, ¶3.c.iii)
  - ¶2.a.(9): The standards of review for medical exemption requests and requests for religious accommodation are different and are governed by separate law and policies. If a member believes he or she is entitled to a medical exemption, they may request a medical exemption independent of this request. Most medical exemptions are temporary in nature as opposed to requests for religious accommodation which are permanent, unless the agency reconsiders. Generally, the only permanent medical exemptions granted are for members who had, or will have, a contraindication to the vaccine and who therefore cannot be vaccinated.

- Member states the mitigation measures implemented during the pandemic should remain effective as the country shifts to an endemic phase. (pg. 4, ¶4.c.2)
  - ¶2.b.(5): The pandemic restrictions are not a tenable long-term solution. The existing pandemic mitigation measures are not as effective as the vaccine in stopping the spread of the virus.

BMCS022

Date of CG-LGL Review: 30 Mar 2022

CG-LGL Recommendation:
Recommend you deny the appeal because the member has failed to demonstrate that there was a specific basis on which the initial denial was in error. Based on this member's circumstances and the operational needs of the Coast Guard, there remain no less restrictive means for the government to achieve its compelling interest.

Name of Appeal Authority: E. C. Jones, RADM

I have reviewed the member's appeal submission and will execute the following:

_____          __30 May 2022_____
Deny Appeal                                                      Date


_____          _____
Grant Appeal                                                    Date


_____          _____
Further Discussion                                          Date

BMCS023

6230
05 Apr 2022

FIRST ENDORSEMENT on BMCS ███████████'s memo 1000 of 28 Feb 2022

From:  M. R. Roschel, CAPT
       Adjudication Authority

To:    E. C. Jones, RADM
       Appellate Authority

Subj:  APPEAL OF DECISION ON RELIGIOUS ACCOMMODATION REQUEST

1.    I have reviewed the member's request for appeal and recommend you deny it because my
denial was not in error.

                                        #



**U.S. Department of Homeland Security**

**United States Coast Guard**

NAVY MSRON-10
United States Coast Guard

Naval Air Station Jacksonville
Building Number 938
Jacksonville, FL 32212
Phone: (904) 542-3807
Email:

1000
28 Feb 2022

# MEMORANDUM

From:

To:     COMDT (CG-1)

Thru:   D. J. Donovan, CDR, USCG
        MSRON-10

Subj:   APPEAL OF DECISION ON RELIGIOUS ACCOMMODATION REQUEST

Ref:        (a) CAPT Roschel Memo 6230 (undated)
            (b) 42 U.S.C. 2000bb, Religious Freedom Restoration Act 1993 (RFRA)
            (c) Military Religious Accommodations, COMDTINST M1000.15(series)
            (d) *Singh v. McHugh*, 109 F. Supp. 3d 72 (D.C. Cir. 2015)
            (e) My Memo 6320 of 26 Oct 2021
            (f) Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases,
                COMDTINST M6230.4 (series)

1. I respectfully request that you reconsider and GRANT my request for a religious accommodation because the adjudication authority's decision in reference (a) failed to follow the analytical framework required by references (b)-(d) because it was incomplete, overly broad, and was comprised of conclusory and unsupported statements that did not consider less restrictive means within the specific nature of my assignment.[1]

2. **Sincerely Held Religious Belief:**

   a. *Responsive Statement*: CAPT Roschel stated that he did not question the sincerity of my religious beliefs but failed to state whether he found my beliefs sincere. He also "reserved the right," on behalf of the Coast Guard, to make the determination later.

   b. *Relevant Law*: Courts have consistently construed my right to belief as sacrosanct and presumptively legitimate. I outlined my faith tradition thoroughly and completely in reference (e) and am confident that it meets the low threshold for sincerity. I am unclear for what occasion the Coast Guard may need to revisit this issue, however, I consider the statements of the adjudicative authority to be a concession regarding the legitimacy of my beliefs because had my belief been deemed insincere, he would not have needed to go to

---

[1] I was not provided any endorsements or commentary provided by my chain of command that may have been considered by the Adjudication Authority, which significantly hampered my ability to craft a responsive appeal. I hereby specifically request copies of all records pertaining to my case, created at any level of the adjudications process, to which I am entitled under the Freedom of Information Act and the Privacy Act. Please consider this a request for those records in addition to a request for reconsideration of my denial.

the next step in the framework.  Because he completed the rest of the framework, he had to have found my beliefs to be sincere.

c.  *Objection*:  The Coast Guard's failure to complete the analytical framework and reserving determinations for some unspecified time appear to demonstrate bad faith and mysterious purpose.  I have been honest and forthright with the Coast Guard regarding my beliefs from the beginning.  I provided a thorough detailing of my faith *as I was asked to do*.  I met with Chaplains, I presented evidence.  For the Coast Guard to refuse to decide what is required under the statute is disappointing.  It is difficult to imagine how CAPT Roschel could properly *balance* the sincerity of my belief against the Coast Guard's compelling interest while only analyzing one side of the scale.  His refusal to properly complete the analysis demonstrates that his consideration was disingenuous and his decision predetermined. Because the adjudicative authority abdicated his responsibility and failed to decide as required by the framework, the appellate authority should consider my request *de novo* and GRANT my request for an accommodation.

3.  **Compelling Government Interest**:

a.  *Responsive Statement*:  CAPT Roschel said that the Coast Guard's compelling interest is in "mission accomplishment, military readiness, unit cohesion, good order and discipline, my health and safety, the health and safety of members assigned to my unit, the health and safety of Members within the Coast Guard (not in my unit), and the public with whom the Coast Guard regularly interacts.  He then restated themes of readiness, military readiness, and broadly asserted that I also place at risk members of my unit and the public.

b.  *Relevant Law*: RFRA claims must be considered on an individual basis. *Singh v. McHugh*, 109 F. Supp. 3d 72, 88 (D.C. Dist. Ct. 2015)  The Supreme Court emphasized that the statute "requires the Government to demonstrate that compelling interest test is satisfied through application of the challenged law to the person – the particular claimant whose sincere exercise of religion is being substantially burdened" *Burwell v. Hobby Lobby Stores*, 134 S. Ct. at 2779, *quoting Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 430-31 (2006).

c.  *Objection*: CAPT Roschel failed to meet the requirements set forth by the Supreme Court when he did not apply the compelling interest test to me, specifically.  His description of the interest consists of sweeping, general concerns at a very high level.  Aside from a brief statement that he "considered my assignment at MSRON 10," many of his conclusions were simply ***incorrect***.  He raised no compelling interest applicable to me, my assigned duties, my organization within MSRON 10, number of people at my unit, and even went so far as to implicate the public when considering the risk posed by my vaccination status.  Examples of DOD special forces communities effectively using non-vaccination COVID mitigation measures are legion.  Indeed, many members of the communities within DOD have been able to complete countless deployments using pre-vaccination COVID mitigation strategies.

Additionally, CAPT Roschel grossly overstates the effectiveness of the vaccine.  The frequent occurrence of breakthrough infections and effectiveness of natural immunity are

2

BMCS026

two substantial mitigating factors that reduce the compelling nature of the government's interest. Many unvaccinated members have never contracted COVID or become ill. Many of my vaccinated coworkers cannot say the same thing. Because this vaccine doesn't work the way CAPT Roschel believes it does, and because the vaccine is not as effective as he thinks it is, the Coast Guard cannot justify forcing me to compromise my conscience and inject a substance I believe to be sinful into my body. As an aside, it is disappointing to see a senior Coast Guard officer express the opinion that a religious accommodation would be damaging to "good order and discipline [and] unit cohesion." For an organization that so frequently touts the benefits of diversity, it is hard for me to imagine how recognizing my religious beliefs might damage my relationship with my shipmates. It seems to me that the Coast Guard either does not favor diversity as much as it claims, or only deems certain types of diversity to be worthy of celebration.

Until COVID-19, DOD recognized that natural immunity was effective to protect against secondary infections. Appendix C-2 of reference (f) permits exemption from a mandatory vaccine based on "evidence" of immunity such as a serology test. Enclosure (2) contains my serology test showing the presence of COVID-2 antigens in my body. The fact that natural immunity is no longer recognized reveals that the *true interest* of the government is not in having a healthy, COVID-free force, but rather having me accept a particular injection. The interest in a healthy force is compelling while the arbitrary desire to have me accept an injection is not. I have had COVID and was symptomatic. I took an antibody test and the antibodies are in my body. Their presence seriously reduces the compelling nature of the government's interest. Two of my doctors wrote and support the idea that a vaccination is unnecessary for me.

CAPT Roschel's lengthy discussion regarding extreme possibilities stemming from the "cascade effect" of my accommodation in the Coast Guard is problematic for several reasons:

i.   First, it essentially means that every member of the Coast Guard is essential, and the mission will fail if every member is not deployment ready, all the time. This is simply untrue. Members are at various stages of deployability for various reasons all the time. Paragraph 3-2.e (4) describes the procedure for short-notice vaccinations in the context of a deployment. This policy shows that short-notice vaccination needs can be anticipated and can be managed. Similarly, the Coast Guard can manage service missions for those whom an accommodation was granted with waivers and other means.

ii.  Second, CAPT Roschel's rationale is stated without limitation or qualification, applying to any accommodation, meaning that the Coast Guard will be unable to function should anyone be accommodated for any reason. This is too broadly stated to be true. I readily concede that it would be more *convenient* for the Coast Guard to avoid the need to accommodate, but the law compels them to do so-specifically and individually.

iii. Third, the Coast Guard is granting medical and administrative accommodations with varying levels of permanence. The religious nature of my accommodation should receive no less consideration. Because the Coast Guard is granting

BMCS027

accommodations in some contexts, they demonstrate that they can accommodate. It is discriminatory and unlawful for the Coast Guard to deny my request because of its faith basis.

I expect that, should I receive PCS orders, or my circumstances change, my religious accommodation status will be reviewed and could be denied based on new duties or circumstances. However, because CAPT Roschel failed to consider my case on a sufficiently individual basis, his decision should be reconsidered *de novo*, and my request for a religious accommodation should be GRANTED.

4. **Least Restrictive Means**:

   a. *Responsive Statement*:  CAPT Roschel completely dismisses any other measures related to virus protection in favor of the vaccine.  He stated broadly, without support or basis, that all other measures are completely ineffective as a risk mitigation approach.

   b. *Relevant Law*: "Courts must review the claims of prisoners and military personnel under the compelling governmental interest test. Seemingly reasonable regulations based upon speculation, *exaggerated fears* or thoughtless policies cannot stand. Officials must show that the relevant regulations are the least restrictive means of protecting a compelling governmental interest.  However, examination of such regulations in light of a higher standard does not mean the expertise and authority of military and prison officials will be necessarily undermined. The Committee recognizes that religious liberty claims in the context of prisons and the military present *far different problems* for the operation of those institutions than they do in civilian settings" (emphasis added).  H.R. Rep. 103-88 (House Report on Religious Freedom Restoration Act of 1993).

   c. *Objection*: CAPT Roschel summarily dismisses all other measures in favor of the vaccine.  The effectiveness of the vaccine is both untested and debatable.  The importance of vaccination at all is changing.  Governments at all levels are relaxing requirements related to the pandemic.  On December 9, 2021, Dr. Tony Fauci urged all vaccinated Americans to get boosted multiple times with additional mRNA to protect them against the vaccine despite the fact that they had just received the vaccination less than a year prior.  On or about February 12th of 2022, just two months later, Dr. Fauci said that boosters will only need to be administered every four or five years.  In that same speech, he advertised those federal restrictions could end this year. This extreme fluctuation and dramatic change in posture from public health officials undercuts the extreme confidence expressed by CAPT Roschel.  It also weakens the argument that the vaccination is the only means of protecting people.

   From March 2020 when the virus first appeared until 2021 when the vaccine became available, the Coast Guard remained effective.  Indeed, the military remained effective. We did not tie up our ships, we did not ground our aircraft, we did not cease ground operations in areas of conflict.  My deployed unit did not cease overseas operations.  We remained effective and at work, using the measures dismissed by CAPT Roschel to remain effective.  Those measures were effective, *in the height of the pandemic*, to keep the military operational.  Now that we are, according to scientists, moving into an "endemic" phase of the virus, those measures are more likely to be effective, not less.

BMCS028

The current military population of unvaccinated individuals is practically and statistically irrelevant, and highly unlikely to pose any significant threat to Coast Guard operations in the manner suggested by CAPT Roschel and can be managed with no more than a *de-minimis* cost to the government.

It is clear from the statement in the House Report that Congress expects the military to experience unique *"problems"* related to accommodating the religious beliefs of its members but passed the law *anyway*. I know that my request presents some administrative burden for the Coast Guard, but it does not present a greater burden than that which is required under the law. Members of the Coast Guard should be permitted to have concerns of conscience, and where, as here, they can be accommodated, they should be. Many vaccinated members continue to get COVID while many unvaccinated do not. The likelihood of an unvaccinated person catching COVID relative to a vaccinated person is *not known* (not withstanding the confidence of CAPT Roschel). Because CAPT Roschel grossly overstated the certainty of his position while grossly understating the effectiveness of less restrictive means, without basis on both counts, my religious accommodation request should be reconsidered and GRANTED.

5. Thank you for your consideration of this appeal. I would be happy to provide additional information if it would be helpful.

<center>#</center>

Enclosure:  (1) My Memo 6320 dated 26 Oct 2021
 (2) Antibody test results BMCS █████
 (3) Doctor letters regarding need for the COVID Vaccine

<center>5</center>

**U.S. Department of Homeland Security**

**United States Coast Guard**

Captain
United States NAVY
Maritime Security Squadron Ten

Naval Air Station Jacksonville Florida
6801 Roosevelt Boulevard
Building Number 938
Jacksonville, Florida 32212
(904) 542-380

6230
26 OCT 2021

# MEMORANDUM

From: ███████████████████ USCG

Reply to
Attn of:

To:    CAPT Ronzelle L. Green, USCG
       CAPT Kelly C. Ward, USN

Thru:  CG-122
       CNO N1

Subj:  REQUEST FOR RELIGIOUS ACCOMMODATION

Ref:   (a) COMDT COGARD WASHINGTON DC 072247Z SEP 21/ALCOAST 315/21
       (b) DoD Instruction 6205.02, DoD Immunization Program (23 Jul 19)
       (c) Immunizations and Chemoprophylaxis, COMDTINST M6230.4 (series)
       (d) Military Religious Accommodations, COMDTINST M1000.15 (series)
       (e) DoD Instruction 1300.17 of 10 February 2009
       (f) SECNAVINST 1730.8
       (g) BUPERSINST 1730.11
       (h) MILPERSMAN 1730-020

Encl:  (1) Documentation of Chromosomal Analysis of daughter ███████████
       (2) Picture of daughter ████████████

1. Respectfully, I request a waiver of policy to accommodate a religious practice based on a sincerely held religious belief in accordance with References (a) thru (h). I request a waiver to the vaccination policy mandating vaccination for SARS CoV2 (COVID-19), specifically that I may be exempt from receiving this vaccine.

2. My request is based on my sincerely held religious beliefs that all life is (i), sanctified by God and, (ii) begins at conception and ends at natural death (*See Jeremiah 1:4-5 : "The word of the Lord came to me, saying, 'Before I formed you in the womb I knew you, before you were born I set you apart; I appointed you as a prophet to the nations"*). Likewise, it is my belief and practice that treatment with or by scientific advances that utilize tissues obtained from aborted babies is immoral and would make me complicit in practices that violate one of the central tenets of my faith.

3. It is well-documented that the available COVID-19 vaccines authorized for use in the United States all utilized fetal cell lines that were descended from tissues originally obtained from aborted babies in either their manufacture (Johnson & Johnson) or their testing (Pfizer and Moderna). While I am not opposed to vaccines typically, I have only recently discovered that

BMCS030

these cell lines were utilized and am compelled by my faith to judge the morality of whether or not to receive the COVID-19 vaccine based on scripture *(Exodus 20:13 and Deuteronomy 5:15 : "Thou shall not murder" )* and the conviction of the Holy Spirit.

4.   On a personal level, it is important to share that when my wife and I were pregnant with our second child, our sweet baby girl, ▮▮▮▮▮▮▮, we were faced with a horrible, somewhat similar dilemma. During the second trimester, it was discovered that our unborn child had a spinal defect, which was spotted on an ultrasound. We were sent to a specialist in maternal-fetal medicine, who upon a second ultrasound explained that she also had hydrocephalus and had a low chance of a normal life. It was the doctor's opinion that because of this, we would do best to terminate the pregnancy right away, at nearly 20 weeks gestation. Despite this medical advice, my wife and I both agreed that this was not what God would want us to do; to take the sovereignty of God's power over life out of His hands and into ours. Even after we got the results of an amniocentesis, which showed ▮▮▮▮ also had a rare genetic disorder, known as Trisomy 18 *(See Enclosures 1 & 2)*, and would in all likelihood not even survive the pregnancy, we kept our faith and determined to leave her life in God's hands–as we are commanded. *(Proverbs 3:5-6 : Trust in the Lord with all thine heart; and lean not unto thine own understanding. In all thy ways acknowledge him, and he shall direct thy paths.)* Although it was not easy, ▮▮▮▮ was born alive, at full term, on the ▮th of October 2002. She had many issues considered "incompatible with life," due to her Trisomy 18, but she did live. She passed away that November 19th, having had a short but important life and having been loved as much as anyone can be. She affected so many nurses and doctors, that later we came to find out the same doctor who advised us to terminate, had become an outspoken advocate against termination of pregnancy simply on the basis of future disability. We saw that as a confirmation that we were right in deciding not to abort our child and in following God's commands. For this reason specifically, the mere thought of utilizing any material originating from a terminated pregnancy, obtained at *any time* past or present, violates my moral conscience.

5.   Finally, I would like to say that I am in a deployable unit, and I had already volunteered to deployed with another company that was shorthanded last year during the height of the COVID pandemic when there were no vaccines available. With proper social distancing, PPE utilization, hygiene and now testing we all managed to stay healthy in a very dirty environment. I take great pride in serving my country and wearing the uniform. My company is next to deploy within the next two years and I am eager to serve with them overseas once more. I respectfully and humbly thank you for your consideration.

6.   I met with Navy Chaplain, LT. Mario Amaro, on 15 OCT 2021. He can be reached at ▮▮▮▮▮▮▮▮ and/or at: ▮▮▮▮▮▮▮▮@yahoo.com.

7.   I also met with USCG Chaplain LT Joseph A. Seifert on 26 OCT 2021. He can be reached at his Office: 843-740-7099, his Cell: ▮▮▮▮▮▮▮▮and/or at Joseph.A.Seifert@uscg.mil

8.   I also met with ARMY National Guard Medical Officer CAPT Khristopher M. Lugo on 12 OCT 2021. He can be reached at ▮▮▮▮▮▮▮▮ and/or at ▮▮▮▮▮▮▮▮

9.   I can be reached at ▮▮▮▮▮▮▮▮ or my personal e-mail: ▮▮▮▮▮▮▮▮@gmail.com; my

BMCS031

Coast Guard e-mail: 

#

## PRIVACY ACT STATEMENT

Pursuant to 5 U.S.C. §552a(e)(3), this Privacy Act Statement serves to inform you of why DHS is requesting the information on this form.

### AUTHORITY: 14 U.S.C. § 505

PURPOSE: To obtain information from a person seeking a military religious accommodation in order to identify the free exercise of religion asserted by the member and make a determination that balances the free exercise of religion with military readiness, unit cohesion, and good order and discipline. A Religious Accommodation Interview Checklist will be used by the Chaplain to record information provided by the member during an interview.

ROUTINE USES: Authorized USCG officials will use this information to determine if a religious accommodation can be approved pursuant to Section 533(a)(1) of Public Law 112-239 (2013), as amended. Any external disclosures of information within this record will be made in accordance with DHS/USCG-014, Military Pay and Personnel, 76 Federal Register 66933 (October 28, 2011).

CONSEQUENCES OF FAILURE TO PROVIDE INFORMATION: Providing this information is voluntary. However, failure to provide this information may delay the administrative process.

BMCS032

Enclosure (1)

**genzyme**
GENERAL
genetics

# Chromosome Analysis

**Patient Name:** ████, BGirl Christi
**Referring Physician:** David  Auerbach, M.D.
**Specimen #:** ████  **Client #:** ████
**Patient ID #:** ████

**DOB:** ████  Date Collected: 10/28/2002
Date Received: 10/28/2002
**SSN:** ___-__-____  Lab ID #:
Hospital ID #:
Specimen Type: **Peripheral Blood**

David  Auerbach, M.D.
Arnold Palmer Hospital
92 West Miller Street

Orlando, FL   32806

**Indications for Study:**   Clinical features of Trisomy 18 /  mylomengocele

**Metaphases Counted:**   22
**Metaphases Analyzed:**   6   **Number of Cultures:**   2
**Metaphases Karyotyped:**   3

**Banding Technique:**   GTW
**Banding Resolution:**   400
**Dept. Section:**   B1

---

**RESULTS:**  47,XX,+18

         **Abnormal karyotype, female**

---

**INTERPRETATION:**

Cytogenetic analysis shows three copies of chromosome 18 in each metaphase cell examined, consistent with trisomy 18 syndrome.  This is associated with severe mental deficiency and major congenital abnormalities.  These include cardiac abnormalities, reduced fetal activity, growth retardation, omphalocele and renal abnormalities.  In liveborns, mortality during the first year of life is greater than 90% (Jones, K.L., Smith's Recognizable Patterns of Human Malformation, 5th edition.  Philadelphia: W.B. Saunders Co., 1997.  Pp. 14-17).

An increased risk for recurrence exists for this or other numerical chromosome abnormalities.

No other chromosome abnormalities are observed. The standard cytogenetic methodology utilized in this analysis does not routinely detect small rearrangements and low level mosaicism, and cannot detect microdeletions.

Genetic counseling is recommended for this family.

Faxed:                    Tele:
Date:                     Date:
By:                       By:

Signed:
‖║▌║▌‖║▌║▌‖                *Rl Miller*                                           Date: 10/30/2002

                          Robert C Miller, Ph. D.                                 ‖║▌║▌‖║▌║▌‖

Testing Performed at Genzyme Genetics 10421 University Center Drive Suite 100 Tampa FL 33612  1-800-966-4440

                                                                                  Page 1 of 1

BMCS033

Enclosure (2)



5

BMCS034



**FINAL REPORT**

| PHYSICIAN | PATIENT | SAMPLE |
|---|---|---|
| LUGO, KHRISTOPHER<br><br>F5292 - BAY AREA MODERN<br>MEDICAL CENTER<br>3644 HENDERSON BLVD,<br><br>TAMPA, FL 33609<br>Acct #: (F5292)          TP5<br>P: (844)789-2266 | DOB: ▮▮▮▮     Age: 48 Y Sex: M<br>U/FL:        Bed:<br>Rm:<br>Patient ID:<br>Address: ▮▮▮▮<br><br>P: | Specimen ID: ▮▮▮▮<br>Date Of Report: 10/13/2021 07:14<br>Date Collected: 10/12/2021 11:34<br>Date Received: 10/13/2021 03:14<br><br><br>*North America Eastern Time* |

Notes: NON FASTING

## CLINICAL REPORT

### -----* MISCELLANEOUS *------

| Test | Result | Abnormal | Reference | Units | RPT Date | Prior Result | Date |
|---|---|---|---|---|---|---|---|
| COVID-19 Antibody S Interp. | Detected | | Detected | | 10/13/21 | | |
| COVID-19 Antibody | >2500.00 | | >0.79 | U/mL | 10/13/21 | | |

SARS-CoV-2 S Antibody Ranges

| Range (U/mL) | Interpretation |
|---|---|
| <0.80 | Negative/Not Detected |
| > or=0.80 | Positive/Detected |

NOTE: Negative results do not rule out SARS-CoV-2
infection, particularly in those who have been in contact
with the virus. Follow-up testing with a molecular
diagnostic assay should be considered to rule out infection
in these individuals.

Results from antibody testing should not be used as the
sole basis to diagnose or exclude SARS-CoV-2 or to
determine infection status. False positive results may
occur due to cross-reactivity from pre-existing antibodies
or other causes. The sensitivity of the assay after early
infection is unknown. At present, it is unknown for how
long antibodies persist after infection.

This immunoassay is under Emergency Use Authorization (EUA)
by the U.S. Food and Drug Administration. BioReference
Laboratories is designated as a high complexity laboratory
by the Clinical Laboratory Improvement Amendments of
1988(CLIA) and is qualified to perform this test.

ASSAY INFORMATION: Chemiluminescence Immunoassay

Florida Clinical Laboratory, Inc.                    James Weisberger M.D.            Page  1 of    1
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 627-1479      Laboratory Director         Printed 10/15/2021 13:28
GenPath is a business unit of Florida Clinical Laboratory, Inc.

BMCS035

Enclosure (3)



October 21st, 2021

To Whom it May Concern,

I am writing this letter stating that ████████████████████████ should not receive the SARS-CoV-2 / COVID-19 vaccine or any vaccine due to the fact he has recently received Monoclonal Antibodies. With that said he needs a 90 day stay from taking any vaccine due to the fact that I had Monoclonal Antibody treatment on September 6th. He also qualifies for a Medical Exemption from the COVID vaccine due to proof of his natural immunity via antibody blood test in accordance with:

- USCG Medical Manual COMDTINST M6000.1F
- USCG Immunizations and Chemoprophylaxis, COMDTINST 6230.4
- DoD Instructions 6205.02, DoD Immunization Program
- ALCOAST 315/21
- NAVADMIN 190/21
- NAVADMIN 225/21

Khristopher M. Lugo, PA

3644 Henderson Blvd, Set B,  Tampa, FL 33609  844-789-2266

www.BAMMC.com

BMCS036

Enclosure (3)



# Compassion
# Primary Care, LLC

10150 Highland Manor Drive
Suite 200
Tampa, Florida 33610
(813) 669-5084
CompassionPrimaryCare.com

**Dr. Stasha-Gae Roberts, APRN**

Good morning / afternoon.

I am Stasha-Gae Roberts, nurse practitioner. I am writing regarding ███████, whom I treated on September 6th[0], 2021, for SARS-CoV-2, of which he has made a full recovery. It is my understanding that even though he has recovered from this illness and has tested positive for antibodies he is still being mandated to have one of the vaccinations. Science does not support this mandate. Several studies over the last year and half, during this pandemic, have demonstrated that natural immunity is equal to or more robust to vaccination. In years past, even the Center for Disease Control and Prevention recognized natural immunity for illnesses such as chickenpox, measles, mumps, and rubella; however, this same recognition is non-existent for SARS-CoV-2.

Here are few examples of studies conducted worldwide regarding the above statements:

- A retrospective observation study conducted by Gazit et al., 2021 consisted of three groups (1) individuals who did not have SARS-CoV-2 and received the two dose BioNTech / Pfizer MRNA vaccine, (2) previously infected individuals who had not been vaccinated, and (3) previously infected and single dose vaccinated individuals. According to the study there was a 13-fold increased risk of breakthrough infections with the Delta variant in the BioNTech / Pfizer (double vaccinated) group. A 5.96-fold increased risk for breakthrough infection versus reinfection was noted in the vaccinated versus previously infected group. Individuals who were vaccinated had a 6.7-fold increased risk of being admitted to the hospital compared to previously infected participants. This demonstrates

1

Enclosure (3)b



# Compassion
# Primary Care, LLC

10150 Highland Manor Drive
Suite 200
Tampa, Florida 33610
(813) 669-3084
CompassionPrimaryCare.com

**Dr. Stasha-Gae Roberts, APRN**

that natural immunity provides longer lasting protection against infection, symptomatic disease, and hospitalization.

- A large-scale study, conducted by Israel, et al., 2021, consisting of 2,653 fully vaccinated (two doses) individuals and 4,361 individuals that had recovered from SARS-CoV-2, initially showed higher IgG antibody titers in vaccinated individuals, after the second vaccine, in comparison to individuals who recovered from the virus. However, in the vaccinated individual antibody titers declined by 40% each subsequent month, while in individuals that had the virus the decline in titers was less than 5%. This study demonstrates the longevity of natural immunity compared to immunity acquired through vaccination for the SARS-CoV-2 virus.

- According to Turner et al., 2021, even mild cases of SARS-CoV-2 offer lasting antibody (bone marrow plasma cells) protection and repeated occurrences of illness are rare

- Haveri et al., 2021 assessed the persistence of serum antibodies following SARS-CoV-2 infection at 8 and 13 months, the results stated that natural antibodies persisted in 89% and S-IgG in 79% of the 367 subjects, 13 months after infection

- Even the World Health Organization in 2021 stated that most individuals develop a strong immune response after infections with SARS-CoV-2. At that time, they stated that natural immunity provided robust protection against reinfection for at least 6 to 8 months.

- A widely publicized study conducted in Israel (Goldberg, et al. 2021), which is a country with vaccination rates as high as 77%, analyzed the entire population to evaluate

2

BMCS038

Encl(osure) (3)



# Compassion
# Primary Care, LLC

10150 Highland Manor Drive
Suite 200
Tampa, Florida 33610
(813) 669-3084
CompassionPrimaryCare.com

**Dr. Stasha-Gae Roberts, APRN**

individuals who had been previously infected with SAS-CoV-2 and those vaccinated.

This study compared subsequent infection with SARS-CoV-2, hospitalization, severe disease, and death. For the vaccinated protection from subsequent infection was 94.8% (CI: [94.4, 95.1]); hospitalization 94.1% (CI: [91.9, 95.7]); severe illness 96.4% (CI: [92.5, 98.3]]; and death 93.7% (CI: [92.5, 94.7]). Protection for the previously infected for documented re-infection was 92.8% (CI: [92.6, 93.0]); hospitalization 94.2% (CI: [93.6, 94.7]); severe illness 94.4% (CI: [93.6, 95.0]). One death occurred in the previously infected group, so protection against death was not estimated. This study also calls into question the necessity for vaccinations in individuals who have previously been infected with SARS-CoV-2.

- A study of 52,238 employees of the Cleveland Clinic Health System (Shrestha, Burke, Nowacki, Terpelik & Gordon, 2021) compared individuals who were previously infected with SARS-CoV-2, to previously infected employees who remained unvaccinated, previously uninfected employees who received the vaccine and previously uninfected employees who remained unvaccinated. The cumulative incidence of SARS-COV-2 infection over the next 5 months remained almost zero for previously infected unvaccinated subjects, previously infected who were vaccinated and previously uninfected subjects who were vaccinated, compared to a steady increase in the previously uninfected and unvaccinated. This study highlights that vaccination for those previously infected with SARS-CoV-2 unlikely provides any benefit.

3

Enclosure (3)b



# Compassion
# Primary Care, LLC

10150 Highland Manor Drive
Suite 200
Tampa, Florida 33610
(813) 669-3084
CompassionPrimaryCare.com

**Dr. Stasha-Gae Roberts, APRN**

Many studies demonstrate the strong robust effect of natural immunity, so vaccination offers either no or very little benefit; however, studies have shown an increased risk for side effects, and even hospitalization (Menni et al., 2021; Mathioudakis et al., 2021). According to Patrick Whelan, of UCLA, the elevated antibodies after vaccination in individuals who were previously infected, possibly contributed to systemic side effects. Most individuals previously infected with the virus have antibodies and if vaccinated this can produce immune complexes which can deposit in the joints, meninges and even kidneys. Broad sweeping strategies are not what the practice of medicine is based on; instead considering the individual patient risk factors (i.e., comorbid conditions, age, gender, etc.) and discussing risks versus benefits is still the best way to practice medicine. Administration of the vaccine to Mr. ███████, due to his natural immunity, would increase the risk of harm versus benefit. Thank you for your time.

*[signature]*

Stasha-Gae Roberts, Adult-Gerontology Nurse Practitioner
DNP, RN, APRN, AGPCNP-BC, MPH

4

BMCS040



U.S. Department of
Homeland Security

**United States
Coast Guard**

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave. S.E.
Washington, DC 20593-7907
Staff Symbol: CG-133
Phone: (202) 475-5368
Fax: (202) 372-8470
Email: HQSPolicyandStandards@uscg.mil

6230

# MEMORANDUM

From:   M. R. Roschel, CAPT
        ADJUDICATION AUTHORITY

To:   ▮▮▮▮▮▮▮▮, BMCS
     Maritime Security Squadron Ten

Subj:   REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE COAST
        GUARD'S COVID-19 VACCINATION MANDATE

Ref:   (a)   Your memo 6230 of 26 OCT 21
      (b)   ALCOAST 305/21 R 262212Z AUG 21
      (c)   ALCOAST 315/21 R 072247Z SEP 21
      (d)   Military Religious Accommodations, COMDTINST M1000.15 (series)
      (e)   Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases,
          COMDTINST M6230.4 (series)
      (f)   42 U.S.C. §§ 2000bb et seq., Religious Freedom Restoration Act of 1993 (RFRA)
      (g)   U.S. Coast Guard Civil Rights Manual, COMDTINST M5350.4 (series)

1.   Reference (a) is your request that the Coast Guard accommodate a religious practice so that
you will not be required to receive the COVID-19 vaccine, as required by references (b) and (c).
I have been delegated the adjudication authority to act on this request by CG-1 pursuant to
reference (d).  I have carefully reviewed your request in accordance with references (d)-(f). **Your
request is denied.**

2.   I made this decision after considering your right to free exercise of your religion or religious
beliefs and the government's compelling interest in mission accomplishment, to include military
readiness; unit cohesion; good order and discipline; and the health and safety of you, the
members assigned to your unit and within the Coast Guard, and the public with whom the Coast
Guard regularly interacts.  I then considered whether requiring you to receive the COVID-19
vaccine is the least restrictive means available to achieve this compelling interest.  It was your
burden to establish the religious nature and sincerity of your beliefs and that receiving the
vaccine would substantially burden your religious belief or practice.  For the purpose of this
administrative decision, I do not question the sincerity of your religious belief or whether
vaccine requirements substantially burden your religious practice.  The Coast Guard reserves the
opportunity to make these determinations, but I do not need to address them here to resolve your
request.

3.   I have concluded that there are no lesser restrictive means available other than vaccination to
achieve the compelling government interest here.  In assessing your request, I considered that the
Coast Guard is a military service that must be ready at all times to perform its mission and other
missions.  The military nature of the Coast Guard and the readiness obligations of military
service would likely suffice to require vaccination. In addition, the Coast Guard is unique
amongst the military services because of the nature of its missions that include support of the

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE        6230
COAST GUARD'S COVID-19 VACCINATION MANDATE

Department of Defense (DoD), homeland security, and non-homeland security missions, specified in law.  The Coast Guard's unique nature is relevant when considering whether there are less restrictive means available to achieve the compelling government interest here.  In addition to meeting the military readiness demands confronting the DoD military services, the Coast Guard also conducts its missions on a 24 hours/7 days a week basis and must also be prepared to respond to domestic emergencies.  Given the small size of the Coast Guard's work force and geographic dispersion of its units, many of which are small, any impact on the readiness of one Coast Guard unit has cascading effects on the entire Coast Guard.  The service is not structured to have multiple layers of coverage that would allow another unit to fill the void left by the impacted unit.  Moreover, we need as many members as possible, regardless of rating or assignment, to be prepared to deploy without significant notice to meet emergent needs.  Further, Coast Guard members have much greater and more frequent interactions with members of the public than our DoD counterparts.  The Coast Guard's eleven statutory missions require Coast Guard personnel to work at times amongst and with the public, and the Coast Guard has an obligation to ensure the safety of both its own personnel as well as those in the communities we serve or with whom we otherwise interact.

4.  I also considered that you are assigned to an operational billet.  In your current assignment to the Maritime Security Squadron Ten, your duties require you to be deployable and cable of leading or augmenting military forces during major marine events, contingencies, and other Coast Guard law enforcement operations. Additionally, your unit deploys in support of major cutters and provides support to Combatant Commanders. With this, the nature of your work requires you to routinely interact, without limitations, and often in close proximity with Coast Guard members, interagency partners, and members of the general public. These interactions place you inside offices, vessels, and other communal meeting locations with insufficient options to consistently maintain compliance with the recommended Center for Disease Control social distancing guidelines.

    a.  Due to the operational nature of your billet, social distancing measures such as isolation, quarantine, and telework are inadequate to mitigate the spread of COVID-19 throughout your unit and the public. As a member assigned to an operational unit, you are unable to accomplish your daily missions or contingency operations while in isolation, in quarantine, or at home.  Your assignment requires your daily physical presence, which renders teleworking without unacceptable loss of mission effectiveness, impossible.  The close working quarters of your unit prevents the Coast Guard from isolating or quarantining you away from your shipmates.  Moreover, the close working quarters renders social distancing impracticable as you are unable to remain six feet away from your shipmates throughout the day while completing the mission.

    b.  Other safety and risk mitigation measures such as masking are also inadequate due to the nature of your billet. Wearing masks, washing hands, and practicing other hygienic techniques do not provide the same level of protection against COVID-19 as full vaccination.  Relying solely upon these less effective means of protection poses a greater risk to the mission because you are significantly more vulnerable to contracting COVID-19 while interacting with the public.  The inefficacy of preventative hygiene and masking means your failure to be vaccinated poses a substantial risk to your shipmates and the members of the public we are charged with protecting or with whom we interact.

    c.  Testing is insufficient to mitigate the risk of COVID-19 due to inaccuracy of rapid antigen tests and the window of time necessary to receive the results of a positive COVID-19 test.  By the time you receive your results, there is a high likelihood you would have already exposed other members of the Coast Guard and the public.

2

BMCS042

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION FROM THE          6230
COAST GUARD'S COVID-19 VACCINATION MANDATE

d.   Finally, as a member of the Coast Guard you must be medically ready for short notice surge staffing operations and worldwide deployment.  The Coast Guard has experienced a significant increase in surge staffing requests in the past year, and the requests are typically filled by members like you, who serve as a Reservist.  Members selected for a surge operation must typically report on scene in a matter of days, if not sooner.  The Coast Guard cannot allow you to remain unvaccinated until you are ordered to respond to such an operation because of the time it takes to build full immunity to COVID-19.  Currently, it takes five weeks to achieve full vaccination against COVID-19 from the date of the first dose of the Pfizer vaccine.  The Pfizer vaccine is currently the only vaccine that is mandated for military personnel.  Therefore, a deferment of vaccination until notice of deployment or temporary duty assignment would result in your inability to execute orders in a timely manner, resulting in mission degradation or failure. The Coast Guard cannot afford to have portions of its workforce unable or unprepared to respond to domestic emergencies and other short-fuse requests for assistance.

5.   Ultimately, unvaccinated Coast Guard members place not only themselves at risk, but also hold at risk every other member in the unit and the public.  Your inability to practice social distancing at your unit and the ineffectiveness of other preventative safety measures pose a substantial risk of you contracting or spreading COVID-19.  This in turn decreases the military readiness of the unit and the Coast Guard as a whole.  You must be medically ready and able to perform your duties for your unit to function effectively.

6.   I therefore find that there are no means less restrictive than full vaccination to achieve the Coast Guard's compelling governmental interest because of the conditions under which the Coast Guard executes its missions and your role within that execution.  **Your request for a religious accommodation to the Coast Guard's COVID-19 vaccine mandate is denied**.

7.   You have 10 business days after receipt of this decision to receive your first dose of a two-dose vaccine or the single dose of a single-dose vaccine.

8.   If you wish to appeal this decision, you must do so within 10 business days after receipt of this decision. The appeal authority for this matter is the Assistant Commandant for Human Resources (CG-1) at HQSPolicyandStandards@uscg.mil. The appeal must include the specific basis on which you believe the initial denial was in error.

9.   You have the right to file an Equal Opportunity complaint by contacting a Civil Rights Service Provider within 45 calendar days of any denial. For complaint processing, see Chapter 5 of Reference (g).

10. If you do not begin the COVID-19 regimen or submit an appeal within 10 business days after the receipt of this decision, you will be in violation of the lawful order in reference (c), as well as any other order that you received from competent authority to become vaccinated against COVID-19, and will be subject to all punitive and administrative consequences for failing to comply.

#

Copy:   Maritime Security Squadron Ten
              COMDT (CG-00A)
              COMDT (CG-00H)
              COMDT (CG-112)

3

BMCS043



**U.S. Department of Homeland Security**

**United States Coast Guard**

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave. S.E.
Washington, DC 20593-7907
Staff Symbol: CG-112
Phone: (202) 475-5165

6230
20 January 2022

# MEMORANDUM

From:   J.S. Ahluwalia, CDR          *J. Ahluwalia*          Reply to    CDR J. Ahluwalia
        COMDT (CG-112)                                         Attn of:    202-475-5212

To:     A.W.Williams, CAPT
        COMDT (CG-133)

Subj:   REVIEW OF REQUEST FOR PERMANENT ADMINISTRATIVE (RELIGIOUS)
        EXEMPTION FROM VACCINATION

Ref:    (a) Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases,
        COMDTINST M6230.4G

1.  BMCS ███████████ has requested a permanent administrative (religious) exemption from
COVID-19. Per Ref (a), COMDT (CG-133) is the designated approval and revocation authority
for administrative immunization exemptions.

2.  BMCS ███████████ has been counseled by a military physician regarding the risks of
forgoing future vaccinations.  Member has also discussed this matter with their Commanding
Officer and has received endorsement from their local command.  Additionally, this request has
been discussed with a military chaplain and the chaplain feels member has a deeply held
religious belief on this matter.

3.  Vaccination against specific diseases is mandatory for all CG Active Duty and Selected
Reserve personnel as a force health protection requirement, IAW Ref (a).  There is no medical
reason to grant permanent vaccination exemption for COVID-19 to BMCS ███████████.
Moreover, permanent exemption from future vaccinations could potentially place BMCS ████
███████████ at risk for contracting a communicable disease and/or put other CG personnel at risk
(should they be medically or administratively exempt from one or more vaccinations).
Therefore, COMDT (CG-112) does not recommend granting BMCS ███████████ a
permanent administrative (religious) waiver from COVID-19.

4.  This is an evaluation of the medical and public health implications of granting an
administrative (religious) exemption request only.  This does not constitute a review of any
medical contraindications to any vaccine.

5.  If you have any questions concerning this matter, please contact CDR Jaspal Ahluwalia at
(202) 475-5212.

#

BMCS044



**U.S. Department of Homeland Security**

**United States Coast Guard**

Commander
United States Coast Guard
Pacific Area

1350 Gator Blvd
Virginia Beach, VA 23459
Phone: (540) 446-3450
Email: Ronzelle.L.Green@uscg.mil

6230
24 NOV 2021

# MEMORANDUM

From: Ronzelle L. Green, CAPT
      MESG TWO

To: Commandant (CG-133)

Thru: Commandant (CG-112)

Subj:  FIRST ENDORSEMENT on BMCS ███████████████ REQUEST FOR RELIGIOUS ACCOMMODATION

Ref:     (a) Military Religious Accommodations, COMDTINST 1000.15

1.  As required by reference (a), BMCS ████████ has been counseled that noncompliance with immunization requirements may adversely affect his ability to deploy, assignment, or international travel.

2.  I am withholding a recommendation and forwarding for consideration. Mission readiness will be impacted if this request for religious accommodation is approved. Maritime Expeditionary Security Squadrons (MSRON) deploy worldwide and require all personnel to support its missions. Unvaccinated members may be unable to attend vital training or meet the requirements set by Combatant Commanders for entry into their area of operations. This reduces the number of qualified personnel available for deployment.

3.  MSRON 10 cannot accommodate this religious accommodation request.  Additional mitigation measures, such as full time masking, regular testing, and maximized telework are not feasible at the unit due to our inherent nature as a Deployable Specialized Forces unit.

4.  There is a mission impact associated with removing BMCS ███████████ from the unit.  BMCS ████████████ is assigned to the DDE N3 Operations billet. Members assigned to this position are critical to security operations, and expected to deploy worldwide.

Copy:  CG PACAREA (PAC-3)
      CG PACAREA (PAC-094)

                      #

**U.S. Department of Homeland Security**

**United States Coast Guard**

Captain
United States NAVY
Maritime Security Squadron Ten

Naval Air Station Jacksonville Florida
6801 Roosevelt Boulevard
Building Number 938
Jacksonville, Florida 32212
(904) 542-380

6230
26 OCT 2021

# MEMORANDUM

From: ██████████████ USCG

Reply to
Attn of:

To:   CAPT Ronzelle L. Green, USCG
      CAPT Kelly C. Ward, USN

Thru: CG-122
      CNO N1

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION

Ref:  (a) COMDT COGARD WASHINGTON DC 072247Z SEP 21/ALCOAST 315/21
      (b) DoD Instruction 6205.02, DoD Immunization Program (23 Jul 19)
      (c) Immunizations and Chemoprophylaxis, COMDTINST M6230.4 (series)
      (d) Military Religious Accommodations, COMDTINST M1000.15 (series)
      (e) DoD Instruction 1300.17 of 10 February 2009
      (f) SECNAVINST 1730.8
      (g) BUPERSINST 1730.11
      (h) MILPERSMAN 1730-020

Encl: (1) Documentation of Chromosomal Analysis of daughter ██████ ████████
      (2) Picture of daughter ██████ ████████

1. Respectfully, I request a waiver of policy to accommodate a religious practice based on a sincerely held religious belief in accordance with References (a) thru (h). I request a waiver to the vaccination policy mandating vaccination for SARS CoV2 (COVID-19), specifically that I may be exempt from receiving this vaccine.

2. My request is based on my sincerely held religious beliefs that all life is (i), sanctified by God and, (ii) begins at conception and ends at natural death (*See Jeremiah 1:4-5 : "The word of the Lord came to me, saying, 'Before I formed you in the womb I knew you, before you were born I set you apart; I appointed you as a prophet to the nations).* Likewise, it is my belief and practice that treatment with or by scientific advances that utilize tissues obtained from aborted babies is immoral and would make me complicit in practices that violate one of the central tenants of my faith.

3. It is well-documented that the available COVID-19 vaccines authorized for use in the United States all utilized fetal cell lines that were descended from tissues originally obtained from aborted babies in either their manufacture (Johnson & Johnson) or their testing (Pfizer and Moderna). While I am not opposed to vaccines typically, I have only recently discovered that

BMCS046

these cell lines were utilized and am compelled by my faith to judge the morality of whether or not to receive the COVID-19 vaccine based on scripture *(Exodus 20:13 and Deuteronomy 5:15 : "Thou shall not murder" )* and the conviction of the Holy Spirit.

4.   On a personal level, it is important to share that when my wife and I were pregnant with our second child, our sweet baby girl, ▮▮▮ ▮▮▮, we were faced with a horrible, somewhat similar dilemma. During the second trimester, it was discovered that our unborn child had a spinal defect, which was spotted on an ultrasound. We were sent to a specialist in maternal-fetal medicine, who upon a second ultrasound explained that she also had hydrocephalus and had a low chance of a normal life. It was the doctor's opinion that because of this, we would do best to terminate the pregnancy right away, at nearly 20 weeks gestation. Despite this medical advice, my wife and I both agreed that this was not what God would want us to do; to take the sovereignty of God's power over life out of His hands and into ours. Even after we got the results of an amniocentesis, which showed ▮▮▮ also had a rare genetic disorder, known as Trisomy 18 (*See Enclosures 1 & 2*), and would in all likelihood not even survive the pregnancy, we kept our faith and determined to leave her life in God's hands–as we are commanded. (*Proverbs 3:5-6 : Trust in the Lord with all thine heart; and lean not unto thine own understanding. In all thy ways acknowledge him, and he shall direct thy paths.*) Although it was not easy, Abigail was born alive, at full term, on the ▮th of October 2002. She had many issues considered "incompatible with life," due to her Trisomy 18, but she did live. She passed away that November 19th, having had a short but important life and having been loved as much as anyone can be. She affected so many nurses and doctors, that later we came to find out the same doctor who advised us to terminate, had become an outspoken advocate against termination of pregnancy simply on the basis of future disability. We saw that as a confirmation that we were right in deciding not to abort our child and in following God's commands. For this reason specifically, the mere thought of utilizing any material originating from a terminated pregnancy, obtained at *any time* past or present, violates my moral conscience.

5.   Finally, I would like to say that I am in a deployable unit, and I had already volunteered to deployed with another company that was shorthanded last year during the height of the COVID pandemic when there were no vaccines available. With proper social distancing, PPE utilization, hygiene and now testing we all managed to stay healthy in a very dirty environment. I take great pride in serving my country and wearing the uniform. My company is next to deploy within the next two years and I am eager to serve with them overseas once more. I respectfully and humbly thank you for your consideration.

6.   I met with Navy Chaplain, LT. Mario Amaro, on 15 OCT 2021. He can be reached at ▮▮▮▮▮▮ and/or at: ▮▮▮▮▮▮ @yahoo.com.

7.   I also met with USCG Chaplain LT Joseph A. Seifert on 26 OCT 2021. He can be reached at his Office: 843-740-7099, his Cell: ▮▮▮▮▮▮ and/or at ▮▮▮▮▮▮ @uscg.mil

8.   I also met with ARMY National Guard Medical Officer CAPT Khristopher M. Lugo on 12 OCT 2021. He can be reached at ▮▮▮▮▮▮ and/or at ▮▮▮▮▮▮

9.   I can be reached at ▮▮▮▮▮▮ or my personal e-mail: ▮▮▮▮▮▮ ; my

BMCS047

Coast Guard e-mail: ███████████ g.mil; and my Navy e-mail:
██ █ ███████ ⁊@navy.mil.

#

PRIVACY ACT STATEMENT

Pursuant to 5 U.S.C. §552a(e)(3), this Privacy Act Statement serves to inform you of why DHS is requesting the information on this form.

AUTHORITY: 14 U.S.C. § 505

PURPOSE: To obtain information from a person seeking a military religious accommodation in order to identify the free exercise of religion asserted by the member and make a determination that balances the free exercise of religion with military readiness, unit cohesion, and good order and discipline. A Religious Accommodation Interview Checklist will be used by the Chaplain to record information provided by the member during an interview.

ROUTINE USES: Authorized USCG officials will use this information to determine if a religious accommodation can be approved pursuant to Section 533(a)(1) of Public Law 112-239 (2013), as amended. Any external disclosures of information within this record will be made in accordance with DHS/USCG-014, Military Pay and Personnel, 76 Federal Register 66933 (October 28, 2011).

CONSEQUENCES OF FAILURE TO PROVIDE INFORMATION: Providing this information is voluntary. However, failure to provide this information may delay the administrative process.

Enclosure (1)

genzyme
GENERAL
genetics

# Chromosome Analysis

**Patient Name:** ▮▮▮▮ BGirl Christi
**Referring Physician:** David Auerbach, M.D.
**Specimen #:** ▮▮▮▮  **Client #:** ▮▮▮▮
**Patient ID #:** ▮▮▮

David Auerbach, M.D.
Arnold Palmer Hospital
92 West Miller Street

**DOB:** ▮▮▮▮   Date Collected: 10/28/2002
Date Received: 10/28/2002
Orlando, FL  32806

**SSN:** ___-__-____   Lab ID #:
Hospital ID #:
Specimen Type: **Peripheral Blood**

**Indications for Study:**   Clinical features of Trisomy 18 / mylomengocele

**Metaphases Counted:** 22   **Banding Technique:** GTW
**Metaphases Analyzed:** 6   **Number of Cultures:** 2   **Banding Resolution:** 400
**Metaphases Karyotyped:** 3   **Dept. Section:** B1

---

**RESULTS:   47,XX,+18**

**Abnormal karyotype, female**

---

**INTERPRETATION:**

Cytogenetic analysis shows three copies of chromosome 18 in each metaphase cell examined, consistent with trisomy 18 syndrome. This is associated with severe mental deficiency and major congenital abnormalities. These include cardiac abnormalities, reduced fetal activity, growth retardation, omphalocele and renal abnormalities. In liveborns, mortality during the first year of life is greater than 90% (Jones, K.L., Smith's Recognizable Patterns of Human Malformation, 5th edition. Philadelphia: W.B. Saunders Co., 1997. Pp. 14-17).

An increased risk for recurrence exists for this or other numerical chromosome abnormalities.

No other chromosome abnormalities are observed. The standard cytogenetic methodology utilized in this analysis does not routinely detect small rearrangements and low level mosaicism, and cannot detect microdeletions.

Genetic counseling is recommended for this family.

Faxed:   Tele:
Date:   Date:
By:   By:

Signed:   Date: 10/30/2002
▌▌▌▌▌▌▌▌▌▌▌   ▌▌▌▌▌▌▌▌▌▌▌
*Robert C Miller, Ph. D.*   Page 1 of 1

Testing Performed at Genzyme Genetics 10421 University Center Drive Suite 100 Tampa FL 33612  1-800-966-4440

4

Enclosure (2)



BMCS050

15 Oct 2021

<u>CHAPLAIN MEMORANDUM FOR THE RECORD</u>

From:  LT Mario Amaro, CHC, USN
To:    CAPT Kelly Ward, USN

Subj:  REQUEST FOR A WAIVER OF POLICY TO ACCOMMODATE PRACTICE
       BASED ON RELIGIOUS BELIEF ICO BMCS ███████

Ref:   (a) SECNAVINST 1730.8B CH-1
       (b) SECNAVINST 1730.9A
       (c) BUPERSINST 1730.11A

1. BMCS ██████ has submitted a request for accommodation of a religious practice per
reference (a). Per reference (c), I interviewed the requestor on 15 Oct 2021.  I explained that this
interview would not be a confidential communication as defined by reference (b) and informed
the requestor that referral for confidential chaplain support was available.

2. Nature of the request. BMCS is requesting a religious accommodation of exemption from
Navy policy regarding the COVID-19 vaccine. He has not previously applied for a religious
exemption.

3. Basis. BMCS has practiced non-support of, and benefit from, abortion; based upon his
religious belief that murder is antithetical to God's intention and biblical injunction. In lieu of the
Navy Page-2 report, member's religious preference is not listed on his Form 2020D. This is a
common occurrence, among Coast Guard personnel; however, his dog tags display "Christian".

4. Alternate means. There are no additional means whereby this request may be met.

5. Sincerity. Demonstrative of his practice, at 21 weeks of gestation, BMCS and his wife, were
presented with medical advice, to abort their child. Deciding against such, the child was brought
to full-term, though she died 3 weeks later from a severe spinal defect. Baptized in 1996, he
regularly attended a Baptist church until 2002. He served as an instrumentalist, in public worship
services, 1999-2006. He co-led a church founding, eventually named Tree of Life Church, 2001-
2006 and WestPoint Church 2007-2009. He continues to attend worship services, with his
family, since 2009. Since 1996, he made regular financial contributions, to local churches; in
addition to Compassion International, a non-profit which partners American donors with
underprivileged overseas children. He led his family in regular prayer and scripture discussions,
2000-2005.  Member has demonstrated sincerity of religious belief, by way of non-support of
abortion, in accordance with this accommodation request.

6. I can be reached at ████████ or ████████@yahoo.com.

M. A. AMARO

Copy to:
BMCS ████████

## CHAPLAIN INTERVIEW CHECKLIST

| Requestor: BMCS ▓▓▓ USCG | Interview Date: 15 OCT 2021 |
|---|---|
| Name: BMCS ▓▓▓ USCG | Chaplain Interviewer: LT WARD AMARO |
| Phone: (407) 435-3495 | Phone: 904 054 2615 |
| E-mail: ▓▓▓ mail.com; ▓▓▓ @uscg.mil; ▓▓▓ @navy.mil | E-mail: ▓▓▓ |
| Command: Navy MSRON-10 Alpha I NAS JAX | Chaplain's Command: NOSC TAMPA |

| | | | Interview Preliminaries |
|---|---|---|---|
| **Yes** | **No** | **N/A** | |
| X | | | Chaplain reviewed policy and doctrine on religious accommodation and the policy for which the requestor is seeking accommodation. |
| X | | | Applicant was notified that the interview is not confidential and will be used to advise the command. |
| X | | | Chaplain explained to the applicant that confidential support can be received from another chaplain. |
| | x | | Applicant has been granted a religious accommodation for this practice previously. |
| | | x | Applicant's Page 2 (NAVPERS 1070/602) reflects the belief cited in the application. |

| | | | Type of Waiver Requested |
|---|---|---|---|
| **Yes** | **No** | **N/A** | |
| | | | Uniform standards |
| | | | Grooming standards |
| x | | | Immunization requirements |
| | | | DNA Sampling |
| | | | Other (Please describe): |

| | | | Interview |
|---|---|---|---|
| **Yes** | **No** | **N/A** | |
| X | | | Requestor's religious beliefs seemed honestly and sincerely held using one or more of the following factors: |
| | | | 1. Requestor was credible (consistently keeps tenets, practices, etc.). |
| | | | 2. Requestor's demeanor and pattern of conduct are consistent with the request. |
| | | | 3. Requestor participates in activities associated with the belief(s). |
| | | | 4. Other persons supporting the claim are credible. |
| | | | 5. Request is supported by letter(s) of verification or endorsement from an organization espousing the beliefs which are the basis for the claim. |
| X | | | Alternate means of accommodating the practice were explored in the interview. |

| | | | Process Checklist |
|---|---|---|---|
| **Yes** | **No** | **N/A** | |
| X | | | Chaplain has prepared a memorandum documenting the interview. |
| X | | | Chaplain reviewed memorandum with applicant and provided a copy. |
| X | | | Chaplain submitted the memorandum and this document to the commanding officer via chain of command. |
| X | | | Chaplain referred applicant to command to process request. |

Extracted from BUPERSINST 1730.11 CH-1

Enclosure (2)

BMCS053

## RELIGIOUS NEEDS ASSESSMENT

The following information is collected to deliver a Command Religious Program that meets the specific religious needs of this command throughout the operational cycle. The command is required to offer this survey to each member. Your voluntary participation is important to assist in meeting your religious needs. Thank you for your cooperation.

**1. My Faith Group(s) (if yours is not listed, check other and write in Faith Group name):**

Advent Christian Church
Adventist, Seventh Day
Adventist, Other
African Methodist Episcopal
African Methodist Episcopal Zion
Anglican Catholic Church
Assemblies of God
Associated Gospel Churches
Baptist, American
Baptist, Free Will
Baptist, Fundamental
Baptist, National
Baptist, Southern
Baptist, Other
Bible Protestant Church
Brethren Churches
Buddhism
Catholic Church, Roman
Catholic Churches, Other
Christian & Missionary Alliance
Christian Church (Disciples of Christ)
Christian Church & Churches of Christ
Christian Methodist Episcopal Church
Church of Christ

Church of Christ, Scientist
Church of God (Anderson, IN)
Church of God (Cleveland, TN)
Church of God in Christ
Church of God in Prophecy
Church of Jesus Christ of Latter-day Saints
Church of the Nazarene
Congregational Churches
Eastern Religions (specify in 'Other')
Episcopal Church
Episcopal Churches, Other
Episcopal, Reformed
Evangelical Covenant Church
Evangelical Free Church in America
Evangelical Churches, Other
Full Gospel
Hinduism
Holiness Churches
Islam
Jewish
Lutheran, Evangelical Church in America
Lutheran Church (Missouri Synod)

Lutheran Churches, Other
Methodist, Free Ch of North America
Methodist, United
Methodist Churches, Other
Native American
New Age Religions (specify in 'Other')
Non-Denominational Christian
Orthodox, Eastern
Orthodox, Greek
Orthodox, Other
Pentecostal Church of God
Pentecostal Holiness Church Int'l
Pentecostal Churches, Other
Presbyterian Church, Evangelical
Presbyterian Church, Reformed
Presbyterian Church, in America (PCA)
Presbyterian Church, USA
Reformed Church in America
United Church of Christ
Wesleyan Church
Wicca
Other **Christian NON-Denominational**
Declined to Respond

**2. Faith Group participation:**
On a scale of 0-10 how often do you participate in your Faith Group activities? 10 being I participate very frequently in my Faith Group activities, 0 being I do not participate in Faith Group activities. **5**

**3. With regard to a Faith Group, I am:**
[ ] Interested in increasing my involvement or growth
[X] Content with my spirituality or world view

**4. I would like to participate in (check all that apply):**
[ ] Faith-specific studies and/or discussion groups
[X] Trips to religious/historic sites
[ ] Religious Community Service projects as an expression of my faith
[ ] Classes/discussions about different religious traditions
[ ] Musical accompaniment for services/events
[ ] Other:_____

**5. I intend to participate in worship services/Faith Group activities while at this command:**
[ ] Yes      [X] No/NA

**6. I am interested in representing my Faith Group as a Command Religious Lay Leader:**
[ ] Yes (please include contact information)      [X] No/NA

**7. I have a previously approved waiver of policy to accommodate a religious practice:**
[ ] Yes (state type of waiver in question 8)      [X] No/NA

**8. Please write any questions or religious accommodation waivers/concerns you have. Previously approved religious accommodation waivers may need to be reviewed. A representative of the Command Religious Program will contact you. (please include contact information)**
_____
_____
_____
_____
_____

**9.Contact Information:**

| Name (Last, First M.I.) | | Dept./Division/Directorate: | Date Checked In: |
|---|---|---|---|
|  | USCG | MSRON 10 NAS JAX | 1 OCT 2018 |
| E-mail: | @gmail.com | | Phone/I Dial: |

FOR OFFICIAL USE ONLY

7

BMCS054

## WARNING ADVISEMENT ABOUT STATEMENTS MADE
## DURING A RELIGIOUS ACCOMODATION INTERVIEW

I, BMCS ▮▮▮▮▮▮▮▮ have been advised that statements that are made during

the course of my religious accommodation interview are not confidential and may be disclosed

by Chaplain LT MARIO AWAR to further my religious accommodation request.

11 OCT 2021
_____
Date

_____
Counselee

15 OCT 2021
_____
Date

_____
Chaplain

**U.S. Department of Homeland Security**

**United States Coast Guard**



Commanding Officer
United States Coast Guard
CG HITRON Jacksonville

6213 Aviation Ave, BLDG 1846
Jacksonville, FL 32221
Phone: (904) 594-6864
Fax: (904) 594-6836

6010
NOV 2 3 2021

# MEMORANDUM

From:   M. A. Sheffler, CAPT
        Flight Surgeon, CG HITRON Jacksonville

To:     COMDT (CG-133)
Thru:   COMDT (CG-112)

Subj:   MEDICAL COUNSELING FOR RELIGIOUS EXEMPTION REQUEST FOR
        MANDATORY VACCINES

Ref:    (a) Immunizations and Chemoprophylaxis for the Prevention of Infection Diseases,
            COMDTINST M6230.4G

1. In accordance with reference (a), certain vaccines are mandatory for all Coast Guard Active
Duty (AD) and Selected Reserve (SELRES) personnel to ensure medical readiness and avoid
disruption of Coast Guard mission accomplishment.

2. In order for BMCS ▮▮▮▮▮▮▮▮ to make an informed decision, member was counseled
regarding vaccines and discussed the risks and benefits of vaccination in addition to the potential
risks of infection incurred by unvaccinated individuals.

3. Based upon review of the available medical record and interview of this member, it is my
opinion that BMCS ▮▮▮▮▮▮ does not have an identifiable or disclosed medical condition
that would contraindicate receipt of these mandatory vaccines.

#